## UNITED STATES COURT OF INTERNATIONAL TRADE

HYUNDAI STEEL COMPANY,

      Plaintiff,

AJU BESTEEL CO., LTD.,
NEXTEEL CO., LTD., and
HUSTEEL CO., LTD.,

      Consolidated Plaintiffs,

and

HUSTEEL CO., LTD.,
NEXTEEL CO., LTD., and
SEAH STEEL CORPORATION,

      Plaintiff-Intervenors,

v.

UNITED STATES,

      Defendant,

and

VALLOUREC STAR, L.P.,
WELDED TUBE USA INC., and
UNITED STATES STEEL
CORPORATION,

      Defendant-Intervenors.

Before:  Hon. Jennifer Choe-Groves, Judge

Consol. Court No. 22-00138

NON-CONFIDENTIAL VERSION

Confidential Business Information Subject to Judicial Protective Order Has Been Removed on Pages 12-17, 28, 33, 35-37.

## MEMORANDUM IN SUPPORT OF THE RULE 56.2 MOTION OF PLAINTIFF, HYUNDAI STEEL COMPANY, FOR JUDGMENT UPON THE AGENCY RECORD

Submitted by:

Robert G. Gosselink
Jarrod M. Goldfeder
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

Dated:  September 20, 2022

*Counsel to Hyundai Steel Company*
*Plaintiff*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

I.    STATEMENT PURSUANT TO RULE 56.2(c) ............................................... 1

      A.    Administrative Determination under Review ........................................ 1

      B.    Issues Presented ................................................................................... 1

II.   STANDARD OF REVIEW ............................................................................. 3

III.  STATEMENT OF FACTS .............................................................................. 3

IV.   SUMMARY OF ARGUMENT ....................................................................... 6

V.    ARGUMENT ................................................................................................. 8

      A.    Commerce's Calculation of CV Profit and Selling Expenses Is Unsupported by
            Substantial Evidence ........................................................................... 8

      B.    Commerce Impermissibly Used a Business Proprietary Information Source to
            Calculate CV Profit and Selling Expenses for Hyundai Steel ............................. 18

      C.    Commerce's CV Profit Cap Rate Determination Is Unsupported by Substantial
            Evidence and Not in Accordance with Law ........................................................ 20

      D.    Commerce's Calculation of Constructed Export Price (CEP) Profit Is Not
            Supported by Substantial Evidence and Not in Accordance with Law ............... 29

      E.    Commerce's Adjustment to the G&A Ratio of Hyundai Steel's U.S. Affiliate,
            HSU, Is Not Supported by Substantial Evidence.................................................. 35

      F.    Commerce's Surrogate Adjustment for Further Manufacturing Yield Loss Is Not
            Supported by Substantial Evidence ..................................................................... 38

VI.   RELIEF REQUESTED.................................................................................... 42

## **TABLE OF AUTHORITIES**

### ***Court Precedent***

Altx, Inc. v. United States, 370 F.3d 1108 (Fed. Cir. 2004)........................................16

Atar S.r.l. v. United States, 730 F.3d 1320 (Fed. Cir. 2013) .......................................20

Atar S.r.l. v. United States, 34 CIT 465, 703 F.Supp.2d 1359 (2010)....................20, 23

Bonney Forge Corp. v. United States, 46 CIT __, 560 F.Supp.3d 1303 (Ct. Int'l Trade 2022)....17

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938).....................................................3

Dorbest v. United States, 30 CIT 1671, 462 F.Supp.2d 1262 (2006)...............................3

Geum Poong Corp. v. United States, 26 CIT 991, 995 (2002) .......................................12

Geum Poong Corp. v. United States, 25 CIT 1089, 163 F.Supp.2d 669 (2001)..............20, 23

Goldlink Indus. Co. v. United States, 30 CIT 616, 431 F.Supp.2d 1323 (2006)..................3

Hung Vuong Corp. v. United States, 483 F.Supp.3d 1321 (Ct. Int'l Trade 2020) ................17

Husteel v. United States, 98 F.Supp.3d 1315 (Ct. Int'l Trade 2015).......................... 23-24

Hyundai Electronics Industries Co., Ltd. v. United States, 28 CIT 517, 342 F.Supp.2d 1141 (2004)..................................................................................................................18

Motor Vehicle Mfrs. Ass'n of U.S. , Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983)...............................................................................................................8, 17

Nippon Steel Corp v. United States, 458 F.3d 1345 (Fed. Cir. 2006) .............................3

Strand v. United States, 951 F.3d 1347 (Fed. Cir. 2020), cert. denied, 141 S. Ct. 894 (2020) .....16

Thai I-Mei Frozen Foods Co. v. United States, 32 CIT 865, 572 F.Supp.2d 1353 (2008)...........29

T-Mobile S., LLC v. City of Roswell, 574 U.S. 293 (2015) .........................................17

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ...............................................3

## *Statutes*

19 U.S.C. § 1516a(b)(l)(B)(i) ......................................................................................3, 16

19 U.S.C. § 1677(35) .................................................................................................. 8-9

19 U.S.C. § 1677a(d) ....................................................................................................30

19 U.S.C. § 1677a(f)(1) ................................................................................................30

19 U.S.C. § 1677a(f)(2)(C) ...........................................................................................30

19 U.S.C. § 1677a(f)(2)(D) ................................................................................2, 30, 31

19 U.S.C. § 1677b(a)(1)(A)-(C) .................................................................................. 8-9

19 U.S.C. § 1677b(a)(4) ..................................................................................................9

19 U.S.C. § 1677b(e) .................................................................................................9, 21

19 U.S.C. § 1677b(e)(2)(A) .............................................................................................9

19 U.S.C. § 1677b(e)(2)(B) ........................................................................... 9-10, 11, 22

19 U.S.C. § 1677b(e)(2)(B)(ii) .....................................................................................21

19 U.S.C. § 1677b(e)(2)(B)(iii) ...................................................5, 11, 20-22, 28-29

19 U.S.C. § 1677e(a)(1) .................................................................................................38

19 U.S.C. § 1677f(i)(3)(A) ............................................................................................16

## *Regulations*

19 C.F.R. § 351.402(d)(1)...................................................................................... 30-31, 34

19 C.F.R. § 351.402(d)(2)..........................................................................................31, 34

19 C.F.R. § 354.3 ............................................................................................................19

### Administrative Determinations

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296 (Dep't Commerce
May 19, 1997) (final rule) ......................................................................................20, 29

Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity
to Request Administrative Review, 85 Fed. Reg. 54,349 (Dep't Commerce Sept. 1, 2020) .........3

Certain Oil Country Tubular Goods from Taiwan, 79 Fed. Reg. 41,979 (Dep't Commerce
July 18, 2014) (final AD determ.) .................................................................................27

Certain Oil Country Tubular Goods from the Republic of Korea, 87 Fed. Reg. 20,815
(Dep't Commerce Apr. 8, 2022) (final results 2019-2020 admin. rev.), and accompanying
unpublished Issues and Decision Memorandum (Dep't Commerce Apr. 1, 2022) ............... passim

Certain Oil Country Tubular Goods from the Republic of Korea, 86 Fed. Reg. 41,015
(Dep't Commerce July 30, 2021) (final results 2018-2019 admin. rev.), and accompanying
Issues and Decision Memorandum (Dep't Commerce July 23, 2021) .........................................31

Certain Oil Country Tubular Goods from the Republic of Korea, 85 Fed. Reg. 41,949
(Dep't Commerce July 13, 2020) (final results 2017-2018 admin. rev.), and accompanying
Issues and Decision Memorandum (Dep't Commerce July 6, 2020) ..........................................26

Certain Oil Country Tubular Goods from the Republic of Korea, 86 Fed. Reg. 54,928
(Dep't Commerce Oct. 5, 2021) (prelim. results 2019-2020 admin. rev.), and accompanying
unpublished Decision Memorandum for the Preliminary Results (Dep't Commerce Sept. 29,
2021) ...............................................................................................................5, 25

Certain Oil Country Tubular Goods from the Republic of Turkey, 79 Fed. Reg. 41,971
(Dep't Commerce July 18, 2014) (final AD determ.) ..............................................................27

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 85 Fed. Reg.
68,840 (Dep't Commerce Oct. 30, 2020) .......................................................................4

### Other Authorities

Statement of Administrative Action Accompanying the Uruguay Round Agreements
Act, H.R. Rep. No. 103-316 (1994), vol. 1, reprinted in 1994 U.S.C.C.A.N. 4040 .......... 10, 20-22

**MEMORANDUM IN SUPPORT OF THE RULE 56.2 MOTION OF**
**PLAINTIFF, HYUNDAI STEEL COMPANY,**
**FOR JUDGMENT UPON THE AGENCY RECORD**

## I.    STATEMENT PURSUANT TO RULE 56.2(c)

Plaintiff, Hyundai Steel Company ("Hyundai Steel"), a producer and exporter of oil country tubular goods ("OCTG") from the Republic of Korea, submits this memorandum in support of its Motion for Judgment upon the Agency Record pursuant to USCIT Rule 56.2.

### A.    Administrative Determination under Review

This action is an appeal from the U.S. Department of Commerce's ("Commerce") final results of the 2019-2020 administrative review of the antidumping duty order on Certain Oil Country Tubular Goods from the Republic of Korea, 87 Fed. Reg. 20,815 (Dep't Commerce Apr. 8, 2022) (final results 2019-2020 admin. rev.) ("Final Results"), P.R.317,[1] as they apply to Hyundai Steel.  The challenged determinations, findings and conclusions are set out primarily in Commerce's unpublished Issues and Decision Memorandum (Dep't Commerce Apr. 1, 2022) ("IDM"), P.R.305.

### B.    Issues Presented

Plaintiff seeks judgment upon the agency record with respect to five aspects of Commerce's Final Results.

1)    Whether Commerce's determination to calculate Hyundai Steel's constructed value ("CV") profit and selling expenses using the business proprietary information ("BPI") of the other mandatory respondent, SeAH Steel Corporation ("SeAH"), related to that respondent's

---

[1] Citations to confidential documents from Commerce's Administrative Record List are designated as "C.R.__," and citations to public documents are designated as "P.R.__."  All record documents cited herein will be included in the Joint Appendix to be filed with the Court.

third-country sales to Kuwait, is unsupported by substantial evidence and otherwise not in

accordance with law given that Hyundai Steel had no ability to review the underlying

information used for this critical component of the antidumping duty calculations; the

information itself suffered from critical flaws that rendered the source unreasonable and

unsuitable for use in calculating Hyundai Steel's weighted-average dumping margin; and more

representative, reasonable, and non-distortive sources existed on the record.

2)      Whether Commerce's failure to calculate, or attempt to calculate, a CV profit rate

"cap" as expressly required by statute is unsupported by substantial evidence and otherwise not

in accordance with law.

3)      Whether Commerce's decision to use the profits earned on SeAH's third-country

sales to Kuwait as the basis for calculating constructed export price ("CEP") profit for Hyundai

Steel, which was the same flawed source that Commerce used for CV profit, is unsupported by

substantial evidence and otherwise not in accordance with the statutory directive under 19 U.S.C.

§ 1677a(f)(2)(D) that CEP profit must reflect "the total profit earned by" Hyundai Steel (the

foreign producer and exporter) and Hyundai Steel USA ("HSU") (a U.S. affiliated party) "with

respect to the sale of the same merchandise for which total expenses are determined."

4)      Whether Commerce's determination to increase the numerator and decrease the

denominator of the general and administrative ("G&A") expense ratio of Hyundai Steel's U.S.

affiliate, HSU, to account for the cost of goods sold ("COGS") of rejected pipes that HSU sold to

an unaffiliated U.S. customer, is unsupported by substantial evidence.

5)      Whether Commerce's determination to apply neutral facts available to the

calculation of HSU's yield loss on further manufacturing operations is unsupported by

substantial evidence.

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

## II.    STANDARD OF REVIEW

This Court is required to hold unlawful Commerce's determinations in an antidumping proceeding if they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(l)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  This standard requires the court to view the record as a whole, and "can be translated roughly to mean 'is {the determination} unreasonable?'" Nippon Steel Corp v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citation omitted).  In order for the Court to affirm Commerce's determination, the agency must have provided "a reasoned explanation . . . that is supported by the administrative record." Dorbest v. United States, 30 CIT 1671, 1677-78, 462 F.Supp.2d 1262, 1269-70 (2006) (citing Goldlink Indus. Co. v. United States, 30 CIT 616, 629, 431 F.Supp.2d 1323, 1334 (2006)).

## III.    STATEMENT OF FACTS

On September 1, 2020, Commerce published a notice of opportunity to request an administrative review for the sixth administrative review period, i.e., September 1, 2019, through August 31, 2020 (the "POR").  See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review, 85 Fed. Reg. 54,349 (Dep't Commerce Sept. 1, 2020), P.R.29.

On September 30, 2020, Hyundai Steel submitted a timely written request to participate as a respondent in Commerce's administrative review.  See P.R.4.

On October 30, 2020, Commerce initiated the sixth administrative review of the antidumping duty order on OCTG from the Republic of Korea review covering all Korean

producers and exporters of subject merchandise for which it received timely review requests, including Hyundai Steel.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 85 Fed. Reg. 68,840 (Dep't Commerce Oct. 30, 2020) ("Initiation Notice"), P.R.10. The Initiation Notice indicated that, in the event Commerce limited the respondents selected for individual examination in accordance with section 777A(c)(2) of the Tariff Act of 1930, as amended, Commerce would select mandatory respondents for individual examination based upon U.S. Customs and Border Protection entry data.  Id. at 68,841.

On December 18, 2020, Commerce issued a memorandum stating that it had selected Hyundai Steel and SeAH as mandatory respondents for individual examination in the 2019-2020 administrative review.  See Commerce Memorandum, "Respondent Selection" (Dec. 18, 2020), C.R.5, P.R.30.

Between February 2021 and September 2021, Hyundai Steel and SeAH submitted timely responses to Commerce's initial antidumping duty questionnaire and several supplemental questionnaires, and thus cooperated with Commerce in all aspects of the administrative review.

Because Hyundai Steel did not have a "viable" comparison market during the POR, Commerce used its CV methodology to calculate normal value.  On March 30, 2021, Commerce solicited information to be used for the profit and selling expense components of Hyundai Steel's CV calculation.  See Commerce Letter to All Interested Parties, "Request for Constructed Value Profit and Selling Expense Comments and Information" (Mar. 30, 2021), P.R.124.  In response, Hyundai Steel submitted comprehensive factual information and comments, including complete and translated audited financial statements of steel pipe producers in Korea and from around the world, for Commerce's use in calculating the CV profit and selling expense ratios.  See Hyundai Steel's CV Profit Comments (Apr. 14, 2021), at 1-4, P.R.145-149; Hyundai Steel's Rebuttal CV

Profit Comments (Apr. 23, 2021), at 1-8, P.R.160-161.  Hyundai Steel submitted additional

comments on the appropriate methodologies for determining CV profit and selling expenses and

for the CEP profit component of the net U.S. price calculations.  See Hyundai Steel's Additional

Pre-Preliminary Comments (Sept. 13, 2021), at 20-26 and Attachments 5-6, C.R.289, P.R.243.

On September 29, 2021, Commerce issued its preliminary results of the 2019-2020

administrative review.  See Certain Oil Country Tubular Goods from the Republic of Korea, 86

Fed. Reg. 54,928 (Dep't Commerce Oct. 5, 2021) (prelim. results 2019-2020 admin. rev.)

("Preliminary Results"), P.R.269, and accompanying unpublished Decision Memorandum for the

Preliminary Results (Dep't Commerce Sept. 29, 2021) ("Preliminary Decision Memo"), P.R.248.

In its Preliminary Results, Commerce calculated antidumping duty margins of 19.38 percent *ad*

*valorem* for Hyundai Steel and 3.85 percent *ad valorem* for SeAH, and assigned a preliminary

antidumping duty rate of 11.62 percent *ad valorem* to 30 non-examined companies based on the

average of the rates calculated for Hyundai Steel and SeAH.  Id. at 54,929.

In its preliminary antidumping duty calculations, Commerce based CV profit and selling

expenses for Hyundai Steel on the BPI of the other mandatory respondent, SeAH, specifically

with regard to SeAH's third-country sales of OCTG to Kuwait, under the "any other reasonable

method" provision of 19 U.S.C. § 1677b(e)(2)(B)(iii).  Commerce used this same source to

calculate CEP profit for Hyundai Steel in the net U.S. price calculations.

In November 2021, interested parties, including Plaintiff, submitted case and rebuttal

briefs addressing issues in the Preliminary Results.  Among other things, Hyundai Steel argued

that Commerce should not use SeAH's third-country sales data as the basis for calculating

Hyundai Steel's CV profit and selling expenses because of the business proprietary nature of the

source, Commerce's failure to apply to the statutorily required "profit cap," and aspects

concerning SeAH's third-country sales data rendered the source unrepresentative for purposes of calculating CV profit and selling expenses for Hyundai Steel.  See Hyundai Steel's Case Brief (Nov. 9, 2021), at 5-29, C.R.313, P.R.281.  Hyundai Steel also opposed Commerce's decision to calculate CEP profit using the same ratio that Commerce used to calculate CV profit for the same reasons afflicting the source for purposes of CV profit, as well as the fact that this source does not comply with the statutory requirement to reflect the "total profit earned by" Hyundai Steel and its U.S. affiliate, HSU, with respect to the sale of the same merchandise for which the companies' total expenses were determined.  Id. at 29-34.

In its rebuttal brief, Hyundai Steel responded to numerous arguments raised by domestic interested parties including, *inter alia*, Hyundai Steel's further manufacturing material yield loss on certain U.S. sales.  See Hyundai Steel's Rebuttal Brief (Nov. 22, 2021), C.R.317, P.R.291.

On April 8, 2022, Commerce published its *Final Results* in which it calculated antidumping duty margins of 19.54 percent *ad valorem* for Hyundai Steel and 3.85 percent *ad valorem* for SeAH.  See Final Results, 85 Fed. Reg. at 20,816.  Commerce also assigned a final antidumping duty rate of 11.70 percent *ad valorem* to the non-examined companies based on the average of the final rates calculated for the two mandatory respondents.  Id.

The legal bases for Commerce's Final Results were set forth in an unpublished Issues and Decision Memorandum dated April 1, 2022, P.R.305.

## IV.    SUMMARY OF ARGUMENT

Commerce's Final Results were unsupported by substantial record evidence and otherwise not in accordance with law in several respects.

1)        Commerce's determination to use SeAH's third-country sales data as the basis for calculating Hyundai Steel's CV profit and selling expenses was unreasonable, unsupported by

**Plaintiff's Rule 56.2 Memorandum**
**Consol. Court No. 22-00138**

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

substantial evidence, and not in accordance with law because:  (a) Hyundai Steel itself has no means to review or analyze the underlying data in order to ascertain the accuracy of such source because it cannot access SeAH's BPI under Commerce's rules; (b) Commerce failed to apply the required CV "profit cap" as required by the statute and court precedent, which was particularly important since SeAH's third-country profit ratio far exceeded other record sources; (c) a confidential analysis of SeAH's third-country sales data revealed that the source was not representative for purposes of calculating CV profit and selling expenses for Hyundai Steel; and (d) the record contained many alternative, publicly available, and contemporaneous sources for calculating CV profit and selling expenses, including certain sources that Commerce had used previously for purposes of calculating CV profit and selling expenses.

2)      Commerce's determination to calculate CEP profit using the same ratio that Commerce used to calculate CV profit was unreasonable, unsupported by substantial evidence, and not in accordance with law because:  (a) this source does not comply with the statutory requirement to reflect the "total profit earned by" Hyundai Steel and its U.S. affiliate, HSU, with respect to the sale of the same merchandise for which the companies' total expenses were determined; (b) this source suffers from the same deficiencies discussed in the CV profit context; and (c) the record contained at least six alternative sources that complied with the statute and all demonstrated that the CEP profit ratio that Commerce used was overstated and distortive.

3)      Commerce unreasonably and erroneously determined to increase the numerator and decrease the denominator of the G&A expense ratio of Hyundai Steel's U.S. affiliate, HSU, to account for the COGS of rejected pipes that HSU sold to an unaffiliated U.S. customer because substantial record evidence showed that:  (a) these rejected pipes were a type of non-subject product that HSU produced from imported OCTG and sold during the POR, and thus

relate to HSU's production operations; and (b) Hyundai Steel calculated HSU's G&A expense ratio consistent with HSU's normal accounting treatment of the costs in question.

    4)    Commerce's determination to apply neutral facts available to the calculation of HSU's yield loss on further manufacturing operations was unsupported by substantial evidence showing that Hyundai Steel fully explained and demonstrated that it reported the per-unit further manufacturing costs based on the actual further manufacturing fees that HSU incurred divided by the same theoretical weight used in all other aspects of the antidumping duty calculations.

## V.    <u>ARGUMENT</u>

### A.    <u>Commerce's Calculation of CV Profit and Selling Expenses Is Unsupported by Substantial Evidence</u>

In its <u>Final Results</u>, Commerce calculated mandatory respondent Hyundai Steel's weighted-average dumping margin by using the unrepresentative third-country sales profit and selling expense information of the other mandatory respondent, SeAH.  By adopting a margin calculation methodology that relied on substitute profit and selling expense information from SeAH and did not reflect Hyundai Steel's own POR sales, Commerce reached a final margin for Hyundai Steel that is unsupported by substantial evidence.  In making its final decision, Commerce also failed to address several arguments presented by Hyundai Steel, and thus failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  The <u>Final Results</u> must be remanded for correction.

In calculating dumping margins, Commerce normally compares the export price or constructed export price (i.e., the price in the United States market) of the merchandise under consideration ("MUC") to the normal value (i.e., the price in the home or third-country market).

See 19 U.S.C. §§ 1677(35), 1677b(a)(1)(A)-(C).   In other words, Commerce ordinarily would compare Hyundai Steel's prices of OCTG in the United States to Hyundai Steel's prices of OCTG in Korea or in a third country (other than Korea or the United States).   If normal value cannot be determined on this basis—as was the case in this review because Hyundai Steel did not have a viable home or third country market—Commerce may use CV to determine normal value. See 19 U.S.C. § 1677b(a)(4).

Under section 1677b(e), the "constructed value of imported merchandise" is equal to the sum of (1) the cost of materials and fabrication or other processing in producing merchandise, and (2) the actual amounts incurred and realized by the specific exporter or producer being examined for selling, general, and administrative costs and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country.   Hyundai Steel reported to Commerce its costs to produce OCTG merchandise.   But Hyundai Steel did not have a viable comparison market during the POR, and Commerce thus did not have comparison market sales upon which to base Hyundai Steel's selling expenses and CV profit under 19 U.S.C. § 1677b(e)(2)(A).   When the primary method to calculate CV profit and selling expenses is unavailable, the antidumping statute directs Commerce to consider the following alternatives:

(i)     "the actual amounts incurred and realized by the specific exporter or producer being examined . . . for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in **the same general category of products** as the subject merchandise;"

(ii)    "the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for profits, in connection with the production and sale of **a foreign like product**, in the ordinary course of trade, for consumption in the foreign country"; or

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

(iii)    "the amounts incurred and realized . . . for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in **the same general category of products** as the subject merchandise."

19 U.S.C. § 1677b(e)(2)(B) (emphasis added).

Importantly, the statute does not establish a hierarchy for selecting among the alternatives for calculating CV profit. See Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Rep. No. 103-316 (1994), vol. 1 at 840; reprinted in 1994 U.S.C.C.A.N. 4040, 4176 (noting that this section "does not establish a hierarchy or preference among these alternative methods" and that "no one approach is necessarily appropriate for use in all cases."). Consequently, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data." Id. Commerce thus normally has discretion to select from any of the three alternative methods, depending on the information available on the record.

In this case, Commerce concluded that it could not rely on option (i) of 19 U.S.C. § 1677b(e)(2)(B) because the other steel products produced by Hyundai Steel, including Hyundai Steel's non-prime OCTG, were not in the "same general category of products" as OCTG. See IDM at 38. Furthermore, Commerce could not rely on alternative (ii) because the other respondent, SeAH, did not sell OCTG in the home market (i.e., Korea). Id. Therefore, based on the data available in the review, Commerce concluded that it was required to resort to the third alternative: "any other reasonable method." Id. at 39. In conducting its analysis, Commerce made particular note that "the specific language of both the preferred and alternative methods appear to show a preference that the profit and selling expenses reflect: (1) production and sales

10

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

in the foreign country; and (2) the foreign like product, i.e., the merchandise under

consideration." Id. (emphasis added).  Commerce went on to conclude that:

> In evaluating the alternatives on the record, for the *Preliminary Results*, we found
> that the combined CV profit and selling expenses for SeAH's third-country
> market sales of OCTG during the POR continues to constitute the best
> information available on the record for valuing Hyundai Steel's CV profit and
> selling expenses in the instant review.  SeAH's combined selling expense and
> profit experience reflects the profit of a Korean OCTG producer, on comparison
> market sales of the merchandise under consideration, in the ordinary course of
> trade.  The profit is specific to OCTG.  Moreover, it represents profit from OCTG
> produced by a Korean producer in Korea.  This alternative closely simulates the
> statutory preference for calculating CV profit and selling expenses.

Id.[2]  But Commerce's reading of the statute is incorrect.

Contrary to Commerce's claim, the statute does not "show a preference" that the CV

profit reflect production and sales of the "foreign like product," and there is no basis for

Commerce's assertion that its approach more "closely simulates the statutory preference."  As

highlighted in the statutory provisions quoted above, two of the three subparts of 19 U.S.C. §

1677b(e)(2)(B) direct Commerce to seek surrogate profit and selling information based on

merchandise that is in "the same general category of products as the subject merchandise."

(Emphasis added.)  Moreover, the specific statutory section on which Commerce relied, i.e., 19

U.S.C. § 1677b(e)(2)(B)(iii), does not even use the term "foreign like product" at all.  Commerce's

claim of a statutory preference for calculating CV profit and selling expenses on the "foreign like

product" thus is incorrect.  By considering in the Final Results the "degrees to which a potential

profit source reflects merchandise under consideration," and whether a profit rate "perfectly

---

[2] Using the BPI of SeAH contained in the preliminary calculation memorandum,
Commerce calculated a combined CV profit and selling expense ratio of 16.3285%, a CV credit
expense ratio of 0.2282%, and a CV surrogate commission ratio of 1.8236%.  See Commerce
File Memorandum, "Constructed Value Selling Expenses and Profit Ratio for Hyundai Steel
Company" (Sept. 29, 2021), at Attachments 1-3, C.R.292-293, P.R.249-250.

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

reflects . . . the foreign like product," IDM at 40, Commerce created a legal constraint that does not exist. When the plain language of the statute requires Commerce to consider "the amounts incurred and realized . . . for profits . . . in connection with the sale . . . of merchandise that is in the same general category of products as the subject merchandise," Commerce's deviation from such instruction and reliance on a narrow selection of SeAH's third-country market sales of OCTG was contrary to law.

Commerce's conclusion in the Final Results that the combined CV profit and selling expenses for SeAH's third-country market sales of OCTG was the best information on the record to value Hyundai Steel's CV profit and selling expenses also was unsupported by substantial evidence. When determining CV profit and selling expenses, it often is difficult for Commerce to decide which substitute information is "more accurate" or "most probative." By definition, there is a built-in inaccuracy when surrogates or substitutes are used. See Geum Poong Corp. v. United States, 26 CIT 991, 995 (2002) ("Precision is not a standard which the court may search for in such circumstances"). Nonetheless, some choices may be so unreasonable that the decision is unsupportable. Here, it was not reasonable for Commerce to use SeAH's sales to Kuwait to calculate the CV profit and selling expenses for Hyundai Steel because SeAH's sales were specifically unrepresentative of Hyundai Steel's actual OCTG sales experience during the POR.

The SeAH sales that Commerce relied on to calculate CV profit and selling expenses were [



]. See Commerce File Memorandum, Preliminary Antidumping Analysis for SeAH

12

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

(Sept. 29, 2021) ("SeAH Prelim. Calc. Memo"), at Attachments 2 and 3, C.R.302-304, P.R.259-261; and SeAH's third-country sales database "SQR_TC_DB" submitted on July 26, 2021, C.R.209. *{SeAH BPI}* [

] during the POR. See Hyundai Steel's Supplemental Section E Response (Sept. 3, 2021), at Exhibit SE-12, "hyunus03" database, C.R.264-265, P.R.237. *{Mixed BPI}* In fact, there was [

]. *{Mixed BPI}* Also, the [

]

*{Mixed BPI}* As such, Commerce based the very significant CV profit and selling expense ratio for Hyundai Steel on third-country sales [

] in Kuwait, which has vastly different market conditions given the robust oil and gas industry in the Middle East, including Kuwait. *{Mixed BPI}*

Furthermore, SeAH reported the following cost information related to the CONNUMs that it sold in the third-country market during the POR:

| CONNUM | PRODQTY | VCOM |
|---|---|---|
| [ | | ] |
| [ | | ] |
| [ | | ] |

*{SeAH BPI}* The average variable costs of manufacture ("VCOM") for the products that SeAH sold to Kuwait during the POR thus were [      ] Korean won. *{SeAH BPI}* In contrast, the weighted-average VCOM of the [   ] separate CONNUMs that Hyundai Steel sold to the United States during the POR were [       ] KRW/MT. See Hyundai Steel's Supplemental Section D Response (Sept. 7, 2021), at Exhibit SD-28, "hyuncop02_act" database, C.R.283-284, P.R.241;

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

Hyundai Steel's Supplemental Section E Response (Sept. 3, 2021), at Exhibit SE-12, "hyunus03" database, C.R.264-265, P.R.237.[3] *{Hyundai Steel BPI}*

The record evidence thus shows that the overall average VCOM for the OCTG that SeAH sold to Kuwait were [                    ] the average VCOM for the OCTG that Hyundai Steel manufactured and sold to the United States during the POR. *{Mixed BPI}* Under longstanding policy and practice, Commerce [


]. See [


] *{Mixed BPI}* If such products are too dissimilar for margin calculation purposes, then it is not reasonable for Commerce to consider them sufficiently similar for purposes of assigning surrogate CV profit and selling expenses.

In the Final Results, Commerce failed to consider or even respond to Hyundai Steel's arguments that the above-described evidence demonstrate that the substantial VCOM differences between Hyundai Steel's and SeAH's sales prevented SeAH's sales from being a reasonable surrogate source for Hyundai Steel's CV profit and selling expenses. See Hyundai Steel's Case Brief (Nov. 9, 2021), at 20-22, C.R.313, P.R.281. It cannot be said that Commerce sufficiently weighed the quality of the SeAH sales data or provided a clear explanation for the action it took. Because the products sold by SeAH in Kuwait [


], it was unreasonable, and thus unsupportable, for Commerce to use SeAH's third-

---

[3] The extended VCOM (i.e., VCOM x QTY1U) equals KRW [                    ] and the extended U.S. sales quantity totals [          ] MT. Thus, the weighted-average VCOM is calculated as follows:  [                                        ] KRW/MT. *{Hyundai Steel BPI}*

**Plaintiff's Rule 56.2 Memorandum**
**Consol. Court No. 22-00138**

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

country sales data to calculate the substitute CV profit and selling expenses for Hyundai Steel.

*{Mixed BPI}*

Commerce's calculation of SeAH's CV profit and selling expense ratio also was unreasonable because Commerce [



], presumably because of Commerce's third-country market sales reporting requirements. *{SeAH BPI}* As a consequence, the CV profit and selling expense ratio that Commerce calculated and assigned to Hyundai Steel also was based on [

]. *{SeAH BPI}* The following table summarizes the information contained in SeAH's third-country sales database and cost database, following the calculation methodology that Commerce employed in the antidumping duty calculations for SeAH:

| CONNUM | Period | Total Cost (a) | Total Value (b) | Profit Rate (c)=(b)-(a)/(a) | Selling Expenses (d) | Indirect Selling Rate (e)=(d)/(a) | Total Ratio (f)=(c)+(e) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

See Hyundai Steel's Case Brief (Nov. 9, 2021), at 22-23, C.R.313, P.R.281, citing SeAH Prelim. Calc. Memo at third-country sales database, C.R.302-306, P.R.259-263. *{SeAH BPI}*

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

The bottom row in the chart reflects the CV profit and selling expense ratios that Commerce calculated and assigned to Hyundai Steel. As the above analysis establishes, the combined CV profit and selling expense ratio calculated by Commerce was [

] POR. *{SeAH BPI}* Commerce's reliance on such third-country sales is further evidence from the administrative record that SeAH's reported third-country sales data did not constitute a representative or suitable source for purposes of calculating the CV profit and selling expense ratio for Hyundai Steel. Equally problematic is that Hyundai Steel raised this argument in writing to Commerce, and Commerce failed to address Plaintiff's concerns in their entirety. See Hyundai Steel's Case Brief (Nov. 9, 2021), at 22-24, C.R.313, P.R.281. Here, the Court may not "presume" an answer for Commerce. The Court may only review answers that Commerce actually gave for substantial evidentiary support. See 19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce has a statutory duty to "include in a final determination . . . an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review . . . concerning the establishment of dumping or a countervailable subsidy." 19 U.S.C. § 1677f(i)(3)(A). The Federal Circuit thus has found that this Court properly remanded determinations when Commerce "fail{ed} to consider all relevant arguments" made by the parties. Altx, Inc. v. United States, 370 F.3d 1108, 1119–20 (Fed. Cir. 2004) (discussing how the Court "reasonably was troubled by the failure" of Commerce to address the position of Japanese producers who were a party to the case). An agency decision is unsupported by substantial evidence when key issues "lack{} record support." Strand v. United States, 951 F.3d 1347, 1349 (Fed. Cir. 2020), cert. denied, 141 S. Ct. 894 (2020). A decision by Commerce cannot be supported by substantial evidence if there is no indication that the agency

**Plaintiff's Rule 56.2 Memorandum**
**Consol. Court No. 22-00138**

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

considered essential arguments or evidence in making its final determination. Indeed, when

"there is nothing in the administrative record showing that Commerce considered (much less

addressed)" a party's explanation or argument relating to an issue "essential to its analysis . . .

the Court cannot sustain Commerce's decision." Hung Vuong Corp. v. United States, 483

F.Supp.3d 1321, 1367 (Ct. Int'l Trade 2020) (remanding a decision where Commerce failed to

consider a respondent's explanation before assigning adverse facts available).

In this case, Commerce failed to address Hyundai Steel's arguments that the OCTG that

SeAH sold to Kuwait [

], and thus not representative of the OCTG that Hyundai Steel sold in the

U.S. market; failed to address that there were substantial differences in the VCOMs between

Hyundai Steel's and SeAH's sales such that the CV profit and selling expense ratio calculations

were based on sales of [                                    ]; and failed to explain why the use of [

] for the selection of POR CV profit and

selling expense ratio. *{SeAH BPI}* The substantial evidence standard requires that Commerce

thoroughly examine the record and "articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made." Motor Vehicle Mfrs., 463

U.S. at 43 (internal quotation marks and citation omitted), accord T-Mobile S., LLC v. City of

Roswell, 574 U.S. 293, 301–02 (2015). It stands to reason that no explanation cannot be "a

satisfactory explanation." Bonney Forge Corp. v. United States, 46 CIT __, 560 F.Supp.3d 1303,

1312 (Ct. Int'l Trade 2022). The Court should remand the Final Results either for Commerce to

provide a fuller explanation of why SeAH's third-country sales were a reasonable basis for the

CV profit and selling expense ratio assigned to Hyundai Steel or for Commerce to reconsider the

CV profit and selling expense ratio selection.

17

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

**B.** **Commerce Impermissibly Used a Business Proprietary Information Source to Calculate CV Profit and Selling Expenses for Hyundai Steel**

Commerce's use of SeAH's BPI third-country sales and corresponding cost data to calculate the CV profit and selling expense ratios also is contrary to law because Hyundai Steel had no means to review or analyze the underlying data as it was not permitted access to SeAH's BPI under Commerce's rules. By adopting a margin calculation methodology that relied on the CV profit and selling expense ratios derived from another party's BPI, which Hyundai Steel itself had no means to review, Commerce reached a final determination for Hyundai Steel that was arbitrary and therefore unsupported by substantial evidence. See, e.g., Hyundai Electronics Industries Co., Ltd. v. United States, 28 CIT 517, 342 F.Supp.2d 1141, 1149-50 (2004) ("The notion of transparency is fundamental to an antidumping proceeding, including access to information on which decisions are based.") (citing S.Rep. No. 96–249 at 41, 98, U.S. CODE CONG. & ADMIN. NEWS 1979, *1150 p. 381; Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103–316 (1994)).

In this case, the public version of Commerce's preliminary CV profit memorandum, as well as the public version of the preliminary analysis memorandum for SeAH on which Commerce based the CV profit calculations (unchanged in the Final Results), did not provide any underlying detail of Commerce's calculations that Hyundai Steel was permitted to review. See Preliminary CV Profit Memo at Attachments 1-3, P.R.249-250; SeAH Prelim. Calc. Memo at Attachments 1-5, P.R.259-263 (Public Version states "Contains Business Proprietary Information; Not Susceptible to Public Summary" with no further details). In particular, the attachments in the public versions of Commerce's calculation memoranda merely identified SeAH's CV profit, selling, credit expense, and surrogate commission rates without showing how those rates were calculated, thereby preventing Hyundai Steel from evaluating the

reasonableness and accuracy of the data Commerce used to calculate a key component of

Hyundai Steel's own normal value.  Id.  Counsel to Plaintiff legally was forbidden under the

terms of the Administrative Protective Order ("APO") from divulging any aspect of SeAH's

underlying BPI to Hyundai Steel under threat of sanctions.  See generally 19 C.F.R. § 354.3.

 In the Final Results, Commerce claimed that the use of SeAH's BPI to determine the CV

profit and selling expenses applied in Hyundai Steel's dumping margin calculation did not

disadvantage Hyundai Steel because "Hyundai Steel's counsel received access to SeAH's BPI

through the APO that was issued by Commerce."  IDM at 37.  Essentially, Commerce argues

that it used the BPI of one respondent to calculation the margin of another because—and only

because—Hyundai Steel was represented by counsel that had access to the BPI that Commerce

used.  But the margin calculation methodologies used by Commerce in any proceeding should

not differ or be dependent on whether a respondent is represented by counsel.  In this case,

Hyundai Steel argued to Commerce that without access to SeAH's underlying BPI sales and cost

data, it was impossible for Hyundai Steel to confirm on its own that the data being used to

calculate the CV profit and selling expense ratios were complete, accurate, reasonable,

representative, or reliable.  While counsel to Hyundai Steel can advocate for the use of particular

sources as a matter of law, Hyundai Steel itself is in the best position to know whether the sale of

particular OCTG products to a particular market might incur reasonable or unreasonable selling

expenses or might or might not result in fair and accurate profit margins.

 Having conceded that it adopted a particular margin calculation approach only because

Hyundai Steel was represented by counsel with access under APO to the BPI of another

respondent, which it might not have adopted if Hyundai Steel was, for example, a *pro se*

respondent without any such access, Commerce has acknowledged the arbitrary nature of its

decision-making.  The Court should remand to Commerce to adopt a CV profit and selling

expense selection approach that is based on substantial evidence that does not penalize Hyundai

Steel for having legal representation in this case.

### C.   Commerce's CV Profit Cap Rate Determination Is Unsupported by Substantial Evidence and Not in Accordance with Law

The statutory provision under which Commerce based CV profit explicitly provides that,

when using a "reasonable method" for CV profit, "the amount allowed for profit may not exceed

the amount normally realized by exporters or producers (other than the exporter or producer

described in clause (i)) in connection with the sale, for consumption in the foreign country, of

merchandise that is in the same general category of products as the subject merchandise{.}"  19

U.S.C. § 1677b(e)(2)(B)(iii).   This provision is termed the "profit cap."  SAA at 840; Atar S.r.l.

v. United States, 730 F.3d 1320, 1322 (Fed. Cir. 2013).  This profit cap "serves to prevent the

various possible calculation methods from yielding anomalous results that stray beyond the

'amount normally realized' from sales of merchandise in the same general category" in the home

market.  Id. at 1327.  The cap, therefore, helps ensure that the profit rate does not yield "irrational

or unrepresentative results."  Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296,

27,360 (Dep't Commerce May 19, 1997) (final rule) ("Preamble") (emphasis added).

The statute provides no exception that permits Commerce to ignore the calculation of a

profit cap, even when Commerce believes there is no suitable home market profit data.  See Atar

S.r.l. v. United States, 34 CIT 465, 470, 703 F.Supp.2d 1359, 1364 (2010) (absence of record

data does not allow Commerce to ignore the profit cap requirement entirely);  see also Geum

Poong Corp. v. United States, 25 CIT 1089, 1097, 163 F.Supp.2d 669, 679 (2001) (the statute

mandates the application of a profit cap and Commerce cannot sidestep the requirement without

giving adequate explanation even in a facts available scenario).

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

Nevertheless, after resorting to SeAH's third-country (i.e., Kuwait) OCTG sales data to derive CV profit, Commerce failed to calculate and apply a home market profit cap on the basis that "the record of this review does not contain information regarding profits earned on Korean sales of OCTG or products in the same general category." IDM at 42. Instead, Commerce concluded that "SeAH's profit data from the sale of OCTG in its third-country market are the best data to be used as the 'facts available' profit cap, because they are specific to OCTG and represent the production experience of a Korean OCTG producer in Korea." Id. at 43. As such, Commerce concluded that "the profit calculated based on SeAH's combined CV profit and selling expenses serves as a reasonable profit cap on a facts available basis for these final results." Id. For the reasons below, Commerce's CV profit cap determination was unsupported by the record evidence and contrary to law.

Commerce has mistaken the reference products identified under the profit cap provision of option (iii). While option (ii), for example, contemplates profit data from other respondents' sales of a "foreign like product," the profit cap provision references normal returns from sales of "merchandise that is in the same general category" as the subject products. Compare 19 U.S.C. § 1677b(e)(2)(B)(ii), with 19 U.S.C. § 1677b(e)(2)(B)(iii). Congress explained that "{t}he term 'general category of merchandise' encompasses a category of merchandise broader than the 'foreign like product.'" SAA at 840. In other words, while a "foreign like product" necessarily qualifies a merchandise within the "same general category" for purposes of § 1677b(e)—and use of data from sales of a foreign like product to address the profit cap requirement fits within the scope of 19 U.S.C. § 1677b(e)(2)(B)(iii)—the statute does not limit Commerce's calculation of the profit cap to sales only of the "foreign like product." In fact, the statute specifically prescribes Commerce from selecting a profit amount that exceeds the amount normally realized

**Plaintiff's Rule 56.2 Memorandum**
**Consol. Court No. 22-00138**

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

in connection with the sale of merchandise that is "in the <u>same general category of products as the subject merchandise</u>." 19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added).

Commerce's limiting conclusion that "SeAH's profit data from the sale of OCTG in its third-country market are <u>the best data</u> to be used as the 'facts available' profit cap, because <u>they are specific to OCTG</u>," IDM at 43 (emphasis added), directly contravenes the statute because the statute contains no such limitation. That is, even if the SAA indicates that Commerce might need to apply alternative (iii) on the basis of facts available,[4] it was not reasonable for Commerce to rely on SeAH's third-country sales as select a single profit source as the "best" data based on product specificity (1) when the statute contains no such requirement, and, in fact, (2) when the statute expressly required Commerce <u>not</u> to adopt such a restrictive analysis.[5] This makes sense because the goal is to identify a profit cap that best reflects the respondent's profit on sales in the foreign country.

In contrast to the average profit realized by multiple producers on sales of products within the "same general category," an approach that relies on a single profit source (even if that source is linked to sales only of the foreign like product) could skew the CV profit rate incorrectly upwards or downwards and could easily not reflect the amount of profit "normally realized," as required under option (iii).

---

[4] Congress anticipated that there would be scenarios in which the expressly identified information is not available: "{W}here, due to the absence of data, Commerce cannot determine amounts for profit under alternatives (1) and (2) or a 'profit cap' under alternative (3), it might have to apply alternative (3) on the basis of 'the facts available.' This ensures that Commerce can use alternative (3) when it cannot calculate the profit normally realized by other companies on sales of the same general category of products." SAA at 841.

[5] Similar to option (iii), option (i) of 19 U.S.C. § 1677b(e)(2)(B) requires Commerce to consider the profit realized by the specific exporter being examined on sales of merchandise that is in the "same general category of products as the subject merchandise." Here, Commerce erred by adopting the OCTG-specificity requirement of the "foreign like product" language of option (ii) and substituting it for the "same general category of products" of option (iii).

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

Commerce's profit cap determination also was erroneous because this Court previously has rejected an "absence of information" excuse that Commerce proffered here for disregarding the statute's profit cap requirement.  In Husteel v. United States, the Court held that Commerce's single-sentence discussion of why it could not calculate a profit cap "falls far short of the standard expressed in the court's prior cases."  98 F.Supp.3d 1315, 1349 (Ct. Int'l Trade 2015). In Husteel, Commerce had attempted to justify its failure to apply a profit cap because, after resorting to a third-country source to measure CV profit, claiming that "we do not have home market profit data for other exporters and producers in Korea of the same general category of products," but the Court found that "Commerce completely failed to consider the possibility of applying a facts available profit cap, based on an erroneous legal conclusion."  Id.  The Court held that "{e}ven assuming that Commerce reasonably concluded that the record lacked data regarding the profit normally realized by Korean producers on Korean sales of merchandise in the same generally {sic} category of products, Commerce still was required to attempt to apply a profit cap on the basis of the facts available."  Id. at 1348.

Decisions of this Court thus make clear that Commerce is required to calculate and apply a profit rate cap in such circumstances based on facts available.  As explained in Geum Poong, "{i}f Alternative Three without the profit cap may be used as 'facts available,' it would seem a 'facts available' profit cap may also be used."  25 CIT at 1097, 163 F.Supp.2d at 679 (2001). The Court continued that, "{b}ecause the statute mandates the application of a profit cap, Commerce cannot sidestep the requirement without giving adequate explanation even in a facts available scenario.  Id., accord Atar, 34 CIT at 470, 703 F.Supp.2d at 1364 ("But even the exception for absence of record data does not allow Commerce to ignore the profit cap requirement entirely when determining constructed value profit.  Where the record lacks data on

profit normally realized by other companies on sales of the same general category of products, Commerce still must attempt to comply with the profit cap requirement through the use of facts otherwise available."); see also Husteel, 98 F.Supp.3d at 1348 (following the Atar and Geum Poong decisions on this point).

As this Court has recognized, because the goal in calculating CV profit is to approximate the home market profit experience of the respondents, the use of an appropriate profit cap is especially important where the profit rate taken from a respondent's third-country sales is not based on any sales in the home market. Husteel, 98 F.Supp.3d. at 1349. As in the instant case, such a profit rate "therefore appears to be a relatively poor surrogate for the home market experience." Id. In Husteel, the Court also cited record evidence indicating that the profit rate of the selected third-country producer was abnormally high and driven by marked differences between the third-country producer and the home market respondents in the products and services they offered. Id. Accordingly, "dispensing with the profit cap requirement entirely in this case could run the risk that the CV profit rate will be unrepresentative of the respondents' expected home market experience." Id.

The record evidence here points to precisely the same conclusion. SeAH, the OCTG producer whose third-country sales Commerce selected to determine CV profit, does not sell OCTG in Korea, i.e., the home market. SeAH's abnormally high third-country profit rate (16.3285%) thus reflects sales of different products in a part of the world other than Korea. This plainly is a "relatively poor surrogate for the home market experience." Id. at 1394.

Commerce claimed in the Final Results that it examined several alternate profit cap sources for suitability for the preliminary results, "considering each for contemporaneity, comparability of products, whether there was in fact a calculated profit. We have reexamined

them for these final results and find no grounds to reach a different conclusion."  IDM at 43

(parenthetical excluded).  But beyond this terse explanation—and Commerce's claim that "none

of the CV profit sources placed on the record by interested parties show 'the amount realized by

exporters or producers in connection with the sale, for consumption in the foreign country, of the

merchandise in the same general category of products as the subject merchandise,'" Preliminary

Decision Memo at 31, P.R.248, which applies equally to SeAH's third country sales of OCTG to

Kuwait—the Final Results contain no discussion of why these alternate sources were unsuitable.

Commerce did not indicate that the available financial statements from other companies were

incomplete or that they suffered from significant flaws or that they were not contemporaneous,

etc.  Commerce's failure to discuss the other record information means that SeAH's third-

country sales data were not the only facts available on the record, and that other information

could have limited the use of SeAH's information.  Commerce's failure to explain why SeAH's

data was the only information available for facts available does not satisfy Commerce's burden

to articulate a reasonable justification for its decision, tied to the record in the proceeding.

Commerce's failure to even attempt to calculate a profit cap using available record data,

and instead to conclude simply that SeAH's third-country sales data "serves as a reasonable

profit cap" without any further analysis is further unreasonable given that Commerce could have

constructed a facts available profit (and selling expense) cap using the average experience of

numerous producers of the same general category of products as the subject merchandise in the

global market.  For example, the following table summarizes additional data from the

administrative record (for the most recent fiscal year for those record sources) that Commerce

could have used to calculate both profit and selling expense components:

| Source | Period | Profit Ratio | Selling Exp. Ratio | Total Ratio |
|--------|--------|--------------|--------------------|-------------|
| Borusan | FY 2019 | 1.80% | 1.17% | 2.97% |
| Chung Hung | FY 2019 | 0.03% | 2.87% | 2.90% |
| Nippon | FY 2020 | 0.00% | 5.79% | 5.79% |
| PAO TMK | FY 2019 | 2.07% | 2.16% | 4.23% |
| Avg. w/o SeAH | - | 0.98% | 3.00% | 3.97% |
| SeAH | FY 2020 | 4.32% | 4.49% | 8.81% |
| Avg. w/SeAH | - | 1.64% | 3.30% | 4.94% |

See Hyundai Steel's Case Brief (Nov. 9, 2021), at 19, C.R.313, P.R.281.

The table above reflects contemporaneous CV profit and selling expense data for PAO TMK. See Hyundai Steel's CV Profit Comments at Exhibit 6, P.R.145-149. This company's data could have provided a suitable source for CV profit and selling expenses because PAO TMK is a leading Russian pipe producer whose operations include OCTG, line pipe, and other comparable industrial pipes, and which competes in global markets against other leading OCTG producers. Thus, PAO TMK produces merchandise that is within the same general category of products as the MUC in this case. Notably, Commerce used PAO TMK's financial data, in part, to calculate CV profit and selling expenses in the fourth administrative review of the underlying proceeding. See Certain Oil Country Tubular Goods from the Republic of Korea, 85 Fed. Reg. 41,949 (Dep't Commerce July 13, 2020) (final results 2017-2018 admin. rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce July 6, 2020), at pp. 67-74 (cmt. 3). Commerce did not explain in the Final Results why it did not include the data of PAO TMK in its facts available profit cap determination.

The table above also reflects contemporaneous CV profit and selling expense data for Borusan Mannesmann Boru Sanayi ve Ticaret ("Borusan"). See Hyundai Steel's CV Profit Comments at Exhibit 3, P.R.145-149. This company's data also could have provided a suitable source for CV profit and selling expenses because Borusan is a leading OCTG producer in Turkey and thus produces identical merchandise to the MUC in the present case. Borusan was a

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

mandatory respondent in the original antidumping duty investigation against <u>OCTG from Turkey</u>, and its information has been used to calculate CV profit for another OCTG producer. <u>See</u> <u>Certain Oil Country Tubular Goods from the Republic of Turkey</u>, 79 Fed. Reg. 41,971 (Dep't Commerce July 18, 2014) (final AD determ.)  Commerce did not explain in the <u>Final Results</u> why it did not include the data of Borusan in its facts available profit cap determination.

The table above also reflects contemporaneous CV profit and selling expense data for Chung Hung Steel Corporation ("Chung Hung").  <u>See</u> Hyundai Steel's CV Profit Comments at Exhibit 4, P.R.145-149.  This company's data similarly could have provided a suitable source for CV profit and selling expenses because Chung Hung is a leading OCTG producer in Taiwan and thus produces identical merchandise to the MUC in this case.  Chung Hung was a mandatory respondent in the original antidumping duty investigation against <u>OCTG from Taiwan</u>.  <u>See</u> <u>Certain Oil Country Tubular Goods from Taiwan</u>, 79 Fed. Reg. 41,979 (Dep't Commerce July 18, 2014) (final AD determ.)  Commerce did not explain in the <u>Final Results</u> why it did not include the data of Chung Hung in its facts available profit cap determination.

The table above also reflects contemporaneous CV profit and selling expense data for Nippon Steel Corporation ("Nippon").  <u>See</u> Hyundai Steel's CV Profit Comments at Exhibit 5, P.R.145-149.  This company's data also could have provided a suitable source for CV profit and selling expenses because Nippon is a leading global OCTG producer and thus produces identical merchandise to the MUC in this case.  Commerce did not explain in the <u>Final Results</u> why it did not include the data of Nippon in its facts available profit cap determination.

As the table above demonstrates, SeAH's Kuwait experience is vastly different from the experience of other global producers of merchandise that falls within the same general category of products as OCTG.  Indeed, SeAH's Kuwait experience is vastly different from SeAH's own

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

experience for its sales of steel pipe products to all markets, with a profit and selling expense

margin that is nearly twice as high as that derived from the company's audited financial

statements (i.e., 16.3285% for Kuwait vs. 8.81% for SeAH's overall operations).

Using the data above, Commerce could have calculated a reasonable facts available profit

cap of 3.97% based on the financial data of four surrogate producers of OCTG and/or other

comparable merchandise.  Commerce previously had determined previously that at least three of

these companies either manufacture OCTG and/or are reasonable proxies for calculating CV

profit for other OCTG producers.  Commerce also could have included SeAH's financial

experience in the profit cap calculation, which would have resulted in a profit cap of 4.94%.

This approach also would have resulted in a representative and reliable facts available profit cap.

In fact, there were several reasonable approaches that Commerce could have adopted to calculate

the CV profit and selling expense ratio to apply to Hyundai Steel.  But Commerce ignored the

wealth of information on the administrative record and instead adopted a surrogate source that

not only was unreasonable, but also was inconsistent with the profit cap statutory provision.

Commerce's selection of a single source of sales of OCTG to calculate the CV profit and

selling expense ratio for Hyundai Steel not only ran counter to the statute's instruction to rely on

sales of "the same general category" of products as the subject merchandise, but also was not a

reasonable approach given that SeAH's sales data were limited to sales [


], and resulted in a profit amount that was several times higher than the profit

realized by producers of comparable products.  *{Mixed BPI}*  On this record, Commerce's failure

to calculate and apply a home market profit rate cap based on merchandise that is "in the same

general category of products as the subject merchandise," as required by 19 U.S.C. §

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

1677b(e)(2)(B)(iii) (emphasis added), runs contrary to Commerce's obligation to ensure that "the

sales used as the basis for CV profit should not lead to irrational or unrepresentative results."

Preamble, 62 Fed. Reg. at 27,360.  As this Court has held, an "unreasonably high profit estimate

will defeat the fundamental statutory purpose of achieving a fair comparison between normal

value and export price."  Thai I-Mei Frozen Foods Co. v. United States, 32 CIT 865, 883, 572

F.Supp.2d 1353, 1368 (2008).  Here, there is no dispute that the CV profit rate assigned to

Hyundai Steel far exceeded—by many orders of magnitude—all record evidence of the normal

industry profit rates realized on sales of OCTG and the same general category of products.

In sum, Commerce was required to calculate and apply an appropriate home market profit

rate cap in this case to ensure that the CV profit rate used was representative of Hyundai Steel's

expected home market experience and to avoid "irrational or unrepresentative results."

Commerce's unlawful failure to do so led to an unreasonably high profit estimate that

undermined the fundamental statutory purpose of achieving a fair comparison between normal

value and export price.  For these reasons, remand for reconsideration is warranted.

### D. Commerce's Calculation of Constructed Export Price (CEP) Profit Is Not Supported by Substantial Evidence and Not in Accordance with Law

In the Final Results, Commerce calculated the CEP profit component of the net U.S.

price calculating using the same flawed method that it used to calculate CV profit and selling

expenses, as described supra source (i.e., SeAH's third-country sales to Kuwait).  See IDM at 43-

47.  Because the source is the same, Plaintiff requests that this Court remand Commerce's

determination for the same reasons as described above in Sections V.A-C.  But beyond those

reasons, Commerce's choice of source for CEP profit was unreasonable, unsupported by

substantial evidence, and not in accordance with law.  In particular, Commerce's choice of

source for CEP profit fails to comply with the statutory directive that CEP profit must reflect

**Plaintiff's Rule 56.2 Memorandum**
**Consol. Court No. 22-00138**

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

"the total profit earned by" Hyundai Steel (the foreign producer and exporter) and HSU (a U.S. affiliated party) "with respect to the sale of the same merchandise for which total expenses are determined." 19 U.S.C. § 1677a(f)(2)(D) .

In order to calculate CEP when a respondent has an affiliated U.S. importer, the statute directs Commerce to reduce the starting price by "additional adjustments," including "the profit allocated to the expenses" incurred based on U.S. economic activities. 19 U.S.C. § 1677a(d). The statute requires Commerce to calculate "total actual profit," 19 U.S.C. § 1677a(f)(1), which is defined as "the total profit earned by the foreign producer, exporter, and affiliated parties . . . with respect to the sale of the same <u>merchandise</u> for which <u>total expenses</u> are determined under such subparagraph." 19 U.S.C. § 1677a(f)(2)(D) (emphasis added). The statute, in turn, defines the "total expenses" as follows:

> The term "total expenses" means all expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise:
>
> (i)   The expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country if such expenses were requested by the administering authority for the purpose of establishing normal value and constructed export price.
> (ii)  The expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise.
> (iii) The expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise.

19 U.S.C. § 1677a(f)(2)(C).

Commerce's regulations clarify that, to calculate CEP profit, it "normally will use the aggregate of expenses and profit for all subject merchandise sold in the United States and all foreign like products sold in the exporting country, including sales that have been disregarded as

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

being below the cost of production."  19 C.F.R. § 351.402(d)(1).  Alternatively, Commerce "may

rely on any appropriate financial reports, including public, audited financial statements, or

equivalent financial reports, and internal financial reports prepared in the ordinary course of

business."  19 C.F.R. § 351.402(d)(2).

Commerce calculated Hyundai Steel's CEP profit ratio using the same source as for CV

profit, which is to say, Commerce used the BPI of SeAH as the source for CEP profit and applied

a surrogate CEP profit ratio of 16.3285%.  See Commerce's Preliminary Calculation

Memorandum (Sept. 29, 2021), at 3 ("{W}e calculated Hyundai Steel's CEP profit rate as the

CV profit rate") and Attachment 3, line 8619, C.R.294, 297, P.R.251, 254.  Notably, this profit

ratio is <u>double</u> the profit ratio that Commerce used for CV profit and CEP profit in the previous

administrative review (i.e., 8.0612%).  See Certain Oil Country Tubular Goods from the

Republic of Korea, 86 Fed. Reg. 41,015 (Dep't Commerce July 30, 2021) (final results 2018-

2019 admin. rev.), and accompanying Issues and Decision Memorandum (Dep't Commerce July

23, 2021), at p. 64 (cmt. 3).  Commerce's choice means that Commerce doubled the profit

components used for the CV build-up and doubled the profit component deducted in the net U.S.

price calculation, which distorted the overall dumping calculations.

Regardless of the source that Commerce selected for CV profit, Commerce was obligated

by law to select a CEP profit ratio that complies with the statutory requirement to reflect "the

total profit earned by" Hyundai Steel and HSU "with respect to the sale of the same merchandise

for which total expenses are determined."  19 U.S.C. § 1677a(f)(2)(D) (emphasis added).

Selecting a source that relates to another company's BPI profit data based on that company's

third-country sales failed to satisfy the express statutory requirement and purpose for CEP profit.

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

Commerce's determination also was unsupported by substantial record evidence.  The record contained at least six different sources that Commerce could have used that were more consistent with the statutory directive and did not suffer from the same flaws as SeAH's third-country sales to Kuwait.  These sources included:  (1) Hyundai Steel's actual OCTG pipe profit ratio during the POR based on the company's submitted reconciliations; (2) Hyundai Steel's overall profit for all steel-related sales and activities based on the company's FY 2020 audited financial statements; (3) HSU's overall profit for all steel-related sales and activities based on the company's FY 2019 and FY 2020 audited financial statements; (4) Hyundai Steel's profit ratio from its submitted U.S. sales database; (5) an average of various surrogate pipe producers from other countries; and (6) SeAH's overall profit for its steel operations in FY 2019 and FY 2020. See Hyundai Steel's Case Brief (Nov. 9, 2021), at 31-32, C.R.313, P.R.281.

Commerce dismissed the first four options because "each source potentially includes 'profit' data from Hyundai Steel's dumped sales, allowing Hyundai Steel to benefit from its own dumping."  IDM at 46.  However, Commerce provides no support that either of these sources contained "dumped" sales and, moreover, Commerce's default source is using a company's actual U.S. sales data when calculating CEP profit, whether or not such U.S. sales are "dumped."  Commerce's reasoning thus is inherently flawed.

Commerce next rejected three of the six sources because they potentially include non-subject merchandise.  Id.  Yet, Commerce emphasized that its choice is based on "the narrowest category of merchandise sold in all countries which includes the subject merchandise."  Id.  Implicitly, this means that a source could include some non-subject merchandise.  Not only is Commerce's rationale internally inconsistent, but it ignores the fact that Commerce routinely

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

uses surrogate producers for profit purposes whose data reflect amounts of non-subject merchandise, including prior segments of this proceeding as explained above in Section V.C.

Commerce later states that, "Only Hyundai Steel's proposed Option #3 . . . and SeAH's Kuwait sales data reflect CEP sales." Id. This statement is incorrect. Hyundai Steel's proposed option #4, which comes from Hyundai Steel's actual U.S. sales database, also reflects CEP sales data. In contrast, SeAH's Kuwait sales data do not reflect CEP (U.S.) sales, but rather, sales of the foreign like product in a third-country market used for normal value. Thus, Commerce has misunderstood the basic nature of the data upon which it based the CEP profit ratio.

Commerce separately concedes that Option #3 (overall profit of HSU for all steel-related sales and activities) "would appear, at first glance, to be a reasonable alternative to the use of SeAH's Kuwait sales data . . ." Id. Commerce then reasons that because "HSU sold products during the POR which were sourced from an unaffiliated supplier . . . {which} would have the potential to wildly skew the data for calculating a CEP profit ratio and make this option unusable, particularly in the absence of any meaningful information about these sales." Id. Commerce cites page 5 of Hyundai Steel's August 23, 2021, supplemental questionnaire response as support, but there is no such discussion on that page, so it remains unclear on what Commerce based this critical decision. See C.R.217, P.R.227.[6] Commerce's reasoning is particularly disingenuous when its ultimate choice suffered from the specific flaws described above that skewed the calculations for Hyundai Steel.

---

[6] In an earlier submission, Hyundai Steel provided a breakdown of HSU's OCTG sales by supplier showing that [    ] of HSU's sales during the POR were supplied from Hyundai Steel (i.e., [                                    ]). See Hyundai Steel's Section C Response (Feb. 19, 2021), at Exhibit C-2-B, C.R.74, P.R.80. This data confirms that a negligible proportion of HSU's sales were sourced from unaffiliated suppliers, further rendering Commerce's finding that HSU's sales of OCTG purchased from other suppliers "ha{s} the potential to wildly skew the data for calculating a CEP profit ratio," IDM at 46, to be unsupported by substantial evidence.

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

Furthermore, Commece's regulations contemplate that Commerce will use a company's own data or, alternatively, "public" financial statements or similar reports as the basis for calculating CEP profit. See 19 C.F.R. §§ 351.402(d)(1) and (2). The fact that Commerce relied on a proprietary source, rather than various public sources available on the record, further shows that Commerce acted inconsistent with its own regulations in reaching its CEP profit decision.

Finally, Commerce makes the bizarre claim that "none of {Hyundai Steel's} options bear any greater relationship to Hyundai Steel's experience in the United States than do SeAH's Kuwait OCTG sales." IDM at 47. It is unclear how Commerce reaches this conclusion when several of the options, including #3 and #4, are specific to Hyundai Steel's actual experience in the U.S. market, including U.S. sales of the subject merchandise during the POR (Option #4), as Commerce itself observed elsewhere. Id. at 45-46.

What Commerce failed to recognize is that while SeAH's third-country sales may satisfy the statutory requirements for CEP profit in SeAH's own antidumping duty calculations, it is not a statutorily permissible alternative for Hyundai Steel's CEP profit and, moreover, is insufficiently representative of the profit associated with the actual expenses that Hyundai Steel and HSU incurred on U.S. sales of subject merchandise. SeAH's third-country profit rate reflected the experience of a different company in a different market environment, which has nothing to do with profit in the U.S. market for the subject merchandise as the statute requires. For example, Hyundai Steel exported plain-end subject merchandise and further processed them in the U.S. market, which the profit calculation should reflect. However, SeAH's third-country market does not reflect Hyundai Steel's U.S. further manufacturing and sales experience in any manner. Thus, using SeAH's third-country market sales experience as a surrogate for Hyundai

34

**Plaintiff's Rule 56.2 Memorandum**
**Consol. Court No. 22-00138**

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

Steel/HSU's U.S. profit experience inherently led to inaccurate and distortive results, and thus was unreasonable, unsupported by substantial evidence, and not in accordance with law.

### E.    Commerce's Adjustment to the G&A Ratio of Hyundai Steel's U.S. Affiliate, HSU, Is Not Supported by Substantial Evidence

Hyundai Steel's U.S. affiliate, HSU, engaged in manufacturing operations related to the subject merchandise through multiple [                              ] with unaffiliated U.S. processors. HSU's business activities involve handling the further manufacturing processes that include threading the pipes, attaching couplings, heat treating the pipes, and/or upsetting the pipe ends. See Hyundai Steel's Section E Response (Feb. 25, 2021), at E-6, C.R.103-104, P.R.82.  As part of its further manufacturing costs, Hyundai Steel included HSU's G&A expenses as required.

Commerce in its Final Results determined to increase the numerator and decrease the denominator of HSU's G&A expense ratio by [        ] to account for the COGS of rejected pipes that HSU sold to an unaffiliated U.S. customer. See IDM at 48-55; Commerce File Memorandum, Final Antidumping Analysis for Hyundai Steel (Apr. 1, 2022), at Attachment 1, C.R.320-321, P.R.306-307.  However, substantial record evidence demonstrates that: (1) these rejected pipes were a type of non-subject product that HSU produced from imported OCTG and sold during the POR, and thus relate to HSU's production operations; and (2) Hyundai Steel calculated HSU's G&A expense ratio consistent with HSU's normal accounting treatment of the costs in question.  As described below, remand is warranted.

Commerce disagreed that the scrap in question related to HSU's production operations. See IDM at 52.  Specifically, Commerce determined "that the scrap related to the rejected pipes is no longer a distinct product" because "these rejected pipes were not sold as non-prime merchandise or for use in any pipe applications.  The rejected pipes were sold for complete processing into scrap metal." Id. at 52-53.  Thus, Commerce decided that "HSU's classification

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

of the scrap as a type of non-subject product does not reasonably reflect the production costs of the merchandise under consideration or the other products included within COGS." Id. at 53.

Commerce misconstrued the record facts. All the merchandise sold as scrap during the POR was prime pipe when initially imported into the United States, and later was rejected after further processing. HSU gathered such rejected pipe for months and sold the merchandise to a company that chose to process the rejected pipes into scrap metal. The once prime pipes became non-subject merchandise. See Hyundai Steel's Supplemental Section E Response (Sept. 3, 2021), at SE-2, C.R.259-260, P.R.237. Hyundai Steel provided Commerce with a detailed explanation as to how the costs were recorded in HSU's normal accounting books and records:

> As explained at page E-13 of the initial Section E response, when unprocessed pipe is imported, the price for the pipe (and all related transportation costs) are recorded as part of the inventory value for the unprocessed pipe, i.e., as part of the semi-finished goods inventory. If an unprocessed pipe subsequently is processed, the quantity of the unprocessed pipe that was processed is deducted from the semi-finished goods inventory quantity for the unprocessed pipe product and added to the inventory quantity for the processed pipe product (finished goods).

> At the same time, the cost of the unprocessed pipe that was processed is deducted from the inventory value of the unprocessed pipe (i.e., as an "input" to the further manufacturing process), and the same cost—plus the amount of the processing fees and any materials that HSU procured—is added to the inventory (production) value for the processed pipe product in the finished goods inventory ledger. The value of the processed product is then transferred from finished goods inventory to the cost of goods sold ("COGS") at the time HSU issues its invoice to the customer for the processed product. The value then is captured in the COGS line item on HSU's income statement and audited reports.

> This accounting recognition flow likewise applies to the rejected products ("Scrap") sales. However, as noted above, HSU maintains a separate inventory ledger for the rejected products. In this regard, the scrap sales were recorded under a different account: [                    ]. Likewise, the COGS of scrap is recorded under "Scrap COGS" account as HSU issued its invoices to the customer for the rejected product (scrap). Please note that this "Scrap COGS" is part of HSU's company-wide COGS that will be used as the denominator in the G&A ratio calculation based on the FY 2020 audited financial statements.

Id. at SE-3 (footnote omitted).

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

As Hyundai Steel's questionnaire responses confirmed, the COGS for scrap is not related to the "general operations" of HSU as a whole. Rather, scrap derives specifically from HSU's production operations from imported OCTG. As such, the scrap COGS was properly classified as part of the COGS denominator used to calculate HSU's G&A ratio, consistent with HSU's normal accounting treatment. It was unreasonable for Commerce to reclassify the COGS of scrap sales as G&A expenses, and then remove the COGS from the denominator of HSU's G&A ratio, in its antidumping duty calculations.

Commerce relies on the fact that, "HSU did not own or operate its own processing facilities, the U.S. processing was performed by unaffiliated outside processors to which HSU paid a fee for the processing services provided" and that, consequently, "HSU's G&A expenses support the general operations of this selling entity and are recovered by HSU through both direct and further processed sales." IDM at 53. However, this reasoning overlooks that HSU in fact is a manufacturing entity. Simply because it does not perform the manufacturing itself does not change the fact that HSU is the producer of the further manufactured merchandise [

                                  ] with unaffiliated U.S. processors, and that the processing costs that HSU incurs and records are manufacturing expenses. The G&A expenses that HSU incurred facilitated the company's <u>manufacturing</u> operations. In that regard, while HSU resold the further-manufactured OCTG that it imported from Hyundai Steel, HSU's business model during the POR was as a manufacturer of threaded and coupled OCTG. Commerce should have recognized that any scrap it generated reasonably reflected the production costs of merchandise included within HSU's COGS, and should not have been treated as a general cost.

Commerce's adjustments to HSU's G&A expense ratio thus were unsupported by substantial record evidence and should be remanded for reconsideration.

Plaintiff's Rule 56.2 Memorandum
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

F.      **Commerce's Surrogate Adjustment for Further Manufacturing Yield Loss Is Not Supported by Substantial Evidence**

In the Final Results, Commerce applied a neutral "facts otherwise available" adjustment, pursuant to 19 U.S.C. § 1677e(a)(1), to the calculation of HSU's yield loss on its U.S. further manufacturing operations based on the cost of pipes rejected during the further manufacturing process as a percentage of the total POR further manufacturing costs.  See IDM at 63-66. Commerce made this adjustment to the further manufacturing costs based on its "find{ing} that Hyundai Steel did not fully explain or demonstrate how its reported costs account for the value of the material lost during certain further manufacturing processes."  Id. at 65.  This finding is contradicted by substantial evidence demonstrating that Hyundai Steel reported the per-unit further manufacturing costs based on the actual further manufacturing fees that HSU incurred divided by the same theoretical weight used in all other aspects of the antidumping calculations.

Commerce described Hyundai Steel's questionnaire response reporting as follows:

> In its EQR, regarding yield loss, Hyundai Steel explained that HSU pays processors to heat-treat, upset, and/or thread imported OCTG, which is the only processing performed on the imported OCTG in the United States prior to sale to the first unaffiliated customer.  Thus, Hyundai Steel stated that HSU does not incur actual costs for yield loss, and it is not claiming a scrap offset.  Further, Hyundai Steel explained that the calculation of HSU's reported processing cost per MT was based on the product-specific amounts for: (1) the total fees paid to the processors that related to sales of the processed product during the POR; and (2) the total quantities actually invoiced to unaffiliated customers for sales of the processed product during the POR.  According to Hyundai Steel, the allocation of the total fees paid by HSU for the processed products that were sold during the POR over the total actual quantity of sales of processed products during the period automatically captures all of the "yield losses" that might arise from differences between the quantities that the processor reported processing and the quantities that HSU actually delivered to customers.

> Commerce requested that Hyundai Steel demonstrate how any yield loss incurred on the entered pipe was accounted for in the reported further manufacturing costs. In the SEQR, Hyundai Steel responded that it did not account for yield loss for further manufacturing given the nature of the processing and accounting. Hyundai Steel explained that in the ordinary course of business, HSU did not

**Plaintiff's Rule 56.2 Memorandum**
**Consol. Court No. 22-00138**

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

> manage the actual length and actual quantity of subject merchandise when it was
> imported into the United States.  Additionally, Hyundai Steel stated that the
> outside processors do not provide information regarding actual lengths and actual
> quantities before processing.  Hyundai Steel concluded that, in any event, the
> costs incurred, recorded, and reported to Commerce are yielded costs since the
> costs incurred were based on the theoretical sizes.

Id. at 65-66.

Hyundai Steel agrees with Commerce's characterization of Hyundai Steel's responses up

to this point in the IDM.  But Commerce unreasonably and incorrectly continued and concluded

that "HSU's reported costs need to be adjusted to account for the value of the pipe lost in the

course of further processing."  Id. at 66.  The record, in fact, shows that Hyundai Steel provided

full explanations to each of Commerce requests and, most critically, demonstrated that it

accounted for further manufacturing material yield loss.

Following the logic that all U.S. prices and expenses must be stated in a consistent unit of

measure, and following Commerce's questionnaire instructions, Hyundai Steel reported all U.S.

sales data—including U.S. further manufacturing expenses—on a theoretical basis using

Commerce's calculation formula for theoretical weight.  See Commerce's Initial Questionnaire

(Dec. 31, 2020), at C-9, P.R.32 (instructing Hyundai Steel that "all calculations of per unit

expense and revenue fields needed for margin calculations should be based upon this {theoretical

weight" quantity" reported in Field Number 2.9 of the U.S. sales file).

Thus, when reporting U.S. further manufacturing expenses (FURMANU) and all other

U.S. expenses on a per-unit basis, Hyundai Steel was required to use the theoretical weight

calculated in the "THEOU" field of the Section C sales file by Commerce's instructions and

using Commerce's specified weight formula.  Hyundai Steel complied with that request.  See

Hyundai Steel's Section C Response (Feb. 19, 2021) at C-17 and C-31 to C-32, C.R.74, P.R.80.

According to Commerce's formula, the theoretical weight used for reporting U.S. sales data is a function of three factors: (1) theoretical weight per meter; (2) number of pieces; and (3) nominal length per piece. See Commerce's Section C Questionnaire (Dec. 31, 2020) at C-8 to C-9, P.R.32. The theoretical weight per meter, in turn, is calculated as follows: *nominal outside diameter – nominal wall thickness) * nominal wall thickness * 0.0246615*. Id. at C-8.

In accordance with Commerce's instructions, which required Hyundai Steel to report this product characteristic information for the "product imported," not the further manufactured product as sold, id. at C-5 to C-6, the reported theoretical weights determined according to Commerce's formula reflect the sizes of the product as imported into the United States prior to further manufacturing. This means that Hyundai Steel's theoretical weights, and in turn the per-unit sales prices and expenses (including further manufacturing costs), are not affected by any subsequent yield losses during the further manufacturing processes in the United States. As Hyundai Steel explained:

> Hyundai Steel did not account for yield loss for FURMANU given the nature of the processing and accounting. In the ordinary course of business, HSU does not manage the actual length and actual quantity of subject merchandise when it is imported into the United States. Also, the outside processors do not provide information regarding actual lengths and actual quantities before processing. In any event, the costs incurred, recorded, and reported to the Department are yield costs since the costs incurred were based on the theoretical sizes.

Hyundai Steel's Supplemental Section E Response (Sept. 3, 2021) at SE-4 to SE-5, C.R. 259, P.R.237.

Commerce's adjustment presumes that HSU did not account for the value of pipes lost in the course of further processing. But by making an adjustment, Commerce unreasonably and unlawfully introduced inaccuracies into the antidumping duty calculations. A simple example demonstrates how Commerce distorted the calculations. Hyundai Steel reported its further

**Plaintiff's Rule 56.2 Memorandum**
Consol. Court No. 22-00138

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

manufacturing fees on a per-unit weight basis, as Commerce's questionnaire required, by dividing (i) the actual expenses that the processor charged to Hyundai Steel by (ii) the theoretical weight of the pipes at the time of importation into the United States calculated according to Commerce's formula.  Thus, if the processors' actual fees were $400 and the calculated theoretical weight was 100 MT, the per-unit further manufacturing fee equals $4.00 per MT (i.e., $400 ÷ 100 MT).  If Hyundai Steel had divided the further manufacturing fees by the weight of the pipes after further manufacturing—assuming, for purposes of this hypothetical, 98 MT—then the per-unit further manufacturing fee would equal $4.08 per MT (i.e., $400 ÷ 98 MT).  But because all the calculations use the weight of the subject merchandise at the time of importation, this means that the extended processor fees would have totaled $408 (i.e., $4.08 per MT x 100 MT).  Thus, by making the adjustment in the manner that it did, Commerce effectively created $8 worth of additional processing fees that HSU never actually incurred.

Commerce's creation of additional costs and overstatement of HSU's further manufacturing costs inherently is unreasonable.  Moreover, Commerce's justification that "in its responses to Commerce, Hyundai Steel did not fully explain whether the scrap generated during the further manufacturing processes is kept by the processors or returned to HSU; nor did it explain how the value of the generated scrap is reflected in the invoices received from its processors," IDM at 66, is unsupportable.  As Commerce's own summary confirms, Hyundai Steel explained and fully documented in its questionnaire responses that it reported the per-unit further manufacturing costs consistent with Commerce's reporting requirements, which were based on the weight at the time of importation, and not the weight after further processing, as Commerce's adjustment presupposes.  For these reasons, Commerce's cost adjustment is unreasonable and unsupported by substantial evidence.  Remand is warranted.

**Plaintiff's Rule 56.2 Memorandum**
**Consol. Court No. 22-00138**

*Non-Confidential Version*
*Proprietary Information Has Been Removed*

## VI.    RELIEF REQUESTED

For the reasons set forth above, Plaintiff respectfully requests that this Court:  (1)

determine that Commerce's Final Results of the 2019-2020 administrative review of the

antidumping duty order against Certain Oil Country Tubular Goods from the Republic of Korea

were unsupported by substantial evidence on the record and were otherwise not in accordance

with law in the ways alleged herein; (2) remand this case to Commerce with instructions to

revise the Final Results consistent with the findings of the Court; and (3) provide such other or

additional relief as this Court may deem just and proper.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Robert G. Gosselink
Jarrod M. Goldfeder

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

Dated:  September 20, 2022

*Counsel to Hyundai Steel Company,*
*Plaintiff*

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HYUNDAI STEEL COMPANY,** | |
| **Plaintiff,** | |
| **AJU BESTEEL CO., LTD.,**<br>**NEXTEEL CO., LTD., and**<br>**HUSTEEL CO., LTD.,** | |
| **Consolidated Plaintiffs,** | |
| **and** | |
| **HUSTEEL CO., LTD.,**<br>**NEXTEEL CO., LTD., and**<br>**SEAH STEEL CORPORATION,** | **Before:  Hon. Jennifer Choe-Groves, Judge** |
| **Plaintiff-Intervenors,** | **Consol. Court No. 22-00138** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **VALLOUREC STAR, L.P.,**<br>**WELDED TUBE USA INC., and**<br>**UNITED STATES STEEL**<br>**CORPORATION,** | |
| **Defendant-Intervenors.** | |

## <u>CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)</u>

The undersigned counsel at Trade Pacific PLLC hereby certifies that the accompanying

Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment upon the Agency

Record, dated September 19, 2022, complies with the maximum 14,000 word-count limitation

described in part 2(B)(1) of the Court's Chambers Procedures.  The memorandum of law

**Consol. Court No. 22-00138**
**Certification of Compliance**

contains 13,295 words according to the word-count function of the word-processing software

used to prepare the memorandum, excluding the table of contents, table of authorities, and

counsel's signature block.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Robert G. Gosselink
Jarrod M. Goldfeder
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

Dated:  September 20, 2022          *Counsel to Hyundai Steel Company,*
                                    *Plaintiff*