IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
_____

|  |  |  |
|---|---|---|
| HYUNDAI STEEL COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Consol. Court No. 22-00138 |
| and | ) | |
| | ) | |
| AJU BESTEEL CO., LTD., NEXTEEL CO., LTD., | ) | |
| and HUSTEEL CO., LTD., | ) | |
| | ) | |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HUSTEEEL CO., LTD, NEXTEEL CO., LTD, and | ) | |
| SEAH STEEL CORPORATION | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| WELDED TUBE USA, INC, and | ) | |
| VALOUREC STAR L.P., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
_____

## <u>ORDER</u>

Upon consideration of plaintiff's, consolidated-plaintiffs' and plaintiff-intervenors'

motions for judgment upon the administrative record, responses thereto, replies, the

administrative record, and all other pertinent papers, it is hereby

ORDERED that the motions are DENIED; and it is further

ORDERED that the Department of Commerce's request for a voluntary remand is GRANTED; and it is further

ORDERED that the Department of Commerce's determination is sustained in all other respects.

Dated: _____, 2022          _____
         New York, New York                                        JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____

|                                                                 |     |                            |
|-----------------------------------------------------------------|-----|----------------------------|
| HYUNDAI STEEL COMPANY,                                          | )   |                            |
|                                                                 | )   |                            |
| Plaintiff,                                                      | )   | Consol. Court No. 22-00138 |
|                                                                 | )   |                            |
| and                                                             | )   |                            |
|                                                                 | )   |                            |
| AJU BESTEEL CO., LTD., NEXTEEL CO., LTD., and HUSTEEL CO., LTD., | )   |                            |
|                                                                 | )   |                            |
| Consolidated Plaintiffs,                                        | )   |                            |
|                                                                 | )   |                            |
| and                                                             | )   |                            |
|                                                                 | )   |                            |
| HUSTEEL CO., LTD, NEXTEEL CO., LTD, and SEAH STEEL CORPORATION  | )   |                            |
|                                                                 | )   |                            |
| Plaintiff-Intervenors,                                          | )   |                            |
|                                                                 | )   |                            |
| v.                                                              | )   |                            |
|                                                                 | )   |                            |
| UNITED STATES,                                                  | )   |                            |
|                                                                 | )   |                            |
| Defendant,                                                      | )   |                            |
|                                                                 | )   |                            |
| and                                                             | )   |                            |
|                                                                 | )   |                            |
| UNITED STATES STEEL CORPORATION, WELDED TUBE USA, INC, and VALOUREC STAR L.P., | )   |                            |
|                                                                 | )   |                            |
| Defendant-Intervenors.                                          | )   |                            |

_____

**DEFENDANT'S RESPONSE IN OPPOSITION TO
MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

OF COUNSEL:                        HARDEEP K. JOSAN
MYKHAYLO GRYZLOV         Trial Attorney
Senior Counsel                    Commercial Litigation Branch
Office of the Chief Counsel      Civil Division
    for Trade Enforcement & Compliance  U.S. Department of Justice
U.S. Department of Commerce     26 Federal Plaza, Suite 346
New York, New York 10278
Tel.: (212) 264-9245
Fax:  (212) 264-1916
Email: hardeep.k.josan@usdoj.gov

December 8, 2022             Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**

STATEMENT PURSUANT TO RULE 56.2............................................................2

    I.    Administrative Decision Under Review............................................2

    II.    The Issues Presented For Review....................................................2

STATEMENT OF FACTS ...............................................................................3

SUMMARY OF ARGUMENT..........................................................................3

ARGUMENT...............................................................................................4

    I.    Standard Of Review.....................................................................4

    II.    Commerce's Calculation Of Hyundai's CV Profit Is Supported By Substantial Evidence And Otherwise In Accordance With Law .................................5

        A.    Legal Framework ..............................................................6

        B.    Commerce Properly Applied The Statute ..................................8

        C.    The Statute Does Not Prohibit Commerce From Using Business Proprietary Information To Calculate CV Profit.............................16

    III.    Commerce Properly Calculated The CV Profit Cap Based On Facts Available ......18

    IV.    Commerce Correctly Adjusted HSU's G&A Expense Ratio.................................27

    V.    Commerce Properly Applied Neutral Facts Available To Adjust HSU's Yield Loss30

    VI.    The Court Should Remand With Respect To Calculation Of The CEP Profit Rate .32

CONCLUSION ...........................................................................................34

# TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE(S)**

*Ad Hoc Shrimp Trade Action Committee v. United States,*
    882 F. Supp. 2d 1377 (Ct. Int'l Trade 2013) ................................................................ 33

*Atar S.r.L. v. United States,*
    730 F.3d 1320 (Fed. Cir. 2013) .................................................................................. 8

*Baroque Timber Indus. (Zhongshan) Co., Ltd. v. United States,*
    925 F. Supp. 2d 1332 (Ct. Int'l Trade 2013) ................................................................ 33

*Bowman Transp. v. Ark.-Best Freight Sys.,*
    419 U.S. 281 (1974) ................................................................................................... 14

*Changzhou Hawd Flooring Co., Ltd. v. United States,*
    6 F. Supp. 3d 1358 (Ct. Int'l Trade 2014) ................................................................. 33

*Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.,*
    467 U.S. 837 (1984) ..................................................................................................... 5

*Consol. Edison Co. of N.Y. v. NLRB,*
    305 U.S. 197 (1938) ..................................................................................................... 5

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ..................................................................................................... 5

*Gleason Indus. Prod. Inc. v. United States,*
    Slip Op. 07-40, 31 C.I.T. 393 (Ct. Int'l Trade Mar. 16, 2007) .............................. 34

*Husteel Co. v. United States,*
    180 F.Supp.3d 1330 (Ct. Int'l Trade 2016) ................................................... passim

*Husteel v. United States,*
    98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ........................................................... 23

*Husteel v. United States,*
    Case No. 16-2732, Dkt. No. 144-2 (Fed. Cir. Feb. 7, 2018) .................................. 9

*Mid Continent Steel and Wire Inc. v. United States,*
    941 F.3d 530 (Fed. Cir. 2019) ............................................................................... 22

*NEXTEEL Co. v. United States,*
    28 F.4th 1226 (Fed Cir. 2022) ............................................................................ passim

*NEXTEEL Co. v. United States*,
   392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019)................................................ passim

*Quingdao Sea-Line Trading Co. v. United States*,
   36 C.I.T. 451, (Ct. Int'l Trade 2012)........................................................... 32

*SeAH Steel Corp. v. United States*,
   513 Fed. Supp. 3d 1367 (Ct. Int'l Trade 2021)............................................ 13

*SeAH Steel Corp. v. United States*,
   704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010)............................................... 33

*Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*,
   412 F. Supp. 2d 1330 (Ct. Int'l Trade 2005).............................................. 33

*SKF USA Inc. v. United States*,
   254 F.3d 1022 (Fed. Cir. 2001) .................................................................. 33

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
   298 F.3d 1330 (Fed. Cir. 2002) .................................................................. 32

*Tianjin Tiancheng Pharm. Co. v. United States*,
   366 F. Supp. 2d 1246 (Ct. Int'l Trade 2005)................................................. 4

*Timken U.S. Corp. v. United States*,
   421 F.3d 1350 (Fed. Cir. 2005) .................................................................. 14

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009).................................................................................... 5

*Valeo N. Am. v. United States*,
   404 F. Supp. 3d 1303 (Ct. Int'l Trade 2019)......................................... 13, 14

*Yantai CMC Bearing Co. v. United States*,
   203 F.Supp.3d 1317 (Ct. Int'l Trade 2017)................................................ 32

*Zenith Radio Corp. v. United States*,
   437 U.S. 443 (1978).................................................................................... 5

## STATUTES AND REGULATIONS

**PAGE(S)**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................... 4, 5

19 U.S.C. § 1677 ....................................................................................... 9, 13

19 U.S.C. § 1677(16) ................................................................................. 7, 10

19 U.S.C. § 1677(35) ..................................................................................... 6

19 U.S.C. § 1677b(a)(4) ................................................................................. 6

19 U.S.C. § 1677b(a)(1)(A)-(C) ...................................................................... 6

19 U.S.C. § 1677b(e) ...................................................................................... 6

19 U.S.C. § 1677b(e)(2)(A) .......................................................................... 10

19 U.S.C. § 1677b(e)(2)(B) ......................................................................... 7, 8

19 U.S.C. § 1677b(e)(2)(B)(i) ...................................................................... 10

19 U.S.C. § 1677b(e)(2)(B)(ii) ..................................................................... 10

19 U.S.C. § 1677b(e)(2)(B)(iii) ............................................................. passim

19 U.S.C. § 3512(d) ....................................................................................... 8

19 C.F.R. § 351 ............................................................................................ 20

19 C.F.R. § 351.414(f)(2)-(3) ....................................................................... 16

## FEDERAL REGISTER NOTICES

**PAGE(S)**

*Notice of Scope Ruling,*
   85 Fed. Reg. 7,921 (Dep't of Commerce Feb. 10, 2020) ................................ 13, 20

*Certain Oil Country Tubular Goods From the Republic of Korea,*
   87 Fed. Reg. 20,815 (Dep't of Commerce April 8, 2022) ..................................... 2

## OTHER AUTHORITIES

**PAGE(S)**

1994 U.S.C.C.A.N. 4040 ........................................................................ passim

Uruguay Round Agreements Act: Statement of Administrative Action,

H.R. Doc. No. 103-316, (1994)............................................................................. 13, 22

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____

|  |  |  |
|---|---|---|
| HYUNDAI STEEL COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Consol. Court No. 22-00138 |
| and | ) | |
| | ) | |
| AJU BESTEEL CO., LTD., NEXTEEL CO., LTD., | ) | |
| and HUSTEEL CO., LTD., | ) | |
| | ) | |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HUSTEEL CO., LTD, NEXTEEL CO., LTD, and | ) | |
| SEAH STEEL CORPORATION | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| WELDED TUBE USA, INC, and | ) | |
| VALOUREC STAR L.P., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Defendant, the United States, respectfully responds in opposition to the motions for

judgment upon the administrative record filed by plaintiff, Hyundai Steel Company (Hyundai),

consolidated plaintiffs,[1] and plaintiff-intervenors,[2] challenging the Department of Commerce's (Commerce) final results of the 2019-2020 administrative review of the antidumping duty order on certain oil country tubular goods (OCTG) from the Republic of Korea.  As we will explain below, with the exception of one issue for which Commerce respectfully requests a remand, the Court should deny the motions and enter judgment for the Government.

## STATEMENT PURSUANT TO RULE 56.2

I.  **Administrative Decision Under Review**

The administrative determination under review is *Certain Oil Country Tubular Goods From the Republic of Korea*, 87 Fed. Reg. 20,815 (Dep't of Commerce April 8, 2022) (final results of 2019-2020 admin. review), P.R. 317, and accompanying Issues and Decision Memorandum (IDM), P.R. 305 (*Final Results*), covering the period of review (POR) from September 1, 2019 through August 31, 2020.[3]

II.  **The Issues Presented For Review**

1.      Whether Commerce's calculation of constructed value (CV) profit is supported by substantial evidence and in accordance with law.

2.      Whether Commerce's calculation of CV profit cap based upon facts available is supported by substantial evidence and in accordance with law.

3.      Whether Commerce's decision to include the cost of goods sold of certain pipe, which entered the United States as prime pipe but was subsequently rejected and sold to an

---

[1] The consolidated plaintiffs are AJU Besteel, Co. (AJU), Ltd, NEXTEEL Co., Ltd. (NEXTEEL), and Husteel Co., Ltd (HUSTEEL).

[2] The plaintiff-intervenors are HUSTEEL, NEXTEEL, SeAH Steel Corporation (SeAH).

[3] "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

unaffiliated customer as scrap, in Hyundai Steel USA's (HSU) general and administrative (G&A) expenses ratio is supported by substantial evidence and in accordance with law.

4.      Whether Commerce's decision to apply neutral facts available to the calculation of HSU's yield loss is supported by substantial evidence and in accordance with law.

5.      Whether the Court should grant a voluntary remand regarding the calculation of Hyundai's constructed export price (CEP) profit rate.

## STATEMENT OF FACTS

Hyundai challenges the following determinations in the *Final Results*:  (1) Commerce's calculation of CV profit; (2) Commerce's calculation of the facts available CV profit cap; (3) Commerce's inclusion of cost of goods sold of certain pipe in HSU's G&A; (4) Commerce's decision to apply neutral facts available to HSU's yield loss calculation; and (5) Commerce's calculation of Hyundai's CEP profit.  AJU, NEXTEEL, HUSTEEL and SeAH join in Hyundai's challenge.

## SUMMARY OF THE ARGUMENT

Commerce's *Final Results* should be sustained.

First, Commerce properly calculated Hyundai's CV profit based on SeAH's sales of OCTG in a third country market under the "any other reasonable method" provision.  This Court and the Federal Circuit have previously sustained a substantially identical methodology. *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1240-41 (Fed Cir. 2022) (*NEXTEEL II*); *NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276, 1290 (Ct. Int'l Trade 2019) (*NEXTEEL*).

Second, Commerce also properly applied a CV profit cap to Hyundai, based on facts available, in accordance with law.  This Court and the Federal Circuit have previously sustained a substantially identical methodology.  *NEXTEEL II*, 28 F.4th at 1241 ("We thus affirm the

holding of the Court of International Trade that Commerce's application of the profit cap was lawful."); *NEXTEEL*, 392 F. Supp. 3d at 1290.

Third, Commerce properly included in HSU's G&A expense ratio the cost of goods sold for pipe that HSU imported as prime pipe for further manufacturing, but subsequently rejected and sold to an unaffiliated company as scrap. Commerce reasonably determined that the cost of goods sold associated with the rejected OCTG was necessarily covered by HSU generally, that is, by all the other products HSU further manufactured and sold.

Fourth, Commerce properly applied neutral facts available to the calculation of HSU's yield loss. Hyundai reported no yield loss from further manufacturing by an unaffiliated processor, but it failed to fully explain whether the unaffiliated processor retained the scrap after further manufacturing OCTG or returned it to HSU and how such scrap is reflected in the invoices from the processor. Without this information, Commerce properly resorted to neutral facts available.

Finally, we respectfully request that the Court remand the CEP profit rate issue to Commerce for the agency to reconsider its selection of the CEP profit source and, if appropriate, recalculate the CEP profit rate.

## ARGUMENT

## I.   Standard Of Review

In reviewing Commerce's antidumping duty proceedings, the Court sustains any determination made by Commerce unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Tianjin Tiancheng Pharm. Co. v. United States*, 366 F. Supp. 2d 1246, 1249 (Ct. Int'l Trade 2005) (quoting 19 U.S.C.

§ 1516a(b)(1)(B)(i)).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Even if it is possible to draw two different inconsistent conclusions from the record evidence, this does not mean that Commerce's findings are unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

In reviewing Commerce's construction of a statute, the Court uses the two-part test articulated in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).  First, the Court determines "whether Congress has directly spoken to the precise question at issue" and clearly expressed its purpose and intent in the statute.  *See id.* at 842-43.  Second, if the statute does not answer the question, the Court assesses whether Commerce's interpretation is "sufficiently reasonable."  *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450-51 (1978) (citation omitted).  Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).

II.    **Commerce's Calculation Of Hyundai's CV Profit Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

Commerce properly calculated Hyundai's CV profit based on the combined profit and selling expenses of SeAH on its sales of OCTG to a third-country market because it was the best information available on the record.  IDM at 39.  Commerce examined the alternative sources of CV profit on the record and found that none of them is superior to the source Commerce selected because they were less specific to OCTG and did not represent profit of a Korean producer and production experience in Korea.  IDM at 40.  Accordingly, Commerce reasonably concluded that SeAH's combined profit and selling expenses "most closely mirrors the preferred method and allows us to calculate CV profit and selling expenses using a Korean OCTG producer's

comparison market sales of the merchandise under consideration that were made in the ordinary course of trade (*i.e.*, this is more precise information) . . . ." *Id.*

Hyundai challenges Commerce's determination on various grounds. First, Hyundai contends that "the statute does not 'show preference' that the CV profit reflect production and sales of the 'foreign like product,' and there is no basis for Commerce's assertion that its approach 'more closely simulates the statutory preference.'" Hyundai Br. at 11. Additionally, Hyundai contends that it was unreasonable for Commerce to disregard Hyundai's argument regarding alleged dissimilarities in the mix of OCTG models sold by Hyundai and SeAH. *Id.* at 12-16. As we demonstrate below, Hyundai's arguments are without merit.

A.   **Legal Framework**

In calculating dumping margins, Commerce normally compares the export price or constructed export price (*i.e.*, price in the United States market) of the merchandise under investigation to the normal value (*i.e.*, price in the home market or to a third-country market). 19 U.S.C. §§ 1677(35), 1677b(a)(1)(A)-(C). In other words, Commerce normally would compare the price of OCTG in the United States to the price of OCTG in Korea or in a third country (*i.e.*, a country other than Korea or the United States). If normal value cannot be determined on this basis – as was the case in this review because Hyundai did not have a viable home market or third country market – Commerce may use CV to determine normal value. 19 U.S.C. § 1677b(a)(4).

Under section 1677b(e), "constructed value of imported merchandise" is equal to the sum of (1) the cost of materials and fabrication or other processing in producing merchandise and (2) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative costs and for profits, in

connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country. This statutorily preferred method contains a preference for profit to reflect the production and sale in the foreign country of the foreign like product (the merchandise under consideration). The statute defines the term "foreign like product" to include "{t}he subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise." 19 U.S.C. § 1677(16).

If the preferred method is unavailable, the antidumping statute permits Commerce to calculate selling, general, and administrative expenses and profit under one of the following alternatives:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review {… } for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in *the same general category of products as the subject merchandise*,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) { . . .}for profits, in connection with the production and sale of a *foreign like product*, in the ordinary course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized {…} for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in *the same general category of products as the subject merchandise*; {(*i.e.,* the "profit cap")}.

19 U.S.C. § 1677b(e)(2)(B) (emphasis added). The statute does not establish a hierarchy for selecting among the alternatives for calculating CV profit. *See* Statement of Administrative

Action for Uruguay Round Agreements Act (SAA), H.R. Rep. No. 103-316, vol. I, at 840 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4176 (noting that "{a}t the outset, it should be emphasized that, consistent with the Antidumping Agreement, new section {1677b}(e)(2)(B) does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases."); *see also* 19 U.S.C. § 3512(d) (adopting the SAA as "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act . . . in any judicial proceeding in which a question arises concerning such interpretation or application"). Moreover, as explained in the SAA, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data." SAA at 840. Accordingly, Commerce has discretion to select from any of the three alternative methods, depending on the information available on the record. By its express terms, the profit data used under "any reasonable method" under alternative (iii) may, but do not have to, come from a foreign country (*i.e.*, the exporting country) or be a foreign like product.

Alternative (iii) further instructs that, when using a "reasonable method" for CV profit, "the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise{.}" 19 U.S.C. § 1677b(e)(2)(B)(iii). This provision is termed the "profit cap." SAA at 840; *Atar S.r.L. v. United States*, 730 F.3d 1320, 1322 (Fed. Cir. 2013).

B.    <u>Commerce Properly Applied The Statute</u>

Here, Commerce properly applied a "reasonable method" under alternative (iii) to

determine CV profit.  *See* IDM at 39.  Commerce determined that alternatives (i) and (ii) were

unavailable because "the other steel products produced by Hyundai Steel, including Hyundai

Steel's non-prime OCTG, are not in the same general category of merchandise as OCTG" and

"because the other respondent did not make sales of OCTG in the home market (*i.e.*, Korea)."  *Id*

at 39-40.  Hyundai does not contest these findings or Commerce's choice to apply "any other

reasonable method" under alternative (iii).  However, Hyundai contends that Commerce's choice

of the CV profit source, *i.e.*, SeAH's profit and selling expenses from its third-country sales of

OCTG, under any other reasonable method, was "unsupported by substantial evidence."

Hyundai Br. at 8.  Hyundai is incorrect.

   In selecting among potential CV profit sources under a "reasonable method" under

alternative (iii), Commerce recognized a statutory preference for profit data that reflect: (1)

production and sales in the foreign country; and (2) the merchandise under consideration.  IDM

at 39 ("In conducting this analysis, we note that the specific language of both the preferred and

alternative methods appear to show a preference that the profit and selling expenses reflect: (1)

production and sales in the foreign country; and (2) the foreign like product, *i.e.*, the merchandise

under consideration."); *accord Husteel Co. v. United States*, 180 F. Supp. 3d 1330, 1346 (Ct.

Int'l Trade 2016) ("Commerce correctly noted that the statute indicates a preference in

calculating CV profit for data sources reflecting production and sales in the foreign country of

the foreign like product."), *aff'd by Husteel Co. v. United States*, Case No. 16-2732, Dkt. No.

144-2 (Fed. Cir. Feb. 7, 2018) (*per curiam*) (Rule 36).

   In evaluating the available sources of CV profit, Commerce found that SeAH's data

constituted the best information available on the record because SeAH's "combined selling

expense and profit experience reflects the profit of a Korean OCTG producer, on comparison

market sales of the merchandise under consideration, in the ordinary course of trade."  IDM at

39.  Commerce further concluded that using this CV profit source "closely simulates the

statutory preference for calculating CV profit and selling expenses."  *Id.* at 39-40.

Hyundai contends incorrectly that "the statute does not 'show preference' that the CV

profit reflect production and sales of 'foreign like product,' and there is no basis for Commerce's

assertion that its approach more 'closely simulates the statutory preference.'"  Hyundai Br. at 11,

*contra Husteel*, 180 F. Supp. 3d at 1346 ("Commerce *correctly* noted that the statute indicates a

preference in calculating CV profit for data sources reflecting production and sales in the foreign

country of the foreign like product") (emphasis added).  Hyundai misinterprets the statute.

Both the preferred method and alternative method (ii) expressly reference "foreign like

product."  19 U.S.C. § 1677b(e)(2)(A) and (B)(ii).  Furthermore, alternative methods (i) and (iii)

reference profit in connection with "merchandise that is in *the same general category of products*

*as the subject merchandise.*"[4]  19 U.S.C. §§ 1677b(e)(2)(B)(i) and (iii) (emphasis added).

Hyundai misinterprets this language as indicating that there is no statutory preference.  However,

the statute defines the term "foreign like product" to include "*{t}he subject merchandise* and

other merchandise which is identical in physical characteristics with, and was produced in the

same country by the same person as, that merchandise."  19 U.S.C. § 1677(16) (emphasis

added).  The statutory reference in some of the alternative methods to "merchandise that is in the

same general category of products as subject merchandise," does not establish the absence of the

statutory preference that the profit should approximate the profit realized in connection with the

"foreign like product."  The statute recognizes that Commerce has less than perfect information

on the record in a situation when it must resort to alternative methods, affording some flexibility

---

[4] We note that alternative (iii) contains this reference with respect to CV profit cap rather than
method itself.  19 U.S.C. § 1677b(e)(2)(B)(iii).

to the agency, but it does not mean that there is no preference in the statute.  It makes sense that the statute has a preference that profit in the CV profit calculation should reasonably approximate the profit connected to the production and sale of merchandise under consideration in a foreign country (as opposed to dissimilar products) as it increases the accuracy. Accordingly, Hyundai is wrong that the statute does not have a preference in calculating CV profit for data sources reflecting production and sales in the foreign country of the foreign like product.  *Husteel*, 180 F. Supp. 3d at 1346.

Furthermore, Hyundai contends that by considering the degrees to which a profit source reflects merchandise under consideration, "Commerce created a legal constraint that does not exist" in the statute.  Hyundai Br. at 11-12.  Far from imposing a legal constraint, Commerce expressly acknowledged that "when selecting a profit rate from available record evidence, we may not be able to find a source that perfectly reflects both (1) production and sales in the foreign country; and (2) the foreign like product, *i.e.*, the merchandise under consideration." IDM at 40.  Accordingly, in applying "any other reasonable method," Commerce considered the quality of available data and selected the profit source that was the best available information for valuing Hyundai's CV profit and selling expenses.  *Id.* ("We have considered the data for Borusan, Chung Hung, Nippon Steel, TMK, Tenaris, and Welspun, and the arguments in favor of the use of some these data urged by Hyundai Steel").  Commerce found that "each of these sources is less specific" to the product under consideration and that "none of them represents production experience in Korea." *Id.*  None of the alternative sources of profit data – financial statements of Borusan, Chung Hung, Nippon Steel, TMK, Tenaris, and Welspun – represents profit from production in Korea, whereas SeAH's profit reflects Korean production, albeit in connection with sales in a third-country market.  Moreover, SeAH's data provides the greatest

specificity to the merchandise under consideration.  Selecting a profit source that has the greatest specificity to the product under consideration (*i.e.*, OCTG) and represents the production of OCTG by a Korean producer in Korea is reasonable.

The record evidence demonstrates that the alternative profit sources include, at least in part, profit from non-comparable products that are not in the same general category of products as subject merchandise.  *See, e.g.*, SeAH April 14, 2021 CV Submission (Part 2) at Attachment 2-C, at 57, 73, 85, 93, 99 (P.R. 139-140) (TMK's 2020 financial statement indicates that TMK produced line pipe, process and power generation pipe, structural and standard pipe, mechanical tube and semi-finished products); Hyundai CV Submission (Part 1) at Exhibit 1, at "Product Information" at 14-49  (P.R. 145) (Borusan's 2020 financial statement indicating that the company produces line pipe, water transmission pipe, construction pipe, and automotive tube); Hyundai CV Submission (Part 2) at Exhibit 2 at Product Information, 1-29 (P.R. 146) (Chung Hung Steel Corporation 2019 financial statement indicating that the company produces hot-rolled steel coils, cold rolled steel coils, line pipe and structural pipe); Hyundai CV Submission (Part 2) at Exhibit 3 at Product Information at 1-29 (P.R. 146) (Nippon Steel's financial statement indicating that the company produces hot-rolled steel coils, cold rolled steel coils, line pipe and structural pipe).

Accordingly, the profit from these alternative sources would be derived from a mixture of various products that includes products that are *outside* the general category of merchandise with subject OCTG, whereas SeAH's third-country sales profit does not include such products.  *See Husteel*, 180 F. Supp. 3d at 1341-42 (sustaining Commerce's determination that the same general category of products is limited to products suitable for "down hole" applications in oil and gas wells such as subject OCTG, non-subject OCTG and drill pipe and does not include line pipe,

standard pipe and other non-OCTG pipe); *see also Notice of Scope Ruling*, 85 Fed. Reg. 7,921, 7,922 (Dep't of Commerce Feb. 10, 2020).

This Court sustained substantially identical reasoning for using SeAH's profit and selling expenses from its third-country sales in litigation regarding a prior administrative review of this antidumping duty order. *SeAH Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1397 (Ct. Int'l Trade 2021).  In that case, similar to this case, plaintiffs advocated the use of an alternative source for CV profit, including "the financial statements of seven non-Korean producers, 'Nippon Steel,' 'Tenaris,' 'TMK,' 'Borusan Mannesmann,' 'Chung Hung Steel Corporation,' 'Maharashtra Seamless Limited,' and 'EVRAZ plc,' many of which included significant sales of non-OCTG products." *Id*. at 1396.  "Commerce favored SeAH's data as the only data available on the record that reflected the profit of a Korean OCTG producer on sales of OCTG in the ordinary course of trade." *Id*.  In sustaining Commerce's reasoning, the Court held that it "regards as reasonable Commerce's explanation that SeAH's financial data are specific and relate to a Korean producer conducting production in Korea and are more accurate than surrogate financial statements from non-Korean producers or regarding a product other than OCTG." *Id*.

Hyundai also contends that Commerce's choice of SeAH data is unreasonable because Commerce did not respond to Hyundai's arguments regarding differences in the model mix of OCTG sold by SeAH and Hyundai.  Hyundai Br. at 12.  However, "the agency need not respond to every argument made by a party, so long as the path of the agency's reasoning is reasonably discernible by the court." *Valeo N. Am. v. United States*, 404 F. Supp. 3d 1303, 1319 (Ct. Int'l Trade 2019) (citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir. 2005)); Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Doc. No. 103-316, at 892 (1994) (SAA) ("The Administration does not intend that new section {1677f(i)} alter

existing law regarding public notice and explanation of antidumping and countervailing duty determinations. *Existing law does not require that an agency make an explicit response to every argument made by a party, but instead requires that issues material to the agency's determination be discussed so that the 'path of the agency may reasonably be discerned' by a reviewing court.*") (emphasis added). Moreover, "{t}he agency must articulate a rational connection between the facts found and choices made" and the courts "will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transp. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285-86 (1974).

In this case, Commerce's path in selecting SeAH's data may be reasonably discerned. Commerce selected SeAH's data because SeAH's "combined selling expense and profit experience reflects the profit of a Korean OCTG producer, on comparison market sales of the merchandise under consideration, in the ordinary course of trade." IDM at 39. With respect to alternative data source, Commerce found that "each of these sources is less specific to OCTG than are the SeAH financial data" and that "none of them represents production experience in Korea." *Id*. at 40. Hyundai's contentions regarding purported dissimilarity among various models of OCTG are unpersuasive, given that the alternative sources advocated by Hyundai contain profit that are based, in part, on products that do not qualify as OCTG and/or *are outside of the same general category of products as the subject merchandise*. In light of Commerce's reasoning, it is unnecessary to dissect the differences among various models of OCTG, when the alternative sources of profit incorporate profit from such dissimilar products as water pipe, line pipe, automotive pipe, structural pipe, various coils, etc. *See, e.g.*, SeAH CV Profit Submission (Part 2) at Attachment 2-C, at 57, 73, 85, 93, 99 (P.R. 139-140) (TMK's 2020 financial statement indicates that TMK produced line pipe, process and power generation pipe, structural and

standard pipe, mechanical tube and semi-finished products); Hyundai CV Profit Submission
(Part 1) at Exhibit 1, at "Product Information" at 14-49  (P.R. 145) (Borusan's 2020 financial
statement indicating that the company produces line pipe, water transmission pipe, construction
pipe, and automotive tube.); Hyundai CV Profit Submission (Part 2) at Exhibit 2 at Product
Information, 1-29 (P.R. 146) (Chung Hung Steel Corporation 2019 financial statement indicating
that the company produces hot-rolled steel coils, cold rolled steel coils, line pipe, and structural
pipe); Hyundai CV profit Submission (Part 2) at Exhibit 3 at Product Information at 1-29 (P.R.
146) (Nippon Steel's financial statement indicating that the company produces hot-rolled steel
coils, cold rolled steel coils, line pipe, and structural pipe). Moreover, even if such statements did
not include profit for dissimilar products (which they do), the alternative sources of profit are
company-wide financial statements that incorporate the profit at the aggregate level.  *See* SeAH
April 14, 2021 CV Profit and Selling Expense Submission (Part 1) at Attachments 1-A and 2-A
(P.R. 139), (Part 2) at Attachment 3-A (P.R. 140), (Part 4) at Attachment 4-A (P.R. 142), (Part 5)
at Attachment 5-A (P.R. 143); Hyundai April 14, 2021 CV Profit and Selling Expense
Submission (Part 1) at Exhibits 1 and 2 (P.R. 145), (Part 2) at Exhibit 3 (146), (Part 3) at Exhibit
4 (P.R. 147); April 14, 2021 Domestic Interest Parties Response to Request for CV Profit and
Selling Expenses (Ex. Part 1) at Exhibit 6 (P.R.154) & (Ex. Part 3) at Exhibit 8 (P.R. 156).
Accordingly, it is impossible to determine the exact model mix for the OCTG these companies
sell or conclude that their model mix is a better fit with Hyundai's model mix.[5]

---

[5] In fact, the record evidence strongly suggests that many of these companies sell less similar
models of OCTG, because they sell seamless OCTG.  The first and, therefore, the most
important model match characteristic is whether OCTG is welded or seamless.  SeAH's third
country sales and Hyundai's U.S. sales relate exclusively to welded pipe.  In contrast, the
product catalogues of Tenaris, TMK and Nippon indicate that they sell some seamless pipe.  *See*
SeAH April 14, 2021 CV Profit and Selling Expense Submission (Part 1) at Attachments 1-C
(Tenaris) and 2-C (TMK) (P.R. 139); Hyundai April 14, 2021 CV Profit and Selling Expense

Similarly, Hyundai's contention that it was unreasonable for Commerce to select SeAH's profit data over profit from alternative sources because some of SeAH's sales in the database may have been made outside of the period of review,[6] is unpersuasive.  Hyundai Br. at 15-16.  This argument does not detract from Commerce's reasoning to select SeAH's profit data as the best available information for valuing CV profit.  Hyundai's argument is irrelevant to Commerce's determination because the argument provides no basis for differentiating SeAH's data from the alternative profit sources that Hyundai advocates.  These alternative profit sources are financial statements of various companies, which reflect profit during a fiscal year (as opposed to the period of review), and thus necessarily include profit from outside the period of review.  IDM at 39 (listing alternative sources).

### C.    The Statute Does Not Prohibit Commerce From Using Business Proprietary Information To Calculate CV Profit

Hyundai contends that "Commerce's use of SeAH's BPI third-country sales and corresponding cost data to calculate the CV profit and selling expense ratios also is contrary to law because Hyundai Steel had no means to review or analyze the underlying data as it was not permitted access to SeAH's BPI under Commerce's rules."  Hyundai Br. at 18.  Hyundai contends that Commerce's determination is arbitrary and not supported by substantial evidence because Hyundai had no means to review SeAH's business proprietary information (BPI) underlying the calculations.  *Id*.  SeAH's arguments are unpersuasive.

---

Submission (Part 1) at Exhibits 3 (Product Information) at 20-21 (Seamless Pipe and Tubes) (P.R. 140) and Exhibit 4 (P.R. 141); April 14, 2021 Domestic Interest Parties Response to Request for CV Profit and Selling Expenses (Ex. Part 1) at 10-11 (P.R.153).

[6] Pursuant to 19 C.F.R. § 351. 414(f)(2)-(3), respondents are required to report sales of subject merchandise that precede the period of review by three months and succeed such period by two months.  Depending upon case-specific facts, such as whether there were sales of foreign like product during the month during which particular U.S. sales under consideration were made, these sales may be used in Commerce's calculation of dumping margin.  *Id*.

First, as Commerce explained, "the statutory provisions on CV profit, profit cap, and CEP profit contain no express limitation on the use of other parties' BPI to fulfill the statutory directive." IDM at 37. Commerce explained that its "administrative protective order (APO) system was established to provide parties with access to other parties' business proprietary information through the issuance of an APO that allows a party's counsel or its representative access to such information." *Id*. The system strikes an appropriate balance between the need to protect business proprietary information of an interested party (which is used in Commerce's calculations) from its competitors, while allowing all interested parties to have their representatives with APO access to review and comment on such information.

Commerce explained that "Hyundai Steel's counsel received access to SeAH's BPI through the APO that was issued by Commerce on November 2, 2020." *Id*. Although Hyundai's executives indeed had no authorized access to the proprietary data of their competitor, Hyundai's counsel and trade/economic consultants were granted full and unimpeded access to SeAH's BPI data. P.R. 321 at pdf page 6. Further, the record demonstrates that Hyundai submitted arguments to Commerce on the issue of CV profit that specifically discussed SeAH's BPI. Hyundai's Case Br. at 22-23 (C.R. 313; P.R. 281) (citing SeAH's Prelim. Calc. Memo at third country database, C.R. 302-306; P.R. 259-263).

Second, Hyundai's arguments are internally inconsistent. On the one hand, Hyundai faults Commerce for using SeAH's proprietary data to which Hyundai's representatives *had* access to under the APO. On the other hand, in its case brief, Hyundai advocated that Commerce should have used alternative profit sources (financial statements of companies that are not involved in this proceeding), even though neither Hyundai nor its counsel had access to the underlying proprietary sales and cost data on which the profit calculations in the financial

17

statements of such companies were based.  Hyundai's Case Br. at 24-26 (C.R. 313; P.R. 281).

## III.   Commerce Properly Calculated The CV Profit Cap Based On Facts Available

In calculating the CV profit under any other reasonable method pursuant to 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce properly calculated the CV profit cap based on "facts available." The relevant statutory provision provides that when Commerce applies "any other reasonable method" alternative (iii), the "amount allowed for profit may not exceed the amount normally realized by the exporters or producer (other than the exporter described in clause (i)) in connection with the sale, for consumption in the foreign country of merchandise in the same general category as the subject merchandise."  19 U.S.C. § 1677b(e)(2)(B)(iii).  Neither Hyundai's nor SeAH's reported profit satisfies the requirements of the profit cap under the statute and, thus, Commerce determined the profit cap based on "facts available" using the profit from SeAH's third-country sales of OCTG as the best available information.

SeAH's profit, which Commerce used as facts available profit cap, reflected the production of OCTG in Korea by a Korean producer and sales of OCTG in the third-country market.  This is substantially the same profit cap as the profit cap that the Federal Circuit and this Court sustained in litigation regarding the 2015-2016 administrative review of this antidumping duty order.  *NEXTEEL*, 392 F. Supp. 3d at 1290, vacated on other grounds but affirmed with respect to CV profit and profit cap by *NEXTEEL II*, 28 F.4th at 1240-41.[7]

Hyundai contends that "Commerce's CV profit cap determination was unsupported by the record evidence and contrary to law."  Hyundai Br. at 21.  Hyundai contends that "Commerce has mistaken the reference products identified under the profit cap provision of option (iii)."  *Id*.  Hyundai also speculates that "a single source (even if that source is linked to

---

[7] Although SeAH's third-country sales on which the profit cap was based in that review were from Canada rather than Kuwait, this distinction is not material.

sales only of the foreign product) could skew the CV profit rate incorrectly upwards or downwards and could easily not reflect the amount of profit "normally realized by as required under option (iii)." *Id*. at 22. Additionally, Hyundai contends that Commerce's facts available profit cap is erroneous because this Court has rejected "an absence of information" excuse. *Id*. at 23. Finally, Hyundai contends that SeAH's profit rate is "abnormally high," and that Commerce failed to sufficiently explain why SeAH's data was the best information available for calculating the profit cap. *Id*. at 25. Hyundai's contentions lack merit.

Hyundai mischaracterizes Commerce's determination when it suggests that Commerce confused the terms foreign like product and the same general category of products as subject merchandise. Hyundai Br. at 21. There is no dispute that the profit cap under 19 U.S.C. § 1677b(e)(2)(B)(iii) references the "same general category of products as subject merchandise" and that the term "same general category" is broader than "foreign like product." In this review, Commerce determined that "the record does not contain profit information for sales in Korea of OCTG *or products in the same general category*." IDM at 42 (emphasis added). Commerce further found that:

> No party disputes that neither mandatory respondent had a viable home market. Neither does any party contend that the alternate sources of CV profit on the record fully represent data described under the profit cap as they are all for third-country. There is no robust market for OCTG within Korea, so sources for profits are limited; *the record of this review does not contain information regarding profits earned on Korean sales of OCTG or products in the same general category of merchandise as OCTG.*

*Id*. (emphasis added).

Commerce did not, as Hyundai contents, confuse the statutory terms. Commerce made an express finding that the record of this review contained no information regarding profits earned on Korean sales of products in the same general category. As explained earlier, the

19

"same general category of products" in this proceeding is limited to products suitable for "down hole" applications in oil and gas wells such as subject OCTG, non-subject OCTG and drill pipe and does not include line pipe, standard pipe and other non-OCTG pipe. *Husteel*, 180 F. Supp. 3d at 1341-42; *Notice of Scope Ruling*, 85 Fed. Reg. 7,921, 7,922 (Dep't of Commerce Feb. 10, 2020). When selecting the best available information, Commerce reasonably considered the fact that SeAH's profit data from third-country sales of OCTG reflected profit from OCTG, which are part of the same general category of products. IDM at 43 ("SeAH's profit data from the sale of OCTG in its third-country market are the best data to be used as the "facts available" profit cap, because they are specific to OCTG and represent the production experience of a Korean OCTG producer in Korea."). Moreover, Commerce reasonably found that (unlike the alternative profit sources on the record) SeAH's data "are not distorted by the production and sale of products not considered to be in the same general category of products as OCTG." *Id*.

The Federal Circuit held that 19 U.S.C. § 1677b(e)(2)(B)(iii) "describes the quantity Commerce must calculate—the profits normally realized by other exporters," but "does not limit the data Commerce may rely on to calculate it" when calculating facts available profit cap. *NEXTEEL II*, 28 F.4th at 1241. Commerce's evaluation of available profit sources is reasonable. SeAH's profit data are the only profit source on the record that is "not distorted by the production and sale of products not considered to be in the same general category of products as OCTG." IDM at 43. Unlike financial statements of other companies, it represents production experience of a Korean OCTG producer and exporter. *Id*. To the extent that Hyundai contends that using "a single source (even if that source is linked to sales only of the foreign product) could skew the CV profit rate incorrectly upwards or downwards," Hyundai Br. at 22, Hyundai's concern about *potential* distortions is outweighed by the fact that the profit in other alternative

sources on the record contains an *actual* distortion because it includes sales of products *outside* the same general category of products.

Hyundai's attempt to compare SeAH's profit to profit from other sources, while asserting that SeAH's profit is abnormally high, is flawed because the alternative sources include, in part, profit from non-comparable products. It is illogical to compare profit from sales of Korean-made OCTG to profit that is derived, in part, from sales of such dissimilar products as Russian power generation pipe, Japanese chemicals and steel sheet, Taiwanese coils, or Turkish automotive tube and water transmission pipe. *See* SeAH April 14, 2021 CV Profit and Selling Expense Submission (Part 2) at Attachment 2-C, at 73 (Russian power generation pipe) (P.R. 140) & (Part 5) at Attachment 4-B, at 26 and 48 (Turkish water transmission pipe and automotive tube) (P.R. 143); Hyundai April 14, 2021 CV Profit and Selling Expense Submission (Part 2) at Exhibit 3 (Financial Statement) at 16, 17, 55-56 (chemicals) and 55-56 (steel sheet) (146); Hyundai April 14, 2021 CV Profit and Selling Expense Submission (Part 2) at Exhibit 2 (Product Information), at 3 ("CHA's main carbon products include hot-rolled steel coils."). For the same reasons, Hyundai's attempt to compare SeAH's overall profit rate with the profit rate from its third-country sales of OCTG is flawed. Hyundai's Br. at 26-27 (contending that SeAH's profit of 16.3 percent from sales of OCTG to Kuwait is significantly higher than SeAH's profit of 8.8 percent from overall operations).[8] SeAH's profit rate from overall operations is different because in addition to sales of OCTG to third-country markets, it includes both profit from OCTG dumped in the U.S. market as well as from sales of lower end merchandise that it outside

---

[8] Contrary to Hyundai's assertions that SeAH's profit from sales of OCTG in Kuwait is abnormally high, SeAH's profit of 16.3 percent from sales of OCTG in Kuwait is almost identical to the average CV profit of 16.2 percent (based on sales of two OCTG producers) that Commerce used on remand in the original investigation, which this Court sustained. *See* February 22, 2016 Remand Redetermination, Consol. Court No. 14-00215, at 52.

of the same general category of products as subject merchandise.  *See, e.g.*, SeAH July 26, 2021

SQR, Vol II, at Appendix SA-5-A, at pdf 383-384 (C.R. 206).

Further, Hyundai's assertions that Commerce's facts available profit cap is erroneous

because this Court has rejected "an absence of information" excuse are contrary to the

controlling law.  The Federal Circuit held that where, as here, due to the absence of data,

Commerce cannot calculate the profit cap under alternative (iii), the agency may either determine

the profit cap on the basis of facts available or, alternatively, conclude that there is no

information on the record that can serve as a suitable profit cap.  *Mid Continent Steel and Wire*

*Inc. v. United States*, 941 F.3d 530, 545-46 (Fed. Cir. 2019) (sustaining Commerce's

determination that it was unable to calculate profit cap due to the absence of information that

could serve as a suitable profit cap); *NEXTEEL*, 392 F. Supp. 3d at 1290 (affirming use of

SeAH's third-country sales as the facts available profit cap); *NEXTEEL II*, 28 F.4th at 1241

(same); Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1 at 841

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177 ("The Administration also recognizes that

where, due to the absence of data, Commerce cannot determine amounts for profit under

alternatives (1) and (2) or a 'profit cap' under alternative (3), it might have to apply alternative

(3) on the basis of "the facts available.").  Commerce's "facts available" profit cap in this case is

also based on SeAH's third-country sales of OCTG.

Hyundai's reliance on this Court's decision in *Husteel v. United States*, 98 F. Supp. 3d

1315, 1349 (Ct. Int'l Trade 2015) is misplaced.  In that administrative determination, Commerce

was unable to calculate a profit cap for Korea under section (iii) because there was no home

market profit data for other exporters and producers in Korea of the same general category of

products.  This Court found that even if Commerce's finding was reasonable, "Commerce was

still required to attempt to apply the profit cap on the basis of facts available." *Husteel*, 98 F.

Supp. 3d at 1349.  Following a remand, in which Commerce attempted to apply a facts available

profit cap, the Court sustained Commerce's determination, stating that while Commerce's

approach essentially constituted a failure to calculate the cap based on actual data, the approach

was necessitated by the data limitations on record, which (as here) contained imperfect profit

sources, and was reasonable.  *Husteel*, 180 F.Supp.3d at 1347-48.  ("Commerce's failure to cap

the profit rate, however, was reasonable based on the record . . . . Commerce was faced with a

difficult decision as all of the information on the record had imperfections, and the court is not

persuaded that any of the 'caps' suggested by Respondents fulfill the statute any better than no

cap").

Here, Commerce calculated a profit cap based on facts available using SeAH's third-

country sales as best available information.  IDM at 42.  Contrary to Hyundai's unsupported

assertions, Commerce examined the alternative profit sources on the record and concluded that

SeAH's data was the best available information for using as the profit cap:

> In the current POR review, neither Hyundai Steel nor SeAH has a
> viable home market, and none of the CV profit sources placed on
> the record by interested parties show "the amount realized by
> exporters or producers in connection with the sale, for
> consumption in the foreign country, of the merchandise in the
> same general category of products as the subject merchandise."
> Moreover, the record of this review does not contain any
> information regarding profits earned on Korean sales of products
> in the same category of merchandise as OCTG.

PDM at 31 (P.R. 248); IDM at 43 (stating that Commerce examined the alternative source in the

Preliminary Results as well as reexamined them for the Final Results and found no grounds to

reach a different conclusion).  Commerce's selection of a facts available profit cap based on

profit from third-country sales of OCTG, which were produced in Korea by a Korean exporter

and producer is a reasonable proxy for profits normally realized by Korean exporters and producers from sales of merchandise in the same category of merchandise.  In contrast to the alternative profit sources, which *all* include sales of products that are outside the same general category of merchandise, "SeAH data meet the CV profit requirements for use with regard to SeAH under the preferred method of the law and *are not distorted by the production and sale of products not considered to be in the same general category of products as OCTG*."  IDM at 43 (emphasis added).  Moreover, as stated earlier, this Court and the Federal Circuit previously sustained identical profit cap, which was based on SeAH's third-country sales to Canada.  *NEXTEEL*, 392 F. Supp. 3d at 1290, vacated on other grounds and affirmed with respect to profit cap by *NEXTEEL II*, 28 F.4th at 1241 ("We thus affirm the holding of the Court of International Trade that Commerce's application of the profit cap was lawful.").

Finally, for its part, SeAH attempts to distinguish the Federal Circuit's decision in *NEXTEEL II* by arguing that the decision "involved different facts and issues than the case before this Court."  SeAH Br. at 4, n. 9.  Specifically, SeAH contends that the main issue on appeal was whether 19 U.S.C. § 1677b(e)(2)(B)(iii) allowed Commerce to base calculation of CV profit and CV profit cap on respondent's own information.  *Id*.  Although the issue before the Federal Circuit centered on SeAH's argument that "Commerce's use of SeAH's own sales to set the profit cap is directly prohibited by the phrase 'other than the exporter or producer described in clause (i)'", the Federal Circuit concluded that "SeAH misreads the statute" and upheld this Court's decision to sustain Commerce's calculation of the profit cap using SeAH's third-country data.  *NEXTEEL II*, 28 F.4 at 1241.

Moreover, contrary to SeAH's assertion, the facts of that case were not materially different. *NEXTEEL II*, 28 F.4 at 1241 ("Commerce ultimately relied again on SeAH's Canadian sales as a profit cap based on 'facts available.'").[9]  In the underlying case, this Court sustained Commerce's calculation of the profit cap that was based on SeAH's third-country sales, rejecting substantially identical arguments that SeAH advances in this case.  *Compare NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276, 1290 (Ct. Int'l Trade 2019) ("Specifically, SeAH argues that Commerce's 'use of the same figures to determine both the profit rate and the 'profit cap' means that no 'profit cap' was actually applied,' and that Commerce erred in not applying a profit cap based upon the profit earned on all home-market sales of merchandise in the same general category of merchandise.") *with* SeAH Br. at 4 ("The use of the same figures to determine both the profit rate and the profit cap means that no profit cap was actually applied, in contravention of the requirements of the statute.").  SeAH's decision to focus its Federal Circuit appeal on its failed statutory interpretation argument, which the Federal Circuit rejected, does not invalidate this Court's underlying decision that sustained Commerce's use of SeAH's third-country profit data as 'facts available' profit cap.

SeAH also contends that it "does not oppose the methodology Commerce used in the remand determination concerning the original investigation of this case" where "Commerce applied a profit cap based on 'the average of the profits in the global market earned by Tenaris and TMK.'"  SeAH Br. at 4.  In that remand, Commerce attempted to calculate the facts available CV profit cap using the same data that it used to determine the CV profit, namely the average of profit rates of two producers, Tenaris and TMK.  *Husteel*, 180 F. Supp. 3d at 1337 ("Because Commerce based this calculation on the average profit rate earned by Tenaris and

---

[9] It is immaterial whether SeAH's third-country sales are made to Canada or to Kuwait, because Commerce used profit from SeAH's OCTG sales in a viable third-country market.

TMK, Commerce's calculation with the 'cap' was the same as the CV Profit rate calculation without the cap.").  Tenaris and TMK data were the best data available in that case.  In this case, however, the record is different.  Here, Commerce used superior and more precise profit data from sales of OCTG by a Korean OCTG producer in a viable market, whereas Tenaris and TMK are companies incorporated in Luxemburg and Russia and produce various products, including OCTG, outside Korea.  *See, e.g.*, Domestic Interested Parties Response to Request for Constructed Value Profit and Selling Expense Comments and Information Exhibits Part 3, at Exhibit 8, pdf page 14 (Tenaris 2020 financial statements indicating that Tenaris is incorporated under Luxemburg laws) (P.R. 156).

Commerce reasonably used data that are more specific to both the exporting country and the product under consideration than Tenaris and TMK data (as SeAH's profit reflects production of OCTG in Korea by a Korean OCTG producer).  In contrast, Tenaris and TMK data reflect production in countries other than Korea and are based, in part, on profit from products that are outside the same general category of products as OCTG.  *See, e.g.*, SeAH CV Submission (Part 2) at Attachment 2-C, at 57, 73, 85, 93, 99 (P.R. 139-140) (TMK's 2020 financial statements indicate that TMK produced line pipe, process and power generation pipe, structural and standard pipe, mechanical tube and semi-finished products); Domestic Interested Parties Response to Request for Constructed Value Profit and Selling Expense Comments and Information Exhibits Part 1, at Exhibit 6, pdf page 304 (Tenaris 2019 financial statements) (P.R. 154) and Exhibits Part 3, at Exhibit 8, pdf page 18 (Tenaris 2020 financial statements) (P.R. 156) (Tenaris 2019 and 2020 financial statements indicate that Tenaris produced line pipe, mechanical and structural pipe, cold drawn pipe, and other products); *see also* IDM at 40.  Thus, Commerce properly calculated CV profit cap based on facts available.

**IV.      Commerce Correctly Adjusted HSU's G&A Expense Ratio**

Commerce correctly adjusted HSU's G&A expense ratio for the cost of certain rejected

pipes.  IDM at 52.  Commerce found that the "rejected pipes were not sold as non-prime

merchandise, but that, instead, HSU gathered the rejected merchandise for months and sold it

entirely to an unaffiliated customer for complete processing into scrap metal." *Id*.  Commerce

found that "the rejected pipes were classified as scrap and were not sold for use in any pipe

applications." *Id*.  Accordingly, Commerce found that "HSU's classification of the scrap as a

type of non-subject product does not reasonably reflect the production costs of the merchandise

under consideration or the other products included within COGS {cost of goods sold}." *Id*. at

53.

Parties disagree regarding how to treat the cost of goods sold of rejected pipes that

entered the United States as prime merchandise, but that were rejected and sold as scrap.

Commerce "adjusted HSU's reported costs to include the cost associated with the rejected pipes

in the G&A expenses, and thus to be carried by the overall production and sales of the

company." *Id*. at 53.  In contrast, Hyundai contends that such costs should be treated as costs of

"a non-subject product that HSU produced from the imported OCTG and sold during the POR."

Hyundai Br. at 35.  Ironically, Hyundai does not even specify what exact non-subject product

HSU purportedly produced and sold.  Yet, Hyundai's questionnaire response shows the type of

product HSU sold:  "HSU gathered such rejected merchandise for months and *sold them as*

*scrap*."  SQR E, at SE-2 (C.R. 259) (emphasis added).  HSU imported these pipes as prime

OCTG merchandise, "these rejected pipes were not sold as non-prime merchandise or for use in

any pipe applications," but rather "were sold for complete processing into scrap metal."  IDM at

52-53.  Accordingly, Commerce reasonably concluded that HSU's classification of the scrap

(which resulted from rejected products that were imported as prime OCTG merchandise to be further processed) as non-subject merchandise does not reasonably reflect the production costs of the merchandise under consideration. *Id.* at 53.

Hyundai contends that "Commerce misconstrued the record facts." Hyundai's Br. at 36. Hyundai is wrong. There is no disagreement that the pipe at issue was imported to the United States as the prime pipe (*i.e.*, OCTG) and later rejected and sold as scrap. This does not mean, however, that the cost of goods sold relates to non-subject merchandise, as Hyundai claims. But for the defect and rejection, these pipes, which entered the United States as prime products, would have been sold to unaffiliated U.S. customers as subject merchandise after further processing. However, when these products were rejected, HSU did not sell them as non-prime merchandise or products for any pipe applications, but rather sold them as scrap. IDM at 52-53.

In making the adjustment, Commerce disagreed with both the domestic industry's approach and Hyundai's approach. Specifically, Commerce disagreed with the domestic industry's suggestion that the difference between the scrap sales value and the original cost of producing the rejected OCTG should be attributed to Hyundai's OCTG further manufactured products as a direct cost. *Id.* at 53. Commerce similarly disagreed with Hyundai that the cost of goods sold for rejected pipes should be attributed to non-subject products and, thus, excluded from the G&A calculations. *Id.* Instead, Commerce found that the cost of the scrap should be borne by all products produced and sold by the further manufacturer. Commerce explained that the "costs associated with the rejected pipes were necessarily covered by HSU generally; that is, by all the other products HSU further manufactured and sold." *Id.*

This was a reasonable and balanced position, which is supported by the record. Based on Hyundai's questionnaire responses, Commerce concluded that "Hyundai Steel sold subject

merchandise during the POR to HSU, which sold the products to unaffiliated U.S. customers."
*Id.*  Further, based on Hyundai's reporting, Commerce concluded that "most of the OCTG that
Hyundai Steel sold through HSU was processed after importation in the United States but prior
to sale; processing included threading, attaching a coupling (or providing a coupling separately),
heat-treating, and/or upsetting the end of the pipe" and that "the U.S. processing was performed
by unaffiliated outside processors to which HSU paid a fee for the processing services provided."
*Id.*  HSU compiled rejected products after further processing of OCTG and "sold them as scrap."
SQR E, at SE-2 (C.R. 259).  Commerce reasonably attributed the costs of rejected products
turned into scrap to "HSU's G&A expenses {that} support the general operations of this selling
entity and are recovered by HSU through both direct and further processed sales."  IDM at 53.

Hyundai contends that based on its questionnaire responses the cost was classified in
HSU's accounting records in a manner that suggests that "the COGS for scrap is not related to
'general operations' of the company as a whole" and that "scrap derives specifically from HSU's
production operations from the imported OCTG."  Hyundai Br. at 36-37.  However, the fact
remains that rejected OCTG products were sold by HSU "as scrap."  SQR E, at SE-2 (C.R. 259).
When the scrap is derived from further processing the subject merchandise (OCTG), it makes no
sense to attribute the cost to non-subject products.  There is no evidence on the record that HSU,
a company with no production facilities,[10] is engaged in the business of importing subject
merchandise (OCTG) to further process it through a tolling arrangement into non-prime
products.  To the contrary, Hyundai acknowledges, as it must, that "HSU's business model

---

[10] Other than the cost of the direct materials that are supplied to the unaffiliated processors (*e.g.*,
OCTG, couplings, protectors), the only further manufacturing expense that HSU incurs is the
processing fee it pays to the unaffiliated processors.  *See* Hyundai Feb. 25, 2021 Section E
Questionnaire Response (Part 1), at E-6 though E-11 (C.R. 103).

during the POR was as a *manufacturer of threaded and coupled OCTG*."  Hyundai's Br. at 37 (emphasis added).

Logically, when a defect in further processing of OCTG occurs, the resulting cost must be covered either by the whole operations of HSU that sells OCTG with and without further processing (and included in the G&A expense calculation, as Commerce did), or by the proceeds from the sale of further manufactured OCTG (in which case, it would be attributed to further manufactured OCTG products as direct cost, as domestic interested parties suggested). However, it is unreasonable to exclude the cost of rejected and scrapped OCTG from the dumping calculations by pretending that HSU is engaged in the business of purchasing expensive high-end products (OCTG) and further processing them into some unspecified non-subject products.  Thus, Commerce properly adjusted HSU's G&A expense ratio.

## V.   Commerce Properly Applied Neutral Facts Available To Adjust HSU's Yield Loss

Commerce properly applied neutral facts available to adjust HSU's reported further manufacturing costs to account for HSU's yield loss.  IDM at 65-66.  In their administrative case brief, domestic interested parties alleged that "U.S. further manufacturing results in a certain amount of material yield loss that is not accounted for in Hyundai Steel's current reporting where it dismissed the 'further manufacturing yield' field (*i.e.*, FURMANYLD) as 'not applicable.'" *Id.* at 63.  Specifically, they argued that HSU "is paying third parties to perform processing; whatever scrap ends up on the factory floor of the U.S. processing operation is not Hyundai Steel's to claim, but rather is retained by the processor and doubtless priced into the processor's fees."  *Id.*  Commerce agreed and found that "HSU's reported costs need to be adjusted to account for the value of the pipe lost in the course of further processing."  *Id.* at 66.

Commerce found that Hyundai cooperated with information request to the best of its ability, despite HSU's failure to track the actual length and quantity of the subject merchandise before processing and its inability to obtain such information from processors. *Id.* at 63. However, Commerce also found that Hyundai "did not fully explain whether the scrap generated during the further manufacturing processes is kept by the processors or returned to HSU; nor did it explain how the value of the generated scrap is reflected in the invoices received from its processors." *Id.* at 66. Accordingly, Commerce found that "necessary information is not available on the record, pursuant to section 776(a)(1) of the Act, and that application of facts available is, therefore, appropriate." *Id.* As a result, as neutral facts available Commerce adjusted HSU's reported further manufacturing costs to include an amount for yield loss, which Hyundai reported as "not applicable." *Id.* at 63, 65.

Hyundai's contention that it complied with Commerce's reporting requirements by reporting theoretical weights misses the point. Hyundai Br. at 38-41. Commerce did not find that Hyundai failed to cooperate to the best of its ability, but rather that the necessary information regarding the further manufacturing yield loss is not on the record. Hyundai's responses "{do} not fully explain whether the scrap generated during the further manufacturing process is kept by the unaffiliated processors or returned to HSU, nor do they explain how the value of generated scrap is reflected in the invoices." IDM at 66. Hyundai contends, however, that because it reported its expenses based on theoretical weight, its per unit sales prices and expenses are not affected by any subsequent yield losses during the further manufacturing process. Hyundai Br. at 40. Hyundai is incorrect. Even when expenses and sales prices are reported based on theoretical weight, it does not resolve the issue of whether the scrap from further manufacturing was retained by the toll processors or returned to HSU and whether it

affected the processing fee. If the unaffiliated toll processors were allowed to retain the scrap resulting from further manufacturing (which would enable them to earn additional revenue by selling scrap), they would likely charge a lower processing fee, artificially lowering HSU's expenses.

Hyundai's hypothetical example (Hyundai Br. at 40-41) fails to address the issue because it presupposes that the value of scrap resulting from further manufacturing could not have been factored into the processing fee. The hypothetical could make sense if Hyundai demonstrated that all scrap resulting from further manufacturing by the unaffiliated processor was returned to HSU. Otherwise, Hyundai effectively granted itself a scrap offset by paying and reporting a processing fee that is reduced by the scrap value retained by the processor. Hyundai, however, fails to identify record evidence demonstrating that the processor returned scrap resulting from further manufacturing to HSU. *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2017) ("It is the respondent's burden to create the record.") (citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002); *Quingdao Sea-Line Trading Co. v. United States*, 36 C.I.T. 451, 460, (Ct. Int'l Trade 2012) ("Ultimately, the burden of creating an adequate record lies with the respondents, not Commerce"). Thus, Commerce properly adjusted HSU's yield loss based on neutral facts available.

## VI.    The Court Should Remand With Respect To Calculation Of The CEP Profit Rate

Hyundai alleges several errors in Commerce's selection of the source for calculating CEP profit rate among several potential sources of CEP profit. Hyundai Br. at 29-36. Hyundai contends, among other things, that some of Commerce's findings are based on an incorrect understanding of the administrative record. *Id.* at 33. For example, Hyundai contends that Commerce incorrectly found that only Hyundai's proposed Option 3 and SeAH's data reflected

CEP sales, whereas Option 4 also reflected CEP sales and SeAH's data did not. *Id*.

The Government respectfully requests the Court to remand the issue of CEP profit rate, without confessing error, so that Commerce may reexamine the administrative record, reconsider its prior position and, if appropriate, recalculate the CEP profit rate. *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001). In *SKF USA*, the Federal Circuit outlined three separate scenarios in which an agency may seek a remand: (1) to reconsider its decision because of intervening events outside of the agency's control; (2) to reconsider its previous position (absent any intervening events) without confessing error; and (3) to change the result because the agency believes the original decision was incorrect on the merits. *Id.* at 1028. Moreover, remand to an agency is "appropriate to correct simple errors, such as clerical errors, transcription errors, or erroneous calculations." *Id.* at 1029.

A voluntary remand is "generally appropriate 'if the agency's concern is substantial and legitimate.'" *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1378 (Ct. Int'l Trade 2010) (quoting *SKF USA*, 254 F.3d at 1029); *see also Ad Hoc Shrimp Trade Action Committee v. United States*, 882 F. Supp. 2d 1377, 1381 (Ct. Int'l Trade 2013); *Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States,* 412 F. Supp. 2d 1330, 1338-39 (Ct. Int'l Trade 2005) (granting motion for voluntary remand, recognizing that the Government is presumed to act in good faith, and that this presumption may only be overcome by "well-nigh irrefragable proof"). "A concern is substantial and legitimate when (1) Commerce has a compelling justification, (2) the need for finality does not outweigh that justification, and (3) the scope of the request is appropriate." *Changzhou Hawd Flooring Co., Ltd. v. United States*, 6 F. Supp. 3d 1358, 1360 (Ct. Int'l Trade 2014) (citing *Baroque Timber Indus. (Zhongshan) Co., Ltd. v. United States,* 925 F. Supp. 2d 1332, 1338-39 (Ct. Int'l Trade 2013)). Furthermore, as this

Court has explained, when an agency seeks a voluntary remand "to correct a mistake or address some other substantial and legitimate concern, it is far more sensible for a court to defer to the agency whose expertise, after all, consists of administering the statute." *Gleason Indus. Prod. Inc. v. United States*, Slip Op. 07-40, 31 C.I.T. 393, 396 (Ct. Int'l Trade Mar. 16, 2007).

Commerce has a substantial and legitimate concern in reaching an accurate determination. If Commerce's analysis of the CEP profit issue is based, in part, on a misunderstanding of facts, as Hyundai appears to suggest, it calls into question the agency's selection among several CEP profit sources on the record. Moreover, these are new allegations that Hyundai makes in response to certain findings that Commerce first made in the *Final Results*. Accordingly, Commerce would like to reexamine the administrative record, reconsider its selection of the CEP profit source, and, if appropriate, recalculate the CEP profit rate.

Should the Court grant Commerce's request, we respectfully propose that the Court provide 90 days for Commerce to submit its remand results to the Court, and permit plaintiffs to file comments on the remand redetermination with the Court within 30 days after Commerce files its remand redetermination, with any response to the comments due 30 days thereafter.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final results in their entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:

/s/Hardeep K. Josan
HARDEEP K. JOSAN

MYKHAYLO GRYZLOV                Trial Attorney
Senior Counsel                  Commercial Litigation Branch
Office of the Chief Counsel     Civil Division
    for Trade Enforcement & Compliance    U.S. Department of Justice
U.S. Department of Commerce     26 Federal Plaza, Suite 346
                                New York, New York 10278
                                Tel.: (212) 264-9245
                                Fax:  (212) 264-1916
                                Email: hardeep.k.josan@usdoj.gov

December 8, 2022                 Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this

Court, that this brief contains 10,506 words, excluding the table of contents, table of authorities,

any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's

signature, as calculated by the word processing system used to prepare this brief (Microsoft

Word).

<u>s/ Hardeep K. Josan</u>
Hardeep K. Josan
Trial Attorney
Department of Justice
Civil Division
