Slip Op. 23-87

# UNITED STATES COURT OF INTERNATIONAL TRADE

HYUNDAI STEEL COMPANY,

     **Plaintiff,**

AJU BESTEEL CO., LTD.,
NEXTEEL CO., LTD., and
HUSTEEL CO., LTD.,

     **Consolidated Plaintiffs,**

and

HUSTEEL CO., LTD., NEXTEEL
CO., LTD., and SEAH STEEL
CORPORATION,

     **Plaintiff-Intervenors,**

v.

UNITED STATES,

     **Defendant,**

and

VALLOUREC STAR, L.P.,
WELDED TUBE USA INC., and
UNITED STATES STEEL
CORPORATION,

     **Defendant-Intervenors.**

**Before:  Jennifer Choe-Groves, Judge**

**Consol. Court No. 22-00138**

## OPINION AND ORDER

[Sustaining in part and remanding in part the final results of the administrative review by the U.S. Department of Commerce in the countervailing duty investigation of certain oil country tubular goods from the Republic of Korea.]

Dated:  June 9, 2023

Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, D.C. argued for Plaintiff Hyundai Steel Company and Consolidated Plaintiff AJU Besteel Co., Ltd. With him on the brief was Robert G. Gosselink.

Brady W. Mills, Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, and Eugene Degnan, Morris, Manning & Martin, LLP, of Washington, D.C., for Consolidated Plaintiff and Plaintiff-Intervenor Husteel Co., Ltd.

Henry D. Almond, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., argued for Consolidated Plaintiff and Plaintiff-Intervenor NEXTEEL Co., Ltd. With him on the brief were J. David Park, Daniel R. Wilson, and Kang Woo Lee.

Jeffrey M. Winton, Amrietha Nellan, Ruby Rodriguez, Jooyoun Jeong, Michael J. Chapman, and Vi Mai, Winton & Chapman PLLC, of Washington, D.C., for Plaintiff-Intervenor SeAH Steel Corporation.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Mykhaylo Gryzlov, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Roger B. Schagrin, Benjamin J. Bay, Christopher T. Cloutier, Elizabeth J. Drake, Jeffrey D. Gerrish, Joseph A. Laroski, Jr., Kelsey M. Rule, Luke A. Meisner, Michelle R. Avrutin, Nicholas J. Birch, Saad Y. Chalchal, and William A. Fennell, Schagrin Associates, of Washington, D.C., for Defendant-Intervenors Vallourec Star, L.P. and Welded Tube USA Inc.

James E. Ransdell, IV, Thomas M. Beline, Myles S. Getlan, Nicole Brunda, and Sarah E. Shulman, Cassidy Levy Kent (USA), LLP, of Washington, D.C., argued for Defendant-Intervenor United States Steel Corporation.

Choe-Groves, Judge:  This action arises from the results of the U.S. Department of Commerce ("Commerce") in the antidumping administrative review of Oil Country Tubular Goods ("OCTG") from the Republic of Korea ("Korea") for September 1, 2019 through August 31, 2020 ("Period of Review").  Summons, ECF No. 1; Compl., ECF No. 8.  Plaintiff Hyundai Steel Company ("Plaintiff" or "Hyundai Steel") filed this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii) contesting Commerce's final results in Certain Oil Country Tubular Goods From the Republic of Korea ("Final Results"), 87 Fed. Reg. 20,815 (Dep't of Commerce Apr. 8, 2022) (final results of antidumping duty administrative review and final determination of no shipments; 2019–2020), and accompanying Issues and Decisions Memorandum ("Final IDM"), ECF No. 41-5.

Before the Court is Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record ("Plaintiff's Motion").  Pl.'s R. 56.2 Mot. J. Agency R., ECF Nos. 55, 59; Pl.'s Mem. Supp. R. 56.2 Mot. Pl. J. Agency R. ("Pl.'s Br."), ECF Nos. 55-2, 59-2. Consolidated Plaintiff and Plaintiff-Intervenor Husteel Co., Ltd. ("Husteel") filed Husteel's Motion for Judgment on the Agency Record and Brief in Support of its Motion for Judgment on the Agency Record incorporating and supporting the arguments raised in Plaintiff's Motion.  Husteel's Mot. J. Agency R., ECF No. 54;

Husteel's Br. Supp. Mot. J. Agency R. ("Husteel's Br."), ECF No. 54-2.  Plaintiff-
Intervenor SeAH Steel Corporation ("SeAH"), Consolidated Plaintiff and Plaintiff-
Intervenor NEXTEEL Co., Ltd. ("NEXTEEL"), and Consolidated Plaintiff AJU
Besteel Co., Ltd. ("AJU Besteel") filed SeAH's Motion for Judgment on the
Agency Record, NEXTEEL's Rule 56.2 Motion for Judgment Upon the Agency
Record, and AJU Besteel's Rule 56.2 Motion for Judgment Upon the Agency
Record, each incorporating and expanding upon arguments raised in Plaintiff's
Motion.  SeAH's Mot. J. Agency Record, ECF No. 56; SeAH's Br. Supp. Rule
56.2 Mot. J. Agency R. ("SeAH's Br."), ECF No. 56-1; NEXTEEL's Mot. J.
Agency R., ECF No. 57; NEXTEEL's Mem. Supp. NEXTEEL's R. 56.2 Mot. J.
Agency R. ("NEXTEEL's Br."), ECF No. 57-2; AJU Besteel's R. 56.2 Mot. J.
Agency R., ECF No. 58; AJU Besteel's Mem. Supp. R. 56.2 Mot. J. Agency R.
("AJU Besteel's Br."), ECF No. 58-2.

Defendant United States ("Defendant") filed Defendant's Response in
Opposition to Motions for Judgment Upon the Administrative Record.  Def.'s
Resp. Opp'n Mot. J. Admin. R. ("Def.'s Resp."), ECF No. 60.  Defendant-
Intervenors United States Steel Corporation, Vallourec Star, L.P., and Welded
Tube USA, Inc. (collectively, "Defendant-Intervenors") filed Response Brief of
Defendant-Intervenors in Opposition to Rule 56.2 Motions for Judgment on the
Agency Record.  Def.-Intervs.' Resp. Br. Opp'n R. 56.2 Mots. J. Agency R.

("Def.-Intervs.' Resp."), ECF No. 61.  Plaintiff, Husteel, AJU Besteel, and

NEXTEEL filed replies.  Husteel's Reply Br. Supp. Mot. J. Agency R. ("Husteel's

Reply"), ECF No. 62; Pl.'s Reply Def.'s Def.-Intervs.' Resp. Br. Opp'n Pl.'s R.

56.2 Mot. J. Agency R. ("Pl.'s Reply"), ECF Nos. 63, 64; AJU Besteel's Reply Br.

Supp. R. 56.2 Mot. J. Agency R. ("AJU Besteel's Reply"), ECF No. 65;

NEXTEEL's Reply Br. Supp. R. 56.2 Mot. J. Agency R. ("NEXTEEL's Reply"),

ECF No. 66.

For the following reasons, the Court sustains in part and remands in part

Commerce's <u>Final Results</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's use of SeAH's business proprietary information was
   in accordance with law;

2. Whether Commerce's calculations of constructed value, constructed value
   profit cap, and constructed export price were supported by substantial
   evidence;

3. Whether Commerce's adjustments to Hyundai Steel USA's general and
   administrative expense ratio were supported by substantial evidence;

4.   Whether Commerce's use of neutral facts available and adjustment to Plaintiff's reported further manufacturing yield loss were supported by substantial evidence;

5.   Whether the weighted-average dumping margin for non-examined respondents should be remanded to allow for recalculation consistent with potential changes to SeAH's weighted-average dumping margin; and

6.   Whether NEXTEEL is barred from relief in this action because NEXTEEL failed to raise its arguments before the administrative agency.

## BACKGROUND

Commerce published an antidumping duty order covering OCTG from Korea on September 10, 2014.  Certain Oil Country Tubular Goods From India, the Republic of Korea, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam, 79 Fed. Reg. 53,691 (Dep't of Commerce Sept. 10, 2014) (antidumping duty orders; and certain oil country tubular goods from the Socialist Republic of Vietnam: amended final determination of sales at less than fair value). Commerce invited interested parties to request an administrative review for the period of September 1, 2019 through August 31, 2020.  Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review, 85 Fed. Reg. 54,349 (Dep't of Commerce Sept. 1, 2020).  United States Steel Corporation, Maverick Tube Corporation, Tenaris Bay

City, Inc., and IPSCO Tubulars Inc. requested review of 33 producers and

exporters of the subject goods.  See Commerce's Decision Mem. Prelim. Results

2019–2020 Admin. Rev. Antidumping Duty Order on Certain Oil Country Tubular

Goods from the Republic of Korea ("Prelim. DM") at 1–2, PR 248.[1]  Hyundai

Steel, SeAH, NEXTEEL, Husteel, AJU Besteel, and ILJIN Steel Corporation

requested examinations of themselves.  Id. at 2; NEXTEEL's Request Admin.

Rev., PR 1; Pl.'s Request Admin. Rev., PR 4; AJU Besteel's Request Admin. Rev.,

PR 5.  Commerce initiated an administrative review on October 30, 2020.

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 85

Fed. Reg. 68,840 (Dep't of Commerce Oct. 30, 2020); Prelim. DM at 1–2.

Commerce selected Hyundai Steel and SeAH as mandatory respondents for

individual examination.  Commerce's Resp. Selection Mem. (Dec. 18, 2020), PR

30.

 Commerce released preliminary results of the administrative review on

September 29, 2021.  Certain Oil Country Tubular Goods From the Republic of

Korea ("Preliminary Results"), 86 Fed. Reg. 54,928 (Dep't of Commerce Oct. 5,

2021) (preliminary results of antidumping duty administrative review and

preliminary determination of no shipments; 2019–2020); Prelim. DM.  Commerce

---

[1]  Citations to the administrative record reflect the public record ("PR") numbers
filed in this case, ECF No. 68.

determined preliminary weighted-average dumping margins of 19.38 percent for

Plaintiff, 3.85 percent for SeAH, and 11.62 percent for non-examined companies.

Preliminary Results, 86 Fed. Reg. at 54,929.  In the Preliminary Results,

Commerce calculated Plaintiff's constructed value profit and selling expenses

using the business proprietary information of SeAH regarding SeAH's third-

country sales of OCTG to Kuwait.  Prelim. DM. at 30–31.  Commerce published

the Final Results on April 8, 2022, in which Commerce calculated weighted-

average dumping margins of 19.54 percent for Plaintiff, 3.85 percent for SeAH,

and 11.70 percent for non-examined companies.  Final Results, 87 Fed. Reg. at

20,816.  Commerce continued to calculate Plaintiff's constructed value profit and

selling expenses using SeAH's combined constructed value profit and selling

expenses for third-country market sales in Kuwait.  Final IDM at 37.  Commerce

also used SeAH's third-country sales data to calculate constructed export price

profit.  Id. at 44–47.

   Plaintiff and Consolidated Plaintiffs initiated four separate actions against

Defendant challenging aspects of the Final Results.  Compl.; Summons; AJU

Besteel Co., Ltd. v. United States, Court No. 22-00139; Nexteel Co., Ltd. v. United

States, Court No. 22-00140; Husteel Co., Ltd. v. United States, Court No. 22-

00143.  The Court consolidated the four cases into to this action.  Order (June 28,

2022), ECF No. 43.  The Court held oral argument on the pending motions for

judgment on the agency record on March 22, 2023.  Docket Entry, ECF No. 72.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28

U.S.C. § 1581(c), which grant the Court authority to review actions contesting the

final results of an administrative review of an antidumping duty order.  The Court

will hold unlawful any determination found to be unsupported by substantial

record evidence or otherwise not in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## STATUTORY FRAMEWORK

Commerce imposes antidumping duties on foreign goods if "(1) it

determines that the merchandise 'is being, or is likely to be, sold in the United

States at less than its fair value,' and (2) the International Trade Commission

determines that the sale of the merchandise at less than fair value materially

injures, threatens, or impedes the establishment of an industry in the United

States." Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306

(Fed. Cir. 2017) (quoting 19 U.S.C. § 1673(1)).  Antidumping duties are calculated

as the difference between the normal value of subject merchandise and the export

price or the constructed export price of the subject merchandise.  See 19 U.S.C.

§ 1673.

Normal value is ordinarily determined using the sales price of the subject merchandise in the seller's home market.  19 U.S.C. § 1677b(a)(1)(B)(i).  If Commerce determines that normal value cannot be calculated reliably using home market or third-country sales, Commerce may use the subject merchandise's constructed value as an alternative to normal value.  Id. § 1677b(a)(4).  The method for calculating constructed value is defined by statute.  Id. § 1677b(e).  When calculating constructed value, Commerce must utilize the respondent's actual selling, general, and administrative expenses, and profits in the respondent's home market or a third-country market.  Id. § 1677b(e)(2)(A).  If Commerce cannot rely on those data, it may look to:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale,

for consumption in the foreign country, of merchandise that is in the
same general category of products as the subject merchandise.

Id. § 1677b(e)(2)(B).

Commerce must also calculate export price or constructed export price.

Export price is:

the price at which the subject merchandise is first sold (or agreed to be
sold) before the date of importation by the producer or exporter of the
subject merchandise outside of the United States to an unaffiliated
purchaser in the United States or to an unaffiliated purchaser for
exportation to the United States, [subject to certain adjustments].

Id. § 1677a(a).  Constructed export price is:

the price at which the subject merchandise is first sold (or agreed to be
sold) in the United States before or after the date of importation by or
for the account of the producer or exporter of such merchandise or by a
seller affiliated with the producer or exporter, to a purchaser not
affiliated with the producer or exporter, [subject to certain
adjustments].

Id. § 1677a(b).  The price used to calculate export price and constructed export

price is reduced by commissions, selling expenses, further manufacturing

expenses, and the profit allocated to these expenses.  Id. § 1677a(d).

## DISCUSSION

### I.    Business Proprietary Information

In calculating Plaintiff's dumping margin, Commerce used SeAH's business

proprietary information concerning third-country sales.  Final IDM at 37.  Plaintiff

contends that Commerce's reliance on SeAH's business proprietary information

prevented Hyundai Steel from presenting effective arguments during the administrative proceedings because Plaintiff's business representatives were unable to review the proprietary data considered by Commerce.  Pl.'s Br. at 18–20. Plaintiff concedes that its counsel had access to SeAH's business proprietary information under an administrative protective order, but argues that Plaintiff's business executives, not its counsel, were best situated to confirm "that the data being used to calculate the [constructed value] profit and selling expense ratios were complete, accurate, reasonable, representative, or reliable."  Id. at 19. Plaintiff asserts that "the margin calculation methodologies used by Commerce in any proceeding should not differ or be dependent on whether a respondent is represented by counsel."  Id.

Defendant argues that Commerce is not prohibited by statute or regulation from considering business proprietary information.  Def.'s Resp. at 17.  Defendant also contends that the administrative protective order system provides parties to an administrative proceeding with an opportunity to access protected information through counsel and experts while protecting the interests of the business proprietary information's owners.  Id.

Commerce's regulations provide for documents to be filed in both "business proprietary" and "public" versions.  19 C.F.R. §§ 351.303(b), 351.304.  Business proprietary information may be made available only to individuals authorized to

review submissions under an administrative protective order, such as counsel and
experts.  Id. §§ 351.303(b)(4), 351.304(a)–(b).  The public version includes
redactions of information designated as business proprietary.  Id.
§§ 351.303(b)(4)(iv), 351.304(c).  This system allows a party access to another
party's business proprietary information while limiting the risk of unnecessary
disclosure to a business competitor.

During the administrative proceeding, SeAH's business proprietary
information was subject to an administrative protective order.  See Final IDM at
37.  Plaintiff argues that the public versions of Commerce's preliminary
constructed value profit memorandum and preliminary analysis memorandum for
SeAH did not provide sufficient detail for Plaintiff's review.  Pl.'s Br. at 18–19.
Plaintiff's counsel and consultants received access to SeAH's business proprietary
information through the administrative protective order.  Final IDM at 37; Admin.
Protective Order Service List at 6, PR 321; see also Pl.'s Br. at 19.  There exists no
statutory or regulatory requirement that Commerce allow a party access to business
proprietary information other than through counsel or that Commerce limit its use
of business proprietary information to only information reviewed by opposing
parties.  Imposing such a requirement would negate the purpose of the
administrative protective order system and would hinder the ability of Commerce
to perform its statutory directive while protecting proprietary information from

business competitors.  Plaintiff was not impaired in its ability to present its

arguments before the administrative agency by its internal business representatives

not having access to the business proprietary information because Plaintiff's

counsel and consultants were able to review and use the relevant information.

Therefore, Commerce's use of SeAH's business proprietary information was not

arbitrary and was in accordance with law.

## II.    Third-Country Sales Data

In the Final Results, Commerce used SeAH's third-country market sales data

of OCTG to Kuwait during the Period of Review to calculate Plaintiff's

constructed value profit and selling expenses and constructed export price profits.

Final IDM at 39–40, 47.  Commerce also used SeAH's third-country sales data as

the "facts available" profit cap.  Id. at 42–43.

Plaintiff asserts multiple challenges to the use of SeAH's third-country

market data.  Specifically, Plaintiff argues that in adopting SeAH's third-country

sales data for calculating constructed value, Commerce incorrectly read into the

applicable statute a preference that constructed value profit should reflect

production and sales of "foreign like products" and unreasonably used data that did

not represent Plaintiff's actual experience during the Period of Review.  Pl.'s Br. at

8, 11–17.  Plaintiff argues that Commerce's use of SeAH's data "as a reasonable

profit cap on a facts available basis" was inconsistent with the statutory objective

to identify a profit cap that best reflects a respondent's profit on sales in the foreign country.  Id. at 20–29 (quoting Final IDM at 43).  Plaintiff also challenges the use of SeAH's third-country data in Commerce's calculation of constructed export price profit as inconsistent with applicable statutory requirements and based on a misunderstanding of record evidence.  Id. at 29–35.

Defendant requests that the Court remand the issue of constructed export price profit to allow Commerce an opportunity to reexamine the administrative record.  Def.'s Resp. at 32–34.

The Court has considerable discretion in deciding whether to grant a request for remand by the Government.  See SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001); Home Prods. Int'l, Inc. v. United States, 633 F.3d 1369, 1378 (Fed. Cir. 2011).  If the agency's concern is substantial and legitimate, a remand may be appropriate.  SKF USA Inc., 254 F.3d at 1029.  This Court has concluded that an agency's concerns are substantial and legitimate if: (1) the agency has provided a compelling justification for its remand request, (2) the need for finality does not outweigh the agency's justification, and (3) the scope of the remand request is appropriate.  See, e.g., Sea Shepherd N.Z. v. United States, 44 CIT __, __, 469 F. Supp. 3d 1330, 1335–36 (2020) (internal quotations omitted) (citing Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 29 CIT 1516, 1522–26, 412 F. Supp. 2d 1330, 1336–39 (2005)).

Defendant requests remand to resolve what it characterizes as "a substantial and legitimate concern in reaching an accurate determination."  Def.'s Resp. at 34. Remand of Commerce's determination regarding the calculation of constructed export price will allow Commerce to reassess its use of SeAH's third-country data in the context of constructed value and the profit cap.  Commerce has an obligation to calculate dumping margins as accurately as possible.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  The Court concludes that Defendant has provided a compelling justification for its remand request, the need for finality does not outweigh the agency's justification, and the scope of Defendant's remand request is appropriate.  The Court remands the calculations of constructed value, constructed value profit cap, and constructed export price to allow Commerce an opportunity to reconsider the issues and reexamine the administrative record.

## III.   General and Administrative Expense Ratio

In the Final Results, Commerce adjusted Hyundai Steel's reported general and administrative expenses for Hyundai Steel's affiliate Hyundai Steel USA to account for the cost of rejected pipe sold to unaffiliated customers.  Final IDM at 52–55; see also Commerce's Final Antidumping Analysis Hyundai Steel Mem. at Att. 1, PR 306.  Plaintiff argues that Commerce's general and administrative expense ratio adjustment was unsupported by record evidence, which demonstrated

that the rejected pipes related to Hyundai Steel USA's production operations as a type of non-subject product and that Plaintiff calculated its proposed general and administrative expense ratio in accordance with Hyundai Steel USA's normal accounting practices.  Pl.'s Br. at 35–37.  Defendant contends that Commerce's adjustment was reasonable.  Def.'s Resp. at 27–30.

In calculating costs as part of constructed value, "Commerce must include selling, general, and administrative expenses."  Mid Continent Steel & Wire, Inc. v. United States, 41 CIT __, __, 273 F. Supp. 3d 1161, 1166 (2017) (citing 19 U.S.C. § 1677b(e)(2)).  General and administrative expenses are not defined in the statute, but "are generally understood to mean expenses which relate to the activities of the company as a whole rather than to the production process."  Id. (internal quotations and citation omitted).  "[T]he numerator of the [general and administrative] expense ratio is the respondent's expenses attributable to general operations of the company and the denominator is the respondent's company-wide [cost of goods sold]."  Id.  Commerce is afforded "significant deference" in the calculation of general and administrative expenses because "it is a determination 'involv[ing] complex economic and accounting decisions of a technical nature.'"  Id. (quoting Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996)).

In the <u>Final Results</u>, Commerce adjusted Hyundai Steel's reported general and administrative expense ratio for Hyundai Steel USA by increasing the numerator and decreasing the denominator to account for the cost of pipes rejected by Hyundai Steel USA and sold to a non-affiliated company for processing into scrap. Final IDM at 52; Commerce's Final Antidumping Analysis Hyundai Steel Mem. at Att. 1. Commerce determined that the scrap material was "a type of non-subject product that [Hyundai Steel USA] produced from imported OCTG and sold during the [Period of Review]." Final IDM at 52. The scrap entered the United States as prime merchandise but was rejected because of damage identified during inspections performed before or after processing. <u>Id.</u>; <u>see</u> Pl.'s Section E Resp. (Feb. 25, 2021) at E-9, PR 82; Pl.'s Supp. Section E Resp. (Sept. 3, 2021) at SE-2, PR 237. The rejected pipes were collected by Hyundai Steel USA over several months and were sold only as scrap. Final IDM at 52; <u>see</u> Pl.'s Supp. Section E Resp. at SE-2; Pl.'s Admin. Rebuttal Br. (Nov. 22, 2021) at 27, PR 291.

Commerce determined that the scrap derived from rejected OCTG pipes was not sold as a distinct product and "that [Hyundai Steel USA's] classification of the scrap as a type of non-subject product [did] not reasonably reflect the production costs of the merchandise under consideration or the other products included within [cost of goods sold]." Final IDM at 52–53. Commerce also determined that:

> The costs associated with the rejected pipes were necessarily covered by [Hyundai Steel USA] generally; that is, by all the other products [Hyundai Steel USA] further manufactured and sold.  Therefore, consistent with the <u>Preliminary Results</u>, we have continued to revise [Hyundai Steel USA's general and administrative] [e]xpense ratio calculation to include in the numerator the [cost of goods sold] of rejected pipes sold to an unaffiliated customer for complete processing into scrap metal (["Scrap cost of goods sold"]) and exclude from the denominator the "Scrap [cost of goods sold]" amount.  However, we have reduced the "Scrap [cost of goods sold]" amount by the scrap sales revenue and the cost of pipes rejected during further manufacturing for these final results.

<u>Id.</u> at 53.

Plaintiff argues that Commerce's methodology is unsupported because it ignores that Hyundai Steel USA is a manufacturing entity, despite using other parties to perform all actual manufacturing.  Pl.'s Br. at 37.  Plaintiff asserts that as a manufacturing entity, Hyundai Steel USA generated scrap that was a production cost of merchandise included in Hyundai Steel USA's cost of goods sold and not a general cost.  <u>Id.</u>  It is Plaintiff's position that because of the specialized nature of prime OCTG, once a defect was identified and the pipe was no longer suitable for its specialized purpose, the rejected pipe ceased to be OCTG and was transformed into non-subject merchandise.  Pl.'s Reply at 16; <u>see</u> Pl.'s Section D Resp. (Feb. 22, 2021) at D-26–D-27, PR 81.  Plaintiff contends that though the rejected pipe was not suitable as prime OCTG, it was theoretically usable in other applications as non-prime merchandise.  Pl.'s Reply at 17.  Plaintiff argues that the decision of

the purchaser to use the rejected pipe as scrap should not impact how Hyundai

Steel considered the materials in its internal records.  Id.; see Pl.'s Supp. Section E

Resp. at SE-3.

　　The Court observes that the record supports Commerce's determination that

Hyundai Steel USA did not sell the rejected pipe as anything other than scrap.  See

Pl.'s Section E Resp. at E-9; Pl.'s Supp. Section E Resp. at SE-2; Pl.'s Admin.

Rebuttal Br. at 27.  Commerce determined that Hyundai Steel USA functioned as a

selling entity for OCTG during the Period of Review and contracted with the

unaffiliated processors to perform certain processing on imported OCTG before

the goods were sold to customers.  Final IDM at 53.  The rejected pipes entered the

United States as prime OCTG, but because of discovered defects, were instead sold

as scrap.  Id. at 52.  As Commerce noted, the record evidence reflects only that the

rejected pipes were sold for processing into scrap metal and does not demonstrate

that Plaintiff sold any rejected pipes as non-subject merchandise.  Id. at 52–53; see

Pl.'s Supp. Section E Resp. at SE-2; Pl.'s Admin. Rebuttal Br. at 27–28.  The

Court concludes that Commerce's determinations that the rejected pipe was not a

distinct non-subject product and that the cost associated with the rejected pipe was

covered generally by Hyundai Steel USA were reasonable and supported by

substantial evidence.  The Court sustains Commerce's adjustment to the general

and administrative expense ratio.

### IV.    Further Manufacturing Yield Loss

Pursuant to 19 U.S.C. § 1677e(a)(1), Commerce applied a neutral facts

otherwise available adjustment to Hyundai Steel USA's reported further

manufacturing costs to account for Hyundai Steel USA's yield loss based on the

costs of rejected pipes.  Final IDM at 65–66.  Plaintiff argues that Commerce's use

of facts otherwise available is contradicted by record evidence demonstrating that

Plaintiff reported pre-unit manufacturing costs based on manufacturing fees

divided by theoretical weight.  Pl.'s Br. at 38.  Plaintiff contends further that

because yield costs were already reflected in its reported data, Commerce's

adjustment distorted the actual costs of production.  Id. at 40–41.  Defendant

argues that Commerce did not err in applying an adjustment for further

manufacturing yield loss because Plaintiff's reported values did not account for the

value of scrap materials.  Def.'s Resp. at 30–32.

Commerce summarized Plaintiff's explanation of yield loss during

Plaintiff's further manufacturing process as:

> In its [Section E Questionnaire Response], regarding yield loss,
> Hyundai Steel explained that [Hyundai Steel USA] pays processors to
> heat-treat, upset, and/or thread imported OCTG, which is the only
> processing performed on the imported OCTG in the United States prior
> to sale to the first unaffiliated customer.  Thus, Hyundai Steel stated
> that [Hyundai Steel USA] does not incur actual costs for yield loss, and
> it is not claiming a scrap offset.

> Further, Hyundai Steel explained that the calculation of [Hyundai Steel USA's] reported processing cost per [metric ton] was based on the product-specific amounts for: (1) the total fees paid to the processors that related to sales of the processed product during the [Period of Review]; and (2) the total quantities actually invoiced to unaffiliated customers for sales of the processed product during the [Period of Review].  According to Hyundai Steel, the allocation of the total fees paid by [Hyundai Steel USA] for the processed products that were sold during the [Period of Review] over the total actual quantity of sales of processed products during the period automatically captures all of the "yield losses" that might arise from differences between the quantities that the processor reported processing and the quantities that [Hyundai Steel USA] actually delivered to customers.

Final IDM at 65–66.  In the Supplemental Section E Questionnaire, Commerce directed Plaintiff to provide an explanation for how any yield loss that was incurred on entered pipe was accounted for as part of further manufacturing expenses or any other variable.  See Pl.'s Supp. Section E Resp. at SE-4.  Plaintiff responded:

> Hyundai Steel did not account for yield loss for [U.S. further manufacturing expenses] given the nature of the processing and accounting.  In the ordinary course of business, [Hyundai Steel USA] does not manage the actual length and actual quantity of subject merchandise when it is imported into the United States.  Also, the outside processors do not provide information regarding actual lengths and actual quantities before processing.  In any event, the costs incurred, recorded, and reported to the Department are yielded costs since the costs incurred were based on the theoretical sizes.

Id. at SE-4–SE-5.  Commerce determined that Plaintiff "did not fully explain whether the scrap generated during the further manufacturing processes is kept by the processors or returned to [Hyundai Steel USA]; nor did it explain how the

value of the generated scrap is reflected in the invoices received from its

processors." Final IDM at 66. Because this information was not on the record,

Commerce applied neutral facts available to adjust Plaintiff's reported further

manufacturing costs to account for yield loss based on the cost of rejected pipes as

a percentage of the total Period of Review further manufacturing costs. Id.

When Commerce determines that necessary information is missing from the

administrative record, it must rely on facts otherwise available to fill in the gap in

the record. 19 U.S.C. § 1677e(a). Commerce may apply facts available in two

circumstances. First, Commerce may apply neutral facts available when

information is absent from the administrative record, regardless of the reason for

the absence. Id. § 1677e(a)(1). Second, Commerce may apply adverse facts

available when a party's act or omission negatively impacts the administrative

record or impedes the proceeding. Id. § 1677e(a)(2). In this case, Commerce

determined that the information missing from the record did not necessarily result

from Plaintiff's inadequate record-keeping or failure to cooperate to the best of its

ability. Final IDM at 66.

Plaintiff argues that Commerce's determination to use neutral facts available

was contradicted by evidence on the record that demonstrated that Plaintiff

accounted for further manufacturing yield loss. Pl.'s Br. at 38–39. Plaintiff

contends that because it reported theoretical weight for products at the time of

importation prior to further manufacturing, theoretical weights and further

manufacturing costs were not affected by subsequent yield losses during the further

manufacturing process.  Id. at 39–40.  Plaintiff also argues that in making an

adjustment to Plaintiff's reported further manufacturing yield loss, Commerce

introduced inaccuracy and added a processing fee that was not actually incurred.

Id. at 40.

  The Court agrees with Commerce's determination that Plaintiff's argument

does not address Commerce's reason for using neutral facts available and adjusting

the reported further manufacturing yield loss.  Commerce cited evidence showing

that Hyundai Steel USA contracted with third-parties to perform further processing

on imported pipes.  Final IDM at 65; Pl.'s Section E Resp. at E-6.  Commerce

determined that the record did not explain how scrap generated through this further

processing impacted the fees related to the further manufacturing process.  Final

IDM at 66.  Commerce determined that Plaintiff's use of theoretical weights at the

time of import did not eliminate the need for Plaintiff to account for the value of

pipe lost during further processing.  Id.  The Court concludes that Commerce's use

of neutral facts available was reasonable and supported by the record.  The Court

sustains Commerce's adjustment to Plaintiff's reported further manufacturing yield

loss.

## V.      Separate Rate for Non-Examined Companies

Consolidated Plaintiff AJU Besteel argues that if the weighted-average

dumping margin for Plaintiff is recalculated, the Court should also require

Commerce to revise the separate weighted-average dumping margin assigned to

respondents that were non-examined companies.  AJU Besteel's Br. at 7–8.  The

separate rate is "the weighted average of the estimated weighted average dumping

margins established for exporters and producers individually investigated,

excluding any zero and de minimis margins, and any margins determined entirely

under [19 U.S.C. § 1677e]."  19 U.S.C. § 1673d(c)(5)(A).  Because the separate

rate is based on the rates calculated for Plaintiff and SeAH, any change to

Plaintiff's individual weighted-average dumping margin on remand will impact the

rate assigned to non-examined companies.  The Court remands the separate rate

calculation for further consideration, if needed, depending on Commerce's

determination regarding Plaintiff's weighted-average dumping margin calculation

on remand.

## VI.     NEXTEEL's Ability to Receive Relief

Defendant-Intervenors argue that NEXTEEL should not be allowed to obtain

relief through this case because NEXTEEL failed to raise its arguments before

Commerce.  Def.-Intervs.' Resp. at 18–20.  NEXTEEL counters that it is not

precluded from seeking relief in this case because the issues on appeal were raised

before Commerce by other parties and that it is entitled to relief as a party with standing.  NEXTEEL's Reply at 1–7.

A party is generally prohibited from raising arguments with the Court that were not first raised with the administrative agency.  See Rhone Poulenc, Inc., 899 F.2d at 1191; Dillinger France S.A. v. United States, 42 CIT __, __, 350 F. Supp. 3d 1349, 1371–72 (2018); see also 28 U.S.C. § 2637(d) ("In any civil action not specified in this section, the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").  Commerce's regulations specifically require that a party raise all arguments in a timely manner before the agency.  Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (citing 19 C.F.R. § 351.309(c)(2)).  "[G]eneral policies underlying the exhaustion requirement—protecting administrative agency authority and promoting judicial efficiency"—would be vitiated if the court were to consider arguments raised for the first time in judicial proceedings.  See id. (internal quotation and citation omitted); see also Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States, 41 CIT __, __, 277 F. Supp. 3d 1346, 1353 (2017).  The Court has recognized limited exceptions to the exhaustion requirement.  See Luoyang Bearing Factory v. United States, 26 CIT 1156, 1186 n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002) (listing common exceptions and citing authorities).  The Court has previously excused a party's failure to raise an argument before the agency

when "the issue was raised by another party, or if it is clear that the agency had an opportunity to consider it." Holmes Prod. Corp. v. United States, 16 CIT 1101, 1104 (1992); see also Natural Res. Def. Council, Inc. v. U.S.E.P.A., 824 F.2d 1146, 1151 (D.C. Cir. 1987) ("[C]ourts have waived exhaustion if the agency has had an opportunity to consider the identical issues presented to the court . . . but which were raised by other parties, or if the agency's decision, or a dissenting opinion, indicates that the agency had the opportunity to consider the very argument pressed by the petitioner on judicial review." (internal quotations and citations omitted)).

During the administrative proceeding, NEXTEEL submitted a letter in support of and incorporating by reference the arguments of Plaintiff and SeAH. NEXTEEL's Letter Supp. Respondents' Rebuttal Br. at 3, PR 289. The arguments against Commerce's calculation of constructed value, profit cap, and constructed export price raised before this Court were raised by Plaintiff in the administrative proceeding. See Pl.'s Admin. Case Br., PR 281. NEXTEEL is not precluded from receiving relief in this case because Commerce was on notice of the arguments raised in this appeal during the administrative proceeding, NEXTEEL participated

in the administrative proceedings as a non-mandatory respondent, and NEXTEEL

expressed its position with regard to the arguments raised by Plaintiff and SeAH.[2]

## CONCLUSION

In summary, the Court remands Commerce's constructed value, constructed

value profit cap, and constructed export price profit calculations and Commerce's

calculation of the weighted-average dumping margin applicable to non-examined

companies.  The Court sustains Commerce's adjustment to Hyundai Steel USA's

general and administrative expense ratio, adjustment to Hyundai Steel's reported

further manufacturing yield loss, and use of SeAH's business proprietary

information.  The Court concludes that NEXTEEL is not precluded from pursuing

its claims for relief in this case.

Accordingly, it is hereby

**ORDERED** that the <u>Final Results</u> are remanded to Commerce for further

proceedings consistent with this opinion; and it is further

**ORDERED** that this action shall proceed according to the following

schedule:

---

[2]  Even though the Court concludes that NEXTEEL's attempt to incorporate the arguments of other parties was sufficient to satisfy the exhaustion requirement in this case, the Court cautions the Parties to articulate their administrative arguments clearly in order to avoid similar disputes in the future.

1. Commerce shall file the remand determination on or before August 15, 2023;

2. Commerce shall file the remand administrative record index on or before August 29, 2023;

3. Comments in opposition to the remand determination shall be filed on or before September 12, 2023;

4. Comments in support of the remand determination shall be filed on or before September 26, 2023;

5. The joint appendix shall be filed on or before October 10, 2023.


    /s/   Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:   June 9, 2023
    New York, New York