A-580-870
Remand
Slip Op. 23-87
POR: 09/01/2019 – 08/31/2020
**Public Document**
E&C/OVI: MF

*Hyundai Steel Co. et al. v. United States*,
**Court No. 22-00138, Slip Op. 23-87 (CIT June 9, 2023)**
**Certain Oil Country Tubular Goods from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or

the Court) in *Hyundai Steel Co. et al. v. United States*, Court No. 22-00138, Slip Op. 23-87 (June

9, 2023) (*Remand Order*).  These final results of redetermination concern the final results of the

2019-2020 administrative review of the antidumping duty order on certain oil country tubular

goods (OCTG) from the Republic of Korea (Korea).[1]  This review of the covers the period

September 1, 2019, through August 31, 2020.[2]

In its decision, the Court sustained Commerce on three matters subject to this litigation:

(1) Commerce's use of proprietary third-country sales information pertaining to SeAH Steel

Corporation (SeAH) in calculations related to Hyundai Steel Company (Hyundai Steel);[3] (2)

Commerce's adjustments of reported general and administrative expenses of Hyundai Steel and

its U.S. affiliate, Hyundai Steel USA, Inc.;[4] and (3) Commerce's application of neutral facts

---

[1] *See Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 20815 (April 8, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *Id.*
[3] *See Remand Order* at 14.
[4] *Id.* at 20.

available to adjust Hyundai Steel's reported further manufacturing costs to account for yield loss based on the cost of rejected pipes as a percentage of the total September 1, 2019, through August 31, 2020, period of review (POR) further manufacturing costs.[5]  The Court remanded to Commerce for further consideration three issues:  (1) the calculation of Hyundai Steel's constructed export price (CEP) profit (for which Commerce requested a voluntary remand);[6] (2) the calculation of Hyundai Steel's constructed value (CV) profit and selling expenses;[7] and (3) the calculation of Hyundai Steel's CV profit cap.[8]  Additionally, the Court remanded for further consideration the dumping margin calculation for non-examined companies, if Commerce recalculated the weighted-average dumping margin for Hyundai Steel,[9] finding that the non-examined companies were not barred from relief for failing to exhaust administrative remedies.[10]

As set forth in detail below, pursuant to the Court's *Remand Order*, Commerce has reconsidered and changed the methodology by which we calculate CEP profit for Hyundai Steel. Where we previously used the third-country sales to Kuwait by another respondent, SeAH, to calculate Hyundai Steel's CEP profit, for these final results of redetermination, we now base this calculation upon the profit reflected in Hyundai Steel's financial statements.  However, Commerce did not change the calculation of the CV profit and selling expenses and CV profit cap.  Based on the results of our analyses, we have recalculated Hyundai Steel's weighted-average dumping margin, which has changed from 19.54 percent to 9.63 percent.  Using Hyundai's recalculated margin to determine the margin applicable to non-examined companies, for these final results of redetermination, we determine the weighted-average dumping margin

---

[5] *Id.* at 24.
[6] *Id.* at 16.
[7] *Id.*
[8] *Id.*
[9] *Id.* at 25.
[10] *Id.* at 27-28.

applicable to the non-examined companies which are parties to this litigation; those companies are AJU Besteel, Co., Ltd. (AJU Besteel), Husteel Co., Ltd. (Husteel), and NEXTEEL Co., Ltd. (NEXTEEL), the margin for which has changed from 11.70 percent to 6.74 percent.  On July 31, 2023, we released our Draft Results of Redetermination to interested parties.[11]  On August 7, 2023, AJU Besteel,[12] Hyundai Steel,[13] and NEXTEEL[14] provided comments.  We respond to these comments below.  After considering these comments, for purposes of these final results of redetermination, we have made no changes to the analysis presented in our Draft Results of Redetermination.

## II.    BACKGROUND

### A.  Calculation of Hyundai Steel's CEP Profit

In the *Final Results*, Commerce based the calculation of Hyundai Steel's CEP profit on SeAH's third-country profit rate.[15]  In its case brief, Hyundai Steel objected to the use of SeAH's third-country profit rate for calculating CEP profit, and it presented six options for calculating the CEP profit ratio:

Option 1:  Hyundai Steel's actual OCTG pipe profit ratio during the POR, based on the information in Hyundai Steel's sales and cost reconciliations in this administrative review.
Option 2:  Hyundai Steel's overall profit for all steel-related sales and activities.
Option 3:  The overall profit of Hyundai Steel USA (HSU) for all steel-related sales and activities.
Option 4:  The actual U.S. sales data reported in Hyundai Steel's most recently submitted U.S. sales and cost of production files.
Option 5:  An average of various surrogate pipe producers from other countries.

---

[11] *See* Draft Results of Redetermination Pursuant to Court Remand, *Hyundai Steel Co. et al. v. United States,* Court No. 22-00138, Slip Op. 23-87 (CIT June 9, 2023), dated July 31, 2023 (Draft Results of Redetermination).
[12] *See* AJU Besteel's Letter, "Comments on Draft Remand Results," dated August 7, 2023 (AJU Besteel's Comments).
[13] *See* Hyundai Steel's Letter, "Comments on Draft Remand Results," dated August 7, 2023 (Hyundai Steel's Comments).
[14] *See* NEXTEEL's Letter, "NEXTEEL's Comments on Draft Remand Redetermination," dated August 7, 2023 (NEXTEEL's Comments).
[15] *See Final Results* IDM at 43-47.

Option 6:    SeAH's overall profit for its steel operations, averaged for the two-year
             period.[16]

Commerce rejected each of these options and relied instead on SeAH's third-country

sales experience based upon our conclusion that these were all CEP sales.[17]  Commerce

requested that the Court grant a voluntary remand on this issue, because of Commerce's concern

that this finding may have relied on a misunderstanding of facts on the administrative record,

which called into question the agency's selection among several CEP profit sources on the

record.

### B.  Calculation of Hyundai Steel's CV Profit

For the *Final Results*, Commerce calculated Hyundai Steel's CV profit and selling

expenses by using SeAH's combined CV profit and selling expenses for third-country market

sales.[18]  Because Hyundai Steel did not have viable home or third-country markets during the

POR to serve as a basis for normal value (NV), we based NV on CV in accordance with section

773(a)(4) of the Tariff Act of 1930, as amended (the Act); we were consequently unable to

calculate CV profit and selling expenses based on the respondent's own home market or third-

country sales made in the ordinary course of trade (the preferred method under section

773(e)(2)(A) of the Act).  Numerous alternative sources for calculating CV profit and selling

expenses were placed on the record:

Alternative 1:    Financial statements for the first three quarters of 2020 and the audited 2019
                  financial statements of Borusan Mannesmann Boru Sanayi ve Ticaret A.S.
                  (Borusan);[19]
Alternative 2:    Financial statements for the first three quarters of 2020 and the audited 2019
                  financial statements of Chung Hung Steel Corp. (Chung Hung);[20]

---

[16] *Id.* at 45-46; *see also* Hyundai Steel's Letter, "Case Brief," dated November 9, 2021 (Hyundai Steel Case Brief),
at 30-31.
[17] *Id.* at 46-47.
[18] *Id.* at 33-41.
[19] *Id.* at 39; *see also* Hyundai Steel's Letter, "Submission of Factual Information and Comments Concerning CV
Profit and Selling Expenses," dated April 14, 2021 (Hyundai Steel's CV Submission), at Exhibit 1.
[20] *See Final Results* IDM at 39; *see also* Hyundai Steel's CV Submission at Exhibit 2.

Alternative 3:    Audited 2020 financial statements of Nippon Steel Corporation (Nippon Steel);[21]

Alternative 4:    Audited 2020 and 2019 financial statements of PAO TMK (TMK);[22]

Alternative 5:    Financial statements for SeAH's third-country POR sales of OCTG;[23]

Alternative 6:    Audited 2020 and 2019 financial statements of Tenaris S.A. (Tenaris);[24]

Alternative 7:    Audited 2020 financial statements of Welspun Corp. Limited (Welspun).[25]

Commerce determined that, in contrast to the alternative data sources submitted by interested parties, the combined CV profit and selling expenses for SeAH's third-country market sales of OCTG during the POR represent the best source for valuing Hyundai Steel's CV profit and selling expenses because they reflect the profit and selling expenses of a Korean OCTG producer, are based on OCTG sales to a viable comparison market, and are derived from sales made in the ordinary course of trade.

C.   Calculation of Hyundai Steel's CV Profit Cap

In the *Final Results*, we found that we were unable to calculate the amount realized by exporters or producers in connection with the sale, for consumption in the foreign country, of the merchandise in the same general category of products as the subject merchandise (*i.e.*, the "profit cap"), in accordance with section 773(e)(2)(B)(iii) of the Act, because the record did not contain sufficient information for making such a calculation.[26]   As facts available, we used SeAH's profits from sales in a third-country market as the best source available for calculation of the profit cap because they are specific to OCTG and reflect the production experience of a Korean

---

[21] *See Final Results* IDM at 39; *see also* Hyundai Steel's CV Submission at Exhibit 3.

[22] *See Final Results* IDM at 39; *see also* Hyundai Steel's CV Submission at Exhibit 4.

[23] *See Final Results* IDM at 39; *see also* SeAH's Letter, "Request for CV Profit and Selling Expense Information," dated April 14, 2021 (SeAH's CV Submission), at Attachment 1.

[24] *See Final Results* IDM at 39; *see also* SeAH's CV Submission at Attachment 2 (2020 financial statement); and Domestic Interested Parties' (consisting of United States Steel Corporation; Maverick Tube Corporation; Tenaris Bay, City, Inc.; and IPSCO Tubulars Inc., collectively, the domestic interested parties) Letter, "Response to Request for Constructed Value Profit and Selling Expense Comments and Information," dated April 14, 2021 (DIPs' CV Submission), at Exhibits 6 and 8 (2019 and 2020 financial statements, respectively).

[25] *See Final Results* IDM at 39; *see also* SeAH's CV Submission at Attachment 3.

[26] *See Final Results* IDM at 41-43.

OCTG producer.[27]  We specifically examined each of these alternative sources for calculating CV profit and selling expenses (listed above in section II.B.) for suitability, considering each for contemporaneity, comparability of products, and whether there was in fact a calculated profit (since those without a calculated profit would not be usable for calculating a profit cap).[28]  We found that SeAH's profit data from the sale of OCTG in its third-country market were the best data to be used as a neutral "facts available" profit cap, because they were specific to OCTG and represented the production experience of a Korean OCTG producer in Korea.[29]  We concluded that the profit calculated based on SeAH's combined CV profit and selling expenses served as a reasonable profit cap on a facts available basis for the calculation of a CV profit cap for Hyundai Steel.[30]

The Court remanded the calculations of CV, CV profit cap, and CEP profit to allow Commerce an opportunity to reconsider the issues and reexamine the administrative record.[31]  On July 31, 2023, we released our Draft Results of Redetermination to interested parties.[32]  On August 7, 2021, AJU Besteel,[33] Hyundai Steel,[34] and NEXTEEL[35] provided comments.  Pursuant to the *Remand Order*, we address below:  (1) calculation of Hyundai Steel's CEP profit; (2) calculation of Hyundai Steel's CV profit; and (3) calculation of Hyundai Steel's CV profit cap.

---

[27] *Id.* at 43.
[28] *Id.* at 42-43.
[29] *Id.*
[30] *Id.* at 43.
[31] *See Remand Order* at 16.
[32] *See* Draft Results of Redetermination.
[33] *See* AJU Besteel's Comments.
[34] *See* Hyundai Steel's Comments.
[35] *See* NEXTEEL's Comments.

III.     **ANALYSIS**

A.     Calculation of Hyundai Steel's CEP Profit

In the *Remand Order*, the CIT stated, "The Court remands the calculations of {…} constructed export price to allow Commerce an opportunity to reconsider the issues and reexamine the administrative record."[36]

As previously stated, in the *Final Results*, Commerce rejected all six of the options for calculation of CEP profit submitted by Hyundai Steel, relying instead on SeAH's third-country sales experience based upon an incorrect conclusion that those sales were all CEP sales. Commerce selected SeAH's Kuwait sales data for calculating CEP profit ratio, based (in part) on its finding that "Hyundai Steel's proposed Option 3 (discussed and discounted above) and SeAH's Kuwait sales data reflect CEP sales."[37]  However, this finding was based on a misunderstanding of the administrative record; upon further consideration, SeAH's Kuwait sales data do not reflect CEP sales.  Accordingly, for these final results of redetermination, we reverse this finding here and reconsider the source for calculating the CEP profit ratio.  We, therefore, reconsider the following options:

Option 1:   Hyundai Steel's actual OCTG pipe profit ratio during the POR, based on the information in Hyundai Steel's sales and cost reconciliations in this administrative review.
Option 2:   Hyundai Steel's overall profit for all steel-related sales and activities.
Option 3:   The overall profit of HSU for all steel-related sales and  activities.
Option 4:   The actual U.S. sales data reported in Hyundai Steel's most recently submitted U.S. sales and cost of production files.
Option 5:   An average of various surrogate pipe producers from other countries.
Option 6:   SeAH's overall profit for its steel operations, averaged for the two-year period.[38]

---

[36] *Id.*
[37] *See Final Results* IDM at 46.
[38] *Id.* at 45-46; *see also* Hyundai Steel Case Brief at 30-31.

Commerce considers these options in accordance with section 772(f)(1) of the Act, which states that "… profit shall be an amount determined by multiplying the total actual profit by the applicable percentage." Sections 772(f)(2)(C) and (D) of the Act provide the definitions of terms for purposes of this subsection:

    (C)    TOTAL EXPENSES. – The term "total expenses" means all expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise:

        (i)    The expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country if such expenses were requested by the administering authority for the purpose of establishing normal value and constructed export price.

        (ii)    The expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise.

        (iii)    The expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise.

    (D)    TOTAL ACTUAL PROFIT. – The term "total actual profit" means the total profit earned by the foreign producer, exporter, and affiliated parties described in subparagraph (C) with respect to the sale of the same merchandise for which total expenses are determined under such subparagraph.

Option 1 (Hyundai Steel's actual OCTG profit ratio), Option 2 (Hyundai Steel's overall profit ratio for steel related activities), Option 3 (HSU's overall profit for steel related activities), and Option 4 (Hyundai Steel's U.S. sales database) each represent some form of actual profit from Hyundai Steel. Option 5 (average of various surrogate pipe producers) represents profit from surrogate pipe producers. Option 6 (SeAH's overall profit for steel related activities) and the methodology Commerce used for the *Final Results* (SeAH's third-country sales) represent profit from SeAH.

Sections 772(f)(2)(C) and (D) of the Act indicate a preference for calculating the CEP profit ratio based on the expenses and profits of the "foreign producer, exporter, and affiliated parties." Therefore, under sections 772(f)(2)(C)(i)-(iii) of the Act, we examine whether any of

8

the four profit sources specific to Hyundai Steel (*i.e.*, Options 1-4) fit within the three alternatives laid out therein.

Examining under section 772(f)(2)(C)(i) of the Act:

- Option 1 (Hyundai Steel's actual OCTG profit ratio) does not fit because OCTG is not sold "in the United States and {…} in the exporting country," as it is not sold in Korea.
- Option 2 (Hyundai Steel's overall profit ratio for steel related activities) does not fit because it is not specific to subject merchandise.
- Option 3 (HSU's overall profit ratio for steel related activities) does not fit because it is not specific to subject merchandise.
- Option 4 (Hyundai Steel's U.S. sales database) does not fit because OCTG is not sold "in the United States and {…} in the exporting country," as it is not sold in Korea.

Because none of the Hyundai profit source options fits within section 772(f)(2)(C)(i), we next examine them under section 772(f)(2)(C)(ii) as "the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise."

- Option 1 (Hyundai Steel's actual OCTG profit ratio) does not fit because OCTG is not "sold in the United States and the exporting country" – it is not sold in Korea.
- Option 2 (Hyundai Steel's overall profit ratio for steel related activities) does not fit because it is not specific to the United States and Korea but rather represents merchandise sold in many countries.
- Option 3 (HSU's overall profit ratio for steel related activities) does not fit because it is specific to the United States (*i.e.*, HSU has no merchandise sold in Korea).
- Option 4 (Hyundai Steel's U.S. sales database) does not fit because it is specific to the United States (*i.e.,* represents no merchandise sold in Korea, as none is sold there).

Because none of the Hyundai profit sources fit within (C)(ii), we next examine the options under section 772(f)(2)(C)(iii) ("… the narrowest category of merchandise sold in all countries which includes the subject merchandise.")

- Option 1 (Hyundai Steel's actual OCTG profit ratio) does not fit because it contains no data for Hyundai Steel's OCTG sold anywhere other than in the United States.
- Option 3 (HSU's overall profit ratio for steel related activities) does not fit because it contains no data for Hyundai Steel's steel related products sold anywhere other than in the United States.
- Option 4 (Hyundai Steel's U.S. sales database) does not fit because it contains no data for Hyundai Steel's OCTG sold anywhere other than in the United States.

- However, Option 2 (Hyundai Steel's overall profit ratio for steel related activities) <u>does</u> fit within section 772(f)(2)(C)(iii) in that 'steel related activities' is a category of merchandise which includes OCTG; and Hyundai Steel sold steel related products in many countries, including the United States and Korea.

Because Option 2 (Hyundai Steel's overall profit ratio for steel related activities) represents actual profit from Hyundai Steel and fits within section 772(f)(2)(C)(iii), we have selected this source for Hyundai Steel's CEP profit calculation in these final results of redetermination, and we have recalculated Hyundai Steel's dumping margin accordingly. All the other sources either did not satisfy any of the three options under section 772(f)(2)(C) of the Act, or represented profit sourced from a company other than "the foreign producer, exporter, and affiliated parties," *i.e.*, Hyundai Steel itself. This methodology is consistent with that used in the 2014-15, 2015-16, and 2016-17 PORs of this proceeding.[39]

B.    Calculation of Hyundai Steel's CV Profit

In the *Remand Order*, the CIT stated that "{t}he Court remands the calculations of constructed value {…} to allow Commerce an opportunity to reconsider the issues and reexamine the administrative record."[40]

As previously stated, in the underlying administrative review, Commerce calculated Hyundai Steel's CV profit and selling expenses by using SeAH's combined CV profit and selling expenses for third-country market sales.[41] Our prior misunderstanding of the administrative

---

[39] *See Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18105 (April 17, 2017) (*OCTG from Korea 2014-15*), and accompanying IDM; *see also Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016* (*OCTG from Korea 2015-16*), 83 FR 17146 (April 18, 2018), and accompanying IDM; *NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276 (CIT 2019) (*NEXTEEL I*); *NEXTEEL Co. v. United States*, 450 F. Supp. 3d 1333 (CIT 2020) (*NEXTEEL II*); *NEXTEEL Co. v. United States*, 475 F. Supp. 3d 1378 (CIT 2020) (*Nexteel III*); *NEXTEEL Co. v. United States*, Slip Op. 23-52, Consol. Court No. 18-00083 (CIT April 19, 2023) (*NEXTEEL IV*); *Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 24085 (May 24, 2019) (*OCTG from Korea 2016-17*), and accompanying IDM.
[40] *See Remand Order* at 16.
[41] *See Final Results* IDM at 33-41.

record with respect to whether the specific source reflected CEP sales and our CEP profit analysis in the *Final Results* have no bearing on our selection of the source for calculating CV profit or the CV profit cap because CV profit and CV profit cap calculations are governed by different statutory provisions with different requirements.  However, for the sake of clarity, we will further explain the basis for our selection of a source for CV profit and CV profit cap calculations.

For these final results of redetermination, though we have modified our methodology with regard to the calculation of Hyundai Steel's CEP profit, we continue to calculate Hyundai Steel's CV profit and selling expenses under section 773(e)(2)(B)(iii) of the Act using SeAH's combined CV profit and selling expenses for third-country market sales.[42]  The statute neither prevents us from selecting nor requires us to select a CV profit source that is the same as the CEP profit source.  To the contrary, the calculation of CEP profit and CV profit are governed by different statutory provisions with different requirements.  *Compare* section 772(f) of the Act *with* section 773(e) of the Act.

Hyundai Steel had no viable home market.  It had no viable third-country market.  The record lacks evidence of actual amounts incurred or realized by Hyundai Steel for profits in connection with production and sale of a foreign like product, in the ordinary course of trade, in Korea.  We were unable to calculate CV profit and selling expenses using the preferred method under section 773(e)(2)(A) of the Act, which would be to base the calculation upon the respondent's own home market or third-country sales made in the ordinary course of trade.  In situations where we cannot calculate CV profit and selling expenses under section 773(e)(2)(A) of the Act, section 773(e)(2)(B) of the Act establishes three alternatives:

---

[42] *Id.*

(i)     the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review … for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii)     the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) … for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii)    the amounts incurred and realized … for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise {(*i.e.*, the "profit cap")}.

The statute does not establish a hierarchy for selecting among the alternatives for calculating CV profit and selling expenses.[43]  Moreover, as discussed in the SAA, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."[44]  Commerce therefore has discretion to select from any of the three alternative methods, depending on the information available on the record.  Here, Commerce is faced with choosing among several alternatives for CV profit based on available data that reflect at least one of the criteria noted above.  We must, therefore, weigh the value of the available data and, in particular, determine which requirement is more relevant for this case based on the record data before us. With each of the statutory alternatives in consideration, we have evaluated the data available on the record and weighed each of the statutory alternatives to determine which surrogate data source most closely fulfills the aim of the statute.  We continue to find that Commerce cannot

---

[43] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 840 ("At the outset, it should be emphasized, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases.").
[44] *Id.*

rely on alternative (i) because the other steel products produced by Hyundai Steel, including

Hyundai Steel's non-prime OCTG, are not in the same general category of merchandise as

OCTG.[45]  Further, Commerce cannot rely on alternative (ii) because the other respondent for

which we have data, SeAH, did not make sales of OCTG in the home market (*i.e.*, Korea).[46]

Therefore, Commerce must resort to the alternative under subsection (iii) (*i.e.*, any other

reasonable method).

The specific language of both the preferred and alternative methods appears to show a

preference that the profit and selling expenses reflect:  (1) production and sales in the foreign

country; and (2) the foreign like product, *i.e.*, the merchandise under consideration.  However,

when selecting a profit rate from available record evidence, we may not be able to find a source

that perfectly reflects both factors.  In addition, there may be varying degrees to which a

potential profit source reflects the merchandise under consideration.  Consequently, we must

weigh the quality of the data against these factors.  For example, we may have profit information

that reflects production and sales in the foreign country of merchandise that is similar to the

foreign like product, but also includes significant sales of completely dissimilar merchandise, or

profit information that reflects production and sales of the merchandise under consideration but

no sales in the foreign country.  Determining how specialized the foreign like product is, what

percentage of sales are of the foreign like product or of the general category of merchandise,

what portion of sales are to which markets, *etc.*, judged against the above criteria, may help to

determine which profit source to rely upon.

---

[45] The CIT upheld this decision from the *OCTG from Korea Final Determination*.  *See Certain Oil Country Tubular Goods from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 79 FR 41983 (July 18, 2014) (*OCTG from Korea Final Determination*); *see also Husteel Co. v. United States*, 180 F. Supp. 3d 1330, 1338-39 (CIT 2016) (*Husteel II*), *aff'd by Husteel Co. v. United States*, 710 F. App'x 890, 891 (Fed. Cir. 2018) (*per curiam*) (Rule 36).
[46] *See Final Results* IDM at 42.

The record of this proceeding contains numerous alternative sources for calculating CV profit and selling expenses. Interested parties placed the financial statements of the following entities on the record as potential sources for CV profit and selling expenses:

Alternative 1:    Financial statements for the first three quarters of 2020 and the audited 2019 financial statements of Borusan;[47]

Alternative 2:    Financial statements for the first three quarters of 2020 and the audited 2019 financial statements of Chung Hung;[48]

Alternative 3:    Audited 2020 financial statements of Nippon Steel;[49]

Alternative 4:    Audited 2020 and 2019 financial statements of TMK;[50]

Alternative 5:    Financial statements for SeAH's third-country POR sales of OCTG;[51]

Alternative 6:    Audited 2020 and 2019 financial statements of Tenaris;[52]

Alternative 7:    Audited 2020 financial statements of Welspun.[53]

In evaluating the alternatives on the record, for the *Final Results*, we found that the combined CV profit and selling expenses for SeAH's third-country market sales of OCTG during the POR continue to constitute the best information available on the record for valuing Hyundai Steel's CV profit and selling expenses in the instant review.[54] SeAH's combined selling expense and profit experience reflects the profit of a Korean OCTG producer, on comparison market sales of the merchandise under consideration, in the ordinary course of trade. The profit is specific to OCTG. Furthermore, it represents profit from OCTG produced by a Korean producer in Korea. This alternative closely simulates the statutory preference for calculating CV profit and selling expenses. Likewise, this alternative eliminates some of the inherent flaws that occur with using surrogate financial statements (*e.g.*, profits reflecting products that are not in the same general category of products as OCTG).

---

[47] *Id.* at 39; *see also* Hyundai Steel's CV Submission at Exhibit 1.

[48] *See Final Results* IDM at 39; *see also* Hyundai Steel's CV Submission at Exhibit 2.

[49] *See Final Results* IDM at 39; *see also* Hyundai Steel's CV Submission at Exhibit 3.

[50] *See Final Results* IDM at 39; *see also* Hyundai Steel's CV Submission at Exhibit 4.

[51] *See Final Results* IDM at 39; *see also* SeAH's CV Submission at Attachment 1.

[52] *See Final Results* IDM at 39; *see also* SeAH's CV Submission at Attachment 2 (2020 financial statement); and DIPs' CV Submission at Exhibits 6 and 8 (2019 and 2020 financial statements, respectively).

[53] *See Final Results* IDM at 39; *see also* SeAH's CV Submission at Attachment 3.

[54] *Id.*

As discussed above, when selecting a profit rate from available record evidence, we may not be able to find a source that perfectly reflects both:  (1) production and sales in the foreign country; and (2) the foreign like product, *i.e.*, the merchandise under consideration.  In addition, there may be varying degrees to which a potential profit source reflects the merchandise under consideration.  Consequently, we must weigh the quality of the data against these factors.

We have considered the financial statements on the record for Borusan, Chung Hung, Nippon Steel, TMK, Tenaris, and Welspun, but find that each of these data sources is less specific to OCTG or even to the products in the same general category of products as OCTG (and, for some, less specific to the POR) than are the financial data pertaining to SeAH's third-country market sales of OCTG during the POR.  Moreover, none of them represent the production experience of an OCTG producer in Korea.  Because we have record information that most closely satisfies the preferred method and allows us to calculate CV profit and selling expenses using a Korean OCTG producer's comparison market sales of the merchandise under consideration that were made in the ordinary course of trade (*i.e.*, this is more precise information), we do not have to resort to the other alternatives.

As stated above, section 773(e)(2)(B)(iii) of the Act states that we are able to calculate CV profit, since the preferred methods are unavailable, "based on any other reasonable method, except that the amount for profit may not exceed the amount realized by exporters or producers (other than the respondent) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise."  We have used SeAH's information in accordance with section 773(e)(2)(B)(iii) of the Act, "any other reasonable method," which does not require the use of profit from the foreign country.  As

discussed further below, only the profit cap under section 773(e)(2)(B)(iii) of the Act includes a reference to profit in the foreign country.

This approach has been sustained by the CIT in *SeAH Steel Corporation et al.*[55]  Because SeAH's data reflect profit from OCTG produced by a Korean producer in Korea and profit made on comparison market sales in the ordinary course of trade, Commerce reasoned in the underlying review in *SeAH Steel Corporation et al.* that using the data eliminates some of the inherent flaws that occur with using surrogate financial statements (*e.g.*, profits reflecting products that are not in the same general category of products as OCTG).[56]  The Court concluded that Commerce's use of SeAH's data was reasonable and supported by substantial evidence.[57]  This methodology is consistent with that used in the 2014-15, 2015-16, and 2016-17 PORs of this proceeding.[58]  Further, it is consistent with the methodology used in *Fabricated Structural Steel from Mexico*,[59] which was recently upheld by the Court.[60]  Therefore, we continue to calculate Hyundai Steel's CV profit and selling expenses under section 773(e)(2)(B)(iii) of the Act using SeAH's combined CV profit and selling expenses for third-country market sales for these final results of redetermination.

---

[55] *See SeAH Steel Corporation et al. v. United States*, 513 F. Supp. 3d 1367 (CIT 2021) (*SeAH Steel Corporation et al.*).

[56] *See OCTG from Korea 2016-17* IDM at 51.

[57] *See SeAH Steel Corporation et al.*, 513 F. Supp. 3d at 1396-97.

[58] *See OCTG from Korea 2014-15*; *OCTG from Korea 2015-16*; *OCTG from Korea 2016-17*; and *NEXTEEL I*, 392 F. Supp. 3d at 1289-90.

[59] *See Certain Fabricated Structural Steel from Mexico:  Final Determination of Sales at Less Than Fair Value*, 85 FR 5390 (January 30, 2020) (*Fabricated Structural Steel from Mexico*), and accompanying IDM.

[60] *See Building Systems de Mexico, S.A. de C.V. v. United States*, Consol. Court No. 20-00069, Slip Op. 22-141 (CIT December 13, 2022), at 10-13.

C.        Calculation of Hyundai Steel's CV Profit Cap

In the *Remand Order*, the CIT stated, "The Court remands the calculations of {…} constructed value profit cap {…} to allow Commerce an opportunity to reconsider the issues and reexamine the administrative record."[61]

As previously stated, our misunderstanding of the administrative record with respect to CEP profit issue has no bearing on our CV profit analysis.  In the *Final Results*, Commerce found that we were unable to calculate the amount realized by exporters or producers in connection with the sale, for consumption in the foreign country, of the merchandise in the same general category of products as the subject merchandise in accordance with section 773(e)(2)(B)(iii) of the Act.[62]  This section of the Act states that, if actual data are not available:

> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise {*i.e.*, the "profit cap")}.

The actual amounts incurred and realized by Hyundai Steel for selling, general, and administrative expenses, and for profits, in connection with the production and sale of OCTG, in the ordinary course of trade, for consumption in Korea, did not exist.  Therefore, in accordance with the SAA, we applied alternative (iii) on the basis of neutral facts available.[63]  We did so because the record does not contain profit information for sales in Korea of OCTG or products in the same general category.  As neutral facts available, we used SeAH's profit from sales in a third country market; we determined that this is the best source available for calculation of the

---

[61] *See Remand Order* at 16.
[62] *See Final Results* IDM at 41-43.
[63] *Id.* at 42.

profit cap because they are specific to OCTG and reflect the production experience of a Korean OCTG producer.  Further, this comports with the methodology we have used for the calculation of Hyundai Steel's CV profit in the "Calculation of Hyundai Steel's CV Profit" section above. The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has sustained a substantially identical approach in *NEXTEEL II*.[64]

No party disputes the contentions of either mandatory respondent that it did not have a viable home market.  Neither does any party contend that the alternate sources of CV profit on the record fully represent data described under the profit cap, as they are all for countries other than Korea.  Because there is no robust market for OCTG within Korea,[65] sources for profits are limited.  The record of the underlying administrative review does not contain information regarding profits earned on Korean sales of OCTG or products in the same general category of merchandise as OCTG.

We specifically examined each of these sources for suitability for the *Final Results*, considering each for contemporaneity, comparability of products, and whether there was in fact a calculated profit (since those without a calculated profit would not be usable for calculating a profit cap).  We have reexamined them for these final results of redetermination and continue to find no basis for reaching a different conclusion.

The Federal Circuit has stated that "Congress intended the profit cap to be:  (1) based on home market sales information of the same general category of products as the subject merchandise, (2) non-aberrational to the industry under consideration, (*i.e.*, 'the amount normally

---

[64] *See Nexteel Co. v. United States*, Consol. Court No. 21-1334 (Fed. Cir. 2022) (*CAFC NEXTEEL II*), at 26-27.
[65] *See Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Investigation Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), Publication 4489 (September 2014), at VII-5.

realized'), and (3) not based on the data of the respondent."[66]  Where such "statutorily specified information {i}s not available," Commerce must resort to facts available to calculate or dispense with a profit cap.[67]  As a lesser (though significant) adjunct point, the CIT has sustained "Commerce's conclusion that non-OCTG pipe is not in the same general category of products as OCTG."[68]

We find that the SeAH third-country data meet the CV profit requirements for use with regard to SeAH under the statutorily preferred method and are not distorted by the production and sale of products not considered to be in the same general category of products as OCTG. SeAH's profit data from the sale of OCTG in its third-country market are the best data to be used as the "facts available" profit cap in calculations for Hyundai Steel, because they are specific to OCTG and represent the production experience of a Korean OCTG producer in Korea.  In fact, the Federal Circuit has sustained a substantially identical approach in *NEXTEEL II*.[69]  Therefore, we continue to conclude that the profit calculated based on SeAH's combined CV profit and selling expenses serves as a reasonable profit cap on a facts available basis for these. final results of redetermination.

---

[66] *See, e.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 545 (Fed. Cir. 2019) (*Mid Continent Steel*); *see also Atar S.r.L. v. United States*, 730 F.3d 1320, 1327 (Fed. Cir. 2013) ("{T}he profit cap provision expressly requires the use of data from different exporters or producers than the one under consideration.").
[67] *See Mid Continent Steel*, 941 F.3d at 545.
[68] *See Husteel II*, 180 F. Supp. 3d at 1342.
[69] *See CAFC NEXTEEL II*, Consol. Court No. 21-1334 at 26-27.

## VI.  INTERESTED PARTY COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On July 31, 2023, we released our Draft Results of Redetermination to interested parties.[70]  On August 7, 2023, AJU Besteel,[71] Hyundai Steel,[72] and NEXTEEL[73] provided comments.  No other interested party submitted comments.

**Comment 1:  Calculation of Hyundai Steel's CEP Profit**

*Hyundai Steel's Comments*

- Commerce's Draft Results of Redetermination, with respect to the CEP profit issue, are reasonable, supported by substantial evidence, and otherwise in accordance with law.[74]

*AJU Besteel's Comments*

- AJU Besteel concurs with, and incorporates by reference, the comments submitted by Hyundai Steel on this issue.[75]

*NEXTEEL's Comments*

- Commerce's revised CEP profit methodology is in accordance with the Court's *Remand Order*; NEXTEEL supports, and incorporates by reference, Hyundai Steel's comments on this issue.[76]

**Commerce's Position:**

All parties which submitted comments regarding the CEP profit issue contend that Commerce's determination with respect to this issue is reasonable, supported by substantial evidence and is otherwise in accordance with law.  Accordingly, in these final results of redetermination, we continue to find that using Hyundai Steel's overall profit ratio for steel related activities (Option 2 above) is the appropriate methodology to calculate Hyundai Steel's

---

[70] *See* Draft Results of Redetermination.
[71] *See* AJU Besteel's Comments.
[72] *See* Hyundai Steel's Comments.
[73] *See* NEXTEEL's Comments.
[74] *See* Hyundai Steel's Comments at 1-2.
[75] *See* AJU Besteel's Comments at 1.
[76] *See* NEXTEEL's Comments at 2.

CEP profit because it represents actual profit from Hyundai Steel, fits within section 772(f)(2)(C)(iii), and is consistent with the methodology used in the 2014-15, 2015-16, and 2016-17 PORs of this proceeding.[77]  Consistent with the Draft Results of Redetermination, we have recalculated Hyundai Steel's dumping margin accordingly.[78]

**Comment 2:  Calculation of Hyundai Steel's CV Profit**

*Hyundai Steel's Comments*

- Commerce did not reexamine the administrative record but recapitulated the same bases upon which it decided to use SeAH's third-country sales data in the *Final Results*.[79]
- Section 773(2)(B) of the Act does not evince a statutory preference that the CV profit and selling expenses must approximate production and sales in Korea of the foreign like product or the merchandise under consideration, since two of the three alternatives refer to the "same general category of products."  Congress did not intend for the alternatives to be interpreted so narrowly, and thus, Commerce must apply the law in accordance with the plain language that reflects clear Congressional intent.[80]
- Because there is no such preference under section 773(2)(B) of the Act, it is unreasonable to assign a legal preference for SeAH's third country sales of foreign like product as the basis for CV profit instead of the alternate financial data of products within the same general category as OCTG; therefore, the Draft Results of Redetermination with respect to the CV profit issue should be reconsidered to ensure that they are reasonable and in accordance with law.[81]
- Using SeAH's business proprietary information (BPI) third-country sales data is not reasonable because Hyundai Steel was not permitted to view the confidential data of SeAH upon which Commerce based this aspect of the margin calculation.[82]
- Commerce never addressed Hyundai Steel's argument that SeAH's third-country sales are not a representative or suitable basis for calculating CV profit and selling expenses for Hyundai Steel.[83]

---

[77] *See OCTG from Korea 2014-15*; *see also OCTG from Korea 2015-16*; *NEXTEEL I*; *NEXTEEL II*; *NEXTEEL III*; *NEXTEEL IV*; and *OCTG from Korea 2016-17.*
[78] *See* Memorandum, "Analysis Memorandum for the Draft Results of Redetermination," dated July 28, 2023..
[79] *See* Hyundai Steel's Comments at 2.
[80] *Id.* at 3.
[81] *Id.* at 5.
[82] *Id.* at 5-6.  With regard to the BPI nature of some of SeAH's data, the Court specifically addressed this issue.  *See Remand Order* at 11-14, which concludes:  "Plaintiff was not impaired in its ability to present its arguments before the administrative agency by its internal business representatives not having access to the business proprietary information because Plaintiff's counsel and consultants were able to review and use the relevant information. Therefore, Commerce's use of SeAH's business proprietary information was not arbitrary and was in accordance with law."  Consequently, it is unnecessary to discuss it further below.
[83] *Id.* at 6.

- Commerce selected this dataset because it contained OCTG, but without recognizing the flaws and unrepresentative nature of that source for calculating CV profit; SeAH's Kuwaiti sales do not reasonably reflect the profitability of Hyundai Steel's OCTG sales.[84]
- Commerce has not given due consideration to other record data sources which are preferable, including the financial statements of TMK, whose financial data was used by Commerce in the fourth administrative review for CV profit purposes.[85]
- Commerce's path is not "reasonably discerned" where the record contains substantial contradictory evidence establishing the unrepresentative and unreasonable nature of using SeAH's third-country sales data.[86]
- Commerce had the option to select a CV profit source based on the third-country sales of non-OCTG products sold to the United States by Hyundai Steel, or Commerce could have selected a CV profit source based on contemporaneous and publicly available financial statements reflecting sales of merchandise within the same general category of products as OCTG (which the statute specifically permits).  Selecting a profit source simply because it represents the production of OCTG by a Korean producer is reasonable only if the basis for the profit rate itself is reasonable, which it was not because these were not equally imperfect options.[87]

*AJU Besteel's Comments*

- AJU Besteel concurs with, and incorporates by reference, the comments submitted by Hyundai Steel on this issue.[88]

*NEXTEEL's Comments*

- NEXTEEL concurs with, and incorporates by reference, the comments submitted by Hyundai Steel on this issue.[89]

**Commerce's Position:**

In these final results of redetermination, we continue to maintain that the use of SeAH's third-country data as a source for CV profit was reasonable and in accordance with the governing sections of the Act.  Hyundai Steel contends that Commerce's choice of the CV profit source, *i.e.*, SeAH's profit and selling expenses from its third-country sales of OCTG, under the 'any other reasonable method' provision, is not supported by substantial evidence.  We disagree.

---

[84] *Id.* at 7.
[85] *Id.*
[86] *Id.*
[87] *Id.* at 7-8.
[88] *See* AJU Besteel's Comments at 1.
[89] *See* NEXTEEL's Comments at 2.

In selecting among potential CV profit sources under a "reasonable method" under alternative (iii), Commerce reasonably selected the profit source that best approximates the statutory preference for profit data that reflect, firstly, production and sales in the foreign country, and, secondly, the merchandise under consideration:

> In conducting this analysis, we note that the specific language of both the preferred and alternative methods appear to show a preference that the profit and selling expenses reflect: (1) production and sales in the foreign country; and (2) the foreign like product, *i.e.*, the merchandise under consideration.[90]

Commerce's recognition of this statutory preference is consistent with what the Court held in *Husteel*:

> Commerce correctly noted that the statute indicates a preference in calculating CV profit for data sources reflecting production and sales in the foreign country of the foreign like product.[91]

In evaluating the available sources of CV profit, Commerce found that SeAH's data constituted the best information available on the record because SeAH's "combined selling expense and profit experience reflects the profit of a Korean OCTG producer, on comparison market sales of the merchandise under consideration, in the ordinary course of trade."[92]  We further concluded that using this CV profit source "closely simulates the statutory preference for calculating CV profit and selling expenses."[93]  Hyundai Steel argues that the statute does not show preference for CV profit data which reflects production and sales of "foreign like product" and that there is no basis for Commerce's assertion that its approach more closely simulates the statutory preference, but the Court has stated: "Commerce correctly noted that the statute indicates a

---

[90] *See Final Results* IDM at 39.
[91] *See Husteel II*, 180 F. Supp. 3d at 1346.
[92] *See Final Results* IDM at 39.
[93] *Id.* at 39-40.

preference in calculating CV profit for data sources reflecting production and sales in the foreign country of the foreign like product."[94]  Hyundai Steel misinterprets the statute.

Both the preferred method in section 773(e)(2)(A) and alternative method (ii) in section 773(e)(2)(B) expressly reference "foreign like product."  Furthermore, alternative methods (i) and (iii) in section 773(e)(2)(B) of the Act reference profit in connection with "merchandise that is in the same general category of products as the subject merchandise."[95]  Hyundai Steel misconstrues this language as indicating that there is no statutory preference, yet section 771(16) of the Act defines the term "foreign like product" to include "*{t}he subject merchandise* and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise."  (Emphasis added).  The statutory reference in some of the alternative methods to "merchandise that is in the same general category of products as subject merchandise" does not establish the absence of a statutory preference that the profit should approximate the profit realized in connection with the "foreign like product."  The Act recognizes that Commerce has imperfect information on the record in situations where we must resort to alternative methods, affording some flexibility to the agency; however, this does not mean that there is no preference in the statute.  It makes sense that the statute has a preference for profit sources in the CV profit calculation reasonably approximating the profit connected to the production and sale of the merchandise under consideration (as opposed to dissimilar products) in a foreign country because it increases the accuracy of that calculation. Accordingly, we disagree with Hyundai Steel's argument that the Act does not have a preference

---

[94] *See Husteel II*, 180 F. Supp. 3d at 1346.
[95] We note that  alternative (iii) under section 773(e)(2)(B) 773(e)(2)(B) of the Act contains this reference with respect to CV profit cap rather than to the CV profit methodology itself.

in calculating CV profit from data sources reflecting production and sales in the foreign country

of the foreign like product.[96]

Hyundai Steel contends that, by considering the degrees to which a profit source reflects

merchandise under consideration, Commerce created a legal preference that does not exist in the

statute.[97]  We disagree.  Commerce examined the language of the statute:

> The specific language of both the preferred and alternative methods appears to show a
> preference that the profit and selling expenses reflect:  (1) production and sales in the
> foreign country; and (2) the foreign like product, *i.e.*, the merchandise under
> consideration.  However, when selecting a profit rate from available record evidence,
> we may not be able to find a source that perfectly reflects both factors.[98]

Accordingly, in applying "any other reasonable method," Commerce considered the quality of

available data and selected the profit source that was the best available information for valuing

Hyundai Steel's CV profit and selling expenses:

> We have considered the financial statements on the record for Borusan, Chung
> Hung, Nippon Steel, TMK, Tenaris, and Welspun, but find that each of these
> data sources is less specific to OCTG or even to the products in the same general
> category of products as OCTG (and, for some, less specific to the POR) than are
> the financial data pertaining to SeAH's third-country market sales of OCTG
> during the POR.[99]

Commerce found, and continues to find, that each of these sources is less specific to the product

under consideration and that "none of them represents production experience in Korea."[100]  We

recognize that the record does not contain a profit source that is perfect in every respect and that

all profit sources contain some flaws and imperfections.  However, on balance, after considering

the pros and cons of these alternatives in light of the statutory preferences, we find that the profit

---

[96] See *Husteel II*, 180 F. Supp. 3d at 1346.
[97] See Hyundai Steel Comments at 5.
[98] *See* Draft Results of Redetermination at 12.
[99] *Id.* at 14.  We note that Hyundai Steel has maintained throughout this segment of the proceeding and litigation that we failed to examine these sources, yet the record clearly shows that we have done so.
[100] *Id.*

from SeAH's third country sales of OCTG is the best choice among various profit sources on the record. None of the alternative sources of profit data – financial statements of Borusan, Chung Hung, Nippon Steel, TMK, Tenaris, and Welspun – represent profit from production in Korea, whereas SeAH's profit reflects Korean production, albeit in connection with sales in a third-country market. The profit from SeAH's third country OCTG sales reflects production of OCTG in Korea, and, in the absence of superior profit sources, can be reasonably used as a CV profit source for determining the profitability of OCTG sales of Hyundai Steel, another Korean producer.

Even more importantly, SeAH's data provide the greatest specificity to the merchandise under consideration. This is a key consideration in a broad field of steel production such as pipe, which incorporates an exceedingly wide variety of products with vast differences in value between them. OCTG are a specialized, high value products that are subject to rigorous testing and certification requirements and are suitable for down-hole applications in the oil and gas wells, where they must be capable of withstanding enormous external and internal pressure. The record evidence demonstrates that the alternative profit sources include, at least in part, profit from non-comparable products that are not in the same general category of products as subject merchandise.[101] Profit from these alternative sources would be derived from a mixture of various products that includes products that are *outside* the general category of merchandise with

---

[101] *See* SeAH's Letter, "Request for CV Profit and Selling Expense Information," dated April 14, 2021 (SeAH CV Submission), at Attachment 2-C (page 57, 73, 85, 93, and 99, providing TMK's 2020 financial statement which indicates that TMK produced line pipe, process and power generation pipe, structural and standard pipe, mechanical tube, and semi-finished products); *see also* Hyundai Steel's Letter, "Submission of Factual Information and Comments Concerning CV Profit and Selling Expenses," dated April 14, 2021 (Hyundai Steel CV Submission), at Exhibits 1 ("Product Information" at 14-49, providing Borusan's 2020 financial statement which indicates that Borusan produced line pipe, water transmission pipe, construction pipe, and automotive tube), 2 ("Product Information" at 1-29, providing Chung Hung Steel Corporation's 2019 financial statement which indicates that Chung Hung produced hot-rolled steel coils, cold rolled steel coils, line pipe, and structural pipe), and 3 ("Product Information" at 1-29146,providing Nippon Steel's financial statement which indicates that Nippon Steel produced hot-rolled steel coils, cold rolled steel coils, line pipe, and structural pipe).

subject OCTG, whereas SeAH's third-country sales profit does not include such products.[102]  We continue to find that the selection of a profit source that has the greatest specificity with regard to the product under consideration (*i.e.*, OCTG), which is necessarily included within the same general category of products under alternative (iii), and represents the production of OCTG by a Korean producer in Korea, is reasonable.

The Court sustained substantially identical reasoning for the use of SeAH's third-country profit and selling expenses in litigation regarding a prior administrative review of this antidumping duty order.[103]  In *SeAH Steel Corporation et al.*, similar to this case, the plaintiffs advocated the use of an alternative source for CV profit, including "the financial statements of seven non-Korean producers, 'Nippon Steel,' 'Tenaris,' 'TMK,' 'Borusan Mannesmann,' 'Chung Hung Steel Corporation,' 'Maharashtra Seamless Limited,' and 'EVRAZ plc,' many of which included significant sales of non-OCTG products."[104]  The plaintiff stated:  "Commerce favored SeAH's data as the only data available on the record that reflected the profit of a Korean OCTG producer on sales of OCTG in the ordinary course of trade."[105]  In sustaining Commerce's reasoning, the Court held that it "regards as reasonable Commerce's explanation that SeAH's financial data are specific and relate to a Korean producer conducting production in Korea and are more accurate than surrogate financial statements from non-Korean producers or regarding a product other than OCTG."[106]

---

[102] *See Husteel II*, 180 F. Supp. 3d at 1341-42 (sustaining Commerce's determination that the same general category of products is limited to products suitable for "down hole" applications in oil and gas wells such as subject OCTG, non-subject OCTG, and drill pipe, and does not include line pipe, standard pipe, and other non-OCTG pipe); *see also Notice of Scope Ruling*, 85 FR 7921, 7922 (February 10, 2020).

[103] *See SeAH Steel Corporation et al.*, 513 F. Supp. at 1397.

[104] *Id.*, 513 F. Supp. at 1396.

[105] *Id.*

[106] *Id.*

Hyundai Steel correctly states that we previously used the financial statements of TMK for the purposes of calculating CV profit in the 2017-2018 administrative review.  However, Hyundai Steel omits the circumstances under which we did so:

> We do not find the alternatives raised by the interested parties to be superior to the combined CV profit and selling expense ratios based on the Tenaris and TMK data. First, as explained above, the Hyundai Steel home market data fails under section 772(e)(2)(A) of the Act since the non-prime sales are not OCTG and the sales were not made in the ordinary course of business, *i.e.*, transacted in a non-viable market at a net loss.  We also find SeAH's third country market data to be unusable under section 772(e)(2)(B)(iii) of the Act because SeAH's sales to the Canadian, Dutch and Kuwaiti markets during the POR failed Commerce's viability test.  We perform our viability test to ensure that there is an adequate population of sales to serve as the basis for normal value.  As Commerce has previously noted, it would be inconsistent and unreasonable for Commerce to not use certain sales for normal value because the market is not viable, but then use the profit on those same sales to calculate a CV-based normal value.  In fact, the use of such data would absurdly result in constructing the very prices that were rejected since price is equal to cost plus profit. Although SeAH contends that non-viable markets should be considered an "other reasonable method," we find this logic, that it is unreasonable to reject non-viable markets for normal value but at the same time use them for constructing CV when normal value is based on CV, prevails both under section 772(e)(2)(A) of the Act as well as under 772(e)(2)(B) of the Act.  Moreover, the record contains profit data from OCTG producers, Tenaris and TMK, that does not suffer from viability concerns. Therefore, on balance, we determine that the use of SeAH's POR sales of OCTG to Canada, the Netherlands, and Kuwait, which fail Commerce's viability test, (and given there are alternative sources of data that do not suffer from the market viability concerns), do not provide reasonable methods for the calculation of CV profit and selling expenses under section 772(e)(2)(B)(iii) of the Act.[107]

In the 2017-2018 administrative review, based on the record of that review, Commerce found that SeAH's third country data were unusable because it failed a viability test.  Additionally, there was a lack of contemporaneity with regard to the other set of SeAH third-country data available on the record during the 2017-2018 (fourth) administrative review:  "… SeAH's CV profit and selling data from the first administrative review, while specific to OCTG, does not

---

[107] *See Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 FR 41949 (July 13, 2020), and accompanying IDM at 70-71 (internal footnotes omitted).

represent sales in the Korean market and has become too removed in time to be considered a viable option for determining either a CV profit rate or a CV profit cap for this POR."[108]  These conditions are not present in the instant review, where no party disputes that the SeAH third-country data on which we have relied are contemporaneous and are derived from a viable third-country market.  In other words, the grounds on which Commerce disqualified the third-country data in the 2017-2018 administrative review (*i.e.*, lack of viable market and lack of contemporaneity) are absent here.  On this record, the profit from SeAH's third-country sales of OCTG is superior to the TMK's data, because TMK's data reflect production experience in Russia and, thus, do not reflect the production experience in the exporting country (Korea) and also are less specific to the product under consideration because it includes aggregate profit from sales of OCTG as well as products that *are not* in the same category of products as subject OCTG.[109]  Although perhaps these flaws in TMK's data could have been excused if there were no usable and more specific data not on the record, the record of this administrative review contains such superior data from the contemporaneous third-country sales of OCTG by SeAH, a Korean producer.

Hyundai Steel also maintains that Commerce's choice of SeAH's third-country sales data is unreasonable because of the differences in the model mix of OCTG sold by SeAH and Hyundai Steel.  Hyundai Steel contends that Commerce has selected a dataset simply because it contained OCTG, but without recognizing the significant flaws and unrepresentative nature of that source and without considering the virtues of other sources, including TMK's financial data.  Hyundai Steel mischaracterizes our analysis.  We examined all potential sources of CV profit

---

[108] *Id.* at 73.
[109] *See* SeAH CV Submission at Attachment 2-C (pages 57, 73, 85, 93, and 99, providing TMK's 2020 financial statement which indicates that TMK produced line pipe, process and power generation pipe, structural and standard pipe, mechanical tube, and semi-finished products).

and selected the source that best reflects the statutory preferences.  SeAH's financial data are specific and relate to a Korean producer conducting production in Korea and are more accurate than surrogate financial statements from non-Korean producers or profit from products that are outside of the same general category of products as subject OCTG.  Moreover, as noted earlier, certain of the alternative sources are less contemporaneous with the POR.

Furthermore, we do not exclude the possibility that a factual record of a particular case could lead us to a conclusion that data which contain a greater percentage of sales specific to a product under consideration could be disregarded based on other case-specific considerations. For example, it could be appropriate to exclude a product-specific profit from a non-viable market or because it is too far removed in time from the POR, when more contemporaneous information from a viable market is available, as we did in the fourth administrative review of this order.  This review, however, is not one of those cases.

In this case, Commerce selected SeAH's data because SeAH's "combined selling expense and profit experience reflects the profit of a Korean OCTG producer, on comparison market sales of the merchandise under consideration, in the ordinary course of trade."[110]  With respect to the alternative data sources, Commerce found, and continues to find, that "each of these data sources is less specific to OCTG or even to the products in the same general category of products as OCTG (and, for some, less specific to the POR) than are the financial data pertaining to SeAH's third-country market sales of OCTG during the POR" and that "none of them represents the production experience of an OCTG producer in Korea."[111]  Hyundai Steel's contentions regarding purported dissimilarity among various models of OCTG are unpersuasive, given that the alternative sources advocated by Hyundai Steel contain profit that are based, in

---

[110] *See Final Results* IDM at 39.
[111] *See* Draft Results of Redetermination at 14.

part, on products that are outside of the same general category of products as the subject merchandise.  Additionally, the profit from the seven suggested non-Korean producers, including TMK, does not represent the production experience in Korea, whereas the profit from sales of OCTG that SeAH produced in Korea does.  To the extent that Hyundai contends that we should consider the differences between OCTG models, we disagree with the notion that we should place a greater weight on the alleged differences between OCTG models than on the more significant differences between OCTG and merchandise not in the same general category as OCTG.  Accordingly, it is unnecessary to dissect the differences among various models of OCTG, when the alternative sources of profit incorporate profit from such dissimilar products as water pipe, line pipe, automotive pipe, structural pipe, various coils, *etc.*[112]

Moreover, even if such statements did not include profit for dissimilar products (which they do), the alternative sources of profit are company-wide financial statements that incorporate the profit at the aggregate level.[113]  Hence, it is impossible to determine the exact model mix for the OCTG these companies sell or conclude that their model mix is a better fit with Hyundai Steel's model mix.  Additionally, the record evidence strongly suggests that many of these companies sell less similar models of OCTG, because they sell seamless OCTG.[114]  The first and, therefore, the most important model match characteristic is whether OCTG is welded or

---

[112] *See* SeAH CV Submission at Attachment 2-C (pages 57, 73, 85, 93, and 99, providing TMK's 2020 financial statement which indicates that TMK produced line pipe, process and power generation pipe, structural and standard pipe, mechanical tube, and semi-finished products); *see also* Hyundai Steel CV Submission at Exhibits 1 ("Product Information" at 14-49, providing Borusan's 2020 financial statement which indicates that Borusan produced line pipe, water transmission pipe, construction pipe, and automotive tube), 2 ("Product Information" at 1-29, providing Chung Hung Steel Corporation's 2019 financial statement which indicates that Chung Hung produced hot-rolled steel coils, cold rolled steel coils, line pipe, and structural pipe), and 3 (at "Product Information" at 1-29, providing Nippon Steel's financial statement which indicates that Nippon Steel produced hot-rolled steel coils, cold rolled steel coils, line pipe, and structural pipe).

[113] *See* SeAH CV Submission at Attachments 1-A through 5-A; *see also* Hyundai Steel CV Submission at Exhibits 1-4; and DIPs' CV Submission at Exhibits 6 and 8.

[114] *See* SeAH CV Submission at Attachments 1-C (Tenaris) and 2-C (TMK); *see also* Hyundai CV Submission at Exhibits 3 ("Product Information" at 20-21, "Seamless Pipe and Tubes") and 4; DIPs' CV Submission at Exhibit 1 (pages 10-11).

seamless.  SeAH's third-country sales and Hyundai's U.S. sales relate exclusively to welded

pipe.  In contrast, the product catalogues of Tenaris, TMK, and Nippon Steel indicate that they

sell some seamless pipe.  Accordingly, to the extent that the product mix is relevant, the record

evidence indicates that these companies sell less similar models of OCTG than SeAH does.[115]

To the extent that Hyundai contends that the financial statements on the record are

superior because they contain hundreds of pages of explanatory notes, we disagree.  The

explanatory notes and other information are helpful as a general matter, but here, they indicate

that the profit from the financial statements is less suitable than the alternative we selected.  As

discussed in greater detail above, the profit from these financial statements reflects production

outside Korea, at times from a non-contemporaneous period, and is largely derived from a

variety of dissimilar products that are not in the same general category with subject OCTG such

as water pipe, line pipe, automotive pipe, structural pipe, various coils, *etc.*[116]

---

[115] In fact, the record evidence strongly suggests that many of these companies sell less similar models of OCTG, because they sell seamless OCTG.  The first and, therefore, the most important model match characteristic is whether OCTG is welded or seamless.  SeAH's third-country sales and Hyundai's U.S. sales relate exclusively to welded pipe.  In contrast, the product catalogues of Tenaris, TMK, and Nippon Steel indicate that they sell some seamless pipe.  *See* SeAH CV Submission at Attachments 1-C (Tenaris) and 2-C (TMK); *see also* Hyundai CV Submission at Exhibits 3 ("Product Information" at 20-21, "Seamless Pipe and Tubes") and 4; DIPs' CV Submission at Exhibit 1 (pages 10-11).

[116] *See* SeAH CV Submission at Attachment 2-C (pages 57, 73, 85, 93, and 99, providing TMK's 2020 financial statement which indicates that TMK produced line pipe, process and power generation pipe, structural and standard pipe, mechanical tube, and semi-finished products); *see also* Hyundai Steel CV Submission at Exhibits 1 ("Product Information" at 14-49, providing Borusan's 2020 financial statement which indicates that Borusan produced line pipe, water transmission pipe, construction pipe, and automotive tube), 2 ("Product Information" at 1-29, providing Chung Hung Steel Corporation's 2019 financial statement which indicates that Chung Hung produced hot-rolled steel coils, cold rolled steel coils, line pipe, and structural pipe), and 3 ("Product Information" at 1-29146, providing Nippon Steel's financial statement which indicates that Nippon Steel produced hot-rolled steel coils, cold rolled steel coils, line pipe, and structural pipe).

**Comment 3:  Calculation of Hyundai Steel's CV Profit Cap**

*Hyundai Steel's Comments*

- Commerce used the same source selected for CV profit as the source for the CV profit cap, which was tantamount to applying no cap at all according to the CIT's decision in *Geum Poong*.[117]
- It is unreasonable to conclude that using the same source selected for CV profit as the source for the CV profit cap does not yield "irrational or unrepresentative results" and is tantamount to no corroboration at all according to the CIT's decision in *Husteel*,[118] which stated that "a non-cap is not a cap."[119]
- Commerce's use of SeAH's third-country sales to Kuwait was widely inconsistent with a broad market average of other record sources which Commerce could have used to calculate a reasonable facts available profit cap of 3.97 percent (the sum of a profit ratio of 0.98 percent plus a selling expense ratio of 3.00 percent) based on the contemporaneous financial data of four surrogate producers of OCTG or other comparable merchandise:  (1) TMK; (2) Borusan; (3) Chung Hung; and (4) Nippon Steel.[120]
- Alternatively, Commerce could have included SeAH's financial experience for its overall operations in the profit cap calculation, which would have resulted in a profit cap for the five companies of 4.94 percent (the sum of a profit ratio of 1.64 percent plus a selling expense ratio of 3.30 percent), which would have resulted in a representative and reliable facts available profit cap.[121]
- Commerce's limiting conclusion that "SeAH's profit data from the sale of OCTG in its third-country market are the best data to be used as the 'facts available' profit cap in calculations for Hyundai Steel, because they are specific to OCTG" is not consistent with the statute because the statute contains no such limitation; rather, the statute expressly requires Commerce not to adopt such a restrictive analysis.[122]
- By not considering the abundance of evidence on the administrative record and applying an unreasonably high profit estimate, the fundamental statutory purpose of achieving a fair comparison between NV and export price is undermined because it does not approximate the home market profit experience of the Hyundai Steel.[123]
- SeAH does not sell OCTG in Korea, and thus, SeAH's abnormally high third-country profit rate reflects sales of different products outside of Korea and is a "relatively poor surrogate for the home market experience,"[124] as evidenced by SeAH's Kuwaiti profits differing vastly from the experience of other global producers of merchandise that falls within the same general category of products as OCTG.[125]

---

[117] *See* Hyundai Steel's Comments at 8-9 (citing *Geum Poong Corp. v. United States*, 163 F. Supp. 2d 669, 679 (CIT 2001) (*Geum Poong*)).
[118] *See Husteel II*, 180 F. Supp. 3d at 1349.
[119] *See* Hyundai Steel's Comments at 9.
[120] *Id.* at 10.
[121] *Id.*
[122] *Id.* at 11.
[123] *Id.*
[124] *See Husteel II*, 180 F. Supp. 3d at 1349.
[125] *See* Hyundai Steel's Comments at 12.

- Commerce should reconsider its determination and use the CV profit ratio of 0.98 percent and a CV selling expense ratio of 3.00 percent (combined 3.97 percent), which will yield rational results representative of Hyundai Steel's expected home market experience, consistent with the statutorily mandated CV profit cap requirement.[126]

*AJU Besteel's Comments*

- AJU Besteel concurs with, and incorporates by reference, the comments submitted by Hyundai Steel on this issue.[127]

*NEXTEEL's Comments*

- NEXTEEL concurs with, and incorporates by reference, the comments submitted by Hyundai Steel on this issue.[128]

**Commerce's Position:**

In calculating the CV profit under any other reasonable method pursuant to section 773(e)(2)(B)(iii) of the Act, Commerce properly calculated the CV profit cap based on "facts available." The relevant statutory provision provides that when Commerce applies "any other reasonable method" alternative (iii), the "amount allowed for profit may not exceed the amount normally realized by the exporters or producer (other than the exporter described in clause (i)) in connection with the sale, for consumption in the foreign country of merchandise in the same general category as the subject merchandise." Neither Hyundai Steel nor SeAH reported profit that satisfies the requirements of the profit cap under the statute (*i.e.*, profit generated from the sale of OCTG or products in the same general category as the subject merchandise in Korea) and, thus, Commerce determined the profit cap based on "facts available" using the profit from SeAH's third-country sales of OCTG as the best available information.

---

[126] *Id.* at 12-13.
[127] *See* AJU Besteel's Comments at 1.
[128] *See* NEXTEEL's Comments at 2.

SeAH's profit of third-country sales of OCTG, which Commerce used as facts available profit cap, reflected the production of OCTG in Korea by a Korean producer and sales of OCTG in the third-country market.  This is substantially the same profit cap as the profit cap that the Federal Circuit and this Court sustained in litigation regarding the 2015-16 administrative review of this antidumping duty order.[129]

Hyundai Steel contends that Commerce's CV profit cap determination is not consistent with the statutorily mandated CV profit cap requirement and is contrary to law.[130]  Hyundai Steel contends that Commerce "has adopted an OCTG-specificity requirement of the 'foreign like product' language of Alternative 2 of {section 773(e)(2)(B) of the Act} and substituted it for the 'same general category of products' of Alternative 3."[131]  Hyundai Steel also speculates that a single source (even if that source is linked to sales only of the foreign product) could move the CV profit rate incorrectly upwards or downwards and could easily not reflect the amount of profit normally realized by as required under option (iii).[132]  Additionally, Hyundai Steel contends that Commerce's facts available profit cap is erroneous because this Court has rejected "an absence of information" excuse.[133]  Finally, Hyundai Steel contends that SeAH's profit rate is "abnormally high," and that Commerce fails to sufficiently explain why SeAH's data are the best information available for calculating the profit cap.[134]  We disagree with each of Hyundai Steel's contentions.

---

[129] *See NEXTEEL I*, 392 F. Supp. 3d at 1290 (vacated on other grounds but affirmed with respect to CV profit and profit cap by *CAFC NEXTEEL II*, 28 F.4th at 1240-41); *see also OCTG from Korea 2015-16.*  Although SeAH's third-country sales on which the profit cap was based in that review were from Canada rather than Kuwait, this distinction is not material.

[130] *See* Hyundai Steel Comments at 8 and 12-13.

[131] *Id.* at 11.

[132] *Id.* at 8.

[133] *Id.* at 11.

[134] *Id.* at 12.

Hyundai Steel mischaracterizes Commerce's determination when it suggests that

Commerce confused the terms "foreign like product" and "the same general category of products

as the subject merchandise."[135]   Commerce does not dispute that the profit cap under section

773b(e)(2)(B)(iii) of the Act references the "same general category of products as the subject

merchandise" and that the term "same general category" is broader than "foreign like product."

In this review, Commerce determined that "the record does not contain profit information for

sales in Korea of OCTG *or products in the same general category*."[136]   Commerce further found

that:

> No party disputes that neither mandatory respondent had a viable home market.
> Neither does any party contend that the alternate sources of CV profit on the
> record fully represent data described under the profit cap as they are all for third-
> country.  There is no robust market for OCTG within Korea, so sources for profits
> are limited; *the record of this review does not contain information regarding
> profits earned on Korean sales of OCTG or products in the same general
> category of merchandise as OCTG.*[137]

Commerce did not, as Hyundai Steel contends, confuse the statutory terms.  Commerce made an

express finding that the record of this review contained no information regarding profits earned

on Korean sales of products in the same general category.  As explained earlier, the "same

general category of products" in this proceeding is limited to products suitable for "down hole"

applications in oil and gas wells such as subject OCTG, non-subject OCTG and drill pipe and

does not include line pipe, standard pipe and other non-OCTG pipe.[138]   When selecting the best

available information, Commerce reasonably considered, and continues to consider, the fact that

SeAH's profit data from third-country sales of OCTG reflected profit from OCTG, which are

---

[135] *Id.* at 11.
[136] *See Final Results* IDM at 42 (emphasis added).
[137] *Id.* (emphasis added).
[138] *See Husteel II*, 180 F. Supp. 3d at 1341-42; *see also Notice of Scope Ruling*, 85 FR 7921, 7922 (February 10, 2020).

part of the same general category of products.[139]  In addition, Commerce reasonably found that

(unlike the alternative profit sources on the record) SeAH's data "are not distorted by the

production and sale of products not considered to be in the same general category of products as

OCTG."[140]

The Federal Circuit has held that section 773(e)(2)(B)(iii) "describes the quantity

Commerce must calculate – the profits normally realized by other exporters," but "does not limit

the data Commerce may rely on to calculate it" when calculating a facts available profit cap.[141]

Commerce's evaluation of available profit sources is reasonable.  SeAH's profit data are the only

profit source on the record that is "not distorted by the production and sale of products not

considered to be in the same general category of products as OCTG."[142]  Unlike the financial

statements of the suggested non-Korean companies, it represents the production experience of a

Korean OCTG producer and exporter.[143]  To the extent that Hyundai Steel argues that using a

single source (even if that source is linked only to sales of the foreign product) could skew the

CV profit rate incorrectly, Hyundai Steel's concern about *potential* distortions is outweighed by

the fact that the profit in other alternative sources on the record contains an *actual* distortion,

because it includes sales of products *outside* the same general category of products.

Hyundai Steel's attempt to compare SeAH's profit to profit from other sources and

concluding that SeAH's profit is abnormally high is flawed because the alternative sources

include, in part, profit from non-comparable products that are outside of the same general

category of products as the subject merchandise.  It is illogical to compare profit from sales of

---

[139] *See Final Results* IDM at 43 ("SeAH's profit data from the sale of OCTG in its third-country market are the best data to be used as the 'facts available' profit cap, because they are specific to OCTG and represent the production experience of a Korean OCTG producer in Korea.").
[140] *Id.*
[141] *See CAFC NEXTEEL II*, 28 F.4th at 1241.
[142] *See Final Results* IDM at 43.
[143] *Id.*

Korean-made OCTG to profit that is derived, in part, from sales of such dissimilar products as Russian power generation pipe, Japanese chemicals and steel sheet, Taiwanese coils, or Turkish automotive tube and water transmission pipe.[144]  For the same reasons, Hyundai Steel's attempt to compare SeAH's overall profit rate with the profit rate from its third-country sales of OCTG is flawed.[145]  SeAH's profit rate from overall operations is different because, in addition to sales of OCTG to third-country markets, it includes both profit from OCTG dumped in the U.S. market as well as from sales of lower-end merchandise that is outside of the same general category of products as the subject merchandise.[146]

Further, Hyundai Steel's assertions that Commerce's facts available profit cap is erroneous because this Court has rejected "an absence of information" excuse are contrary to the controlling law.  The Federal Circuit has held that where, as here, due to the absence of data, Commerce cannot calculate the profit cap under alternative (iii), the agency may either determine the profit cap on the basis of facts available or, alternatively, conclude that there is no information on the record that can serve as a suitable profit cap.[147]  Commerce's "facts available" profit cap in this case is based on SeAH's third-country sales of OCTG.  In fact, the courts have

---

[144] *See* SeAH CV Submission at Attachments 2-C (page 73 – Russian power generation pipe) and 4-B (pages 26 and 48 – Turkish water transmission pipe and automotive tube); *see also* Hyundai Steel CV Submission at Exhibits 2 ("Product Information" at 3 – hot-rolled steel coils) and 3 ("Financial Statement" at 16, 17, 55-56 – chemicals, and 55-56 – steel sheet).

[145] *See* Hyundai Steel Comments at 12.  Here, Hyundai Steel maintains that SeAH's profit of 16.3 percent from sales of OCTG to Kuwait is significantly higher than SeAH's profit of 8.8 percent from overall operations.  Contrary to Hyundai's assertions that SeAH's profit from sales of OCTG in Kuwait is abnormally high, SeAH's profit of 16.3 percent from sales of OCTG in Kuwait is almost identical to the average CV profit of 16.2 percent (based on sales of two OCTG producers) that Commerce used on remand in the original investigation, which this Court sustained.  *See Final Results of Redetermination Pursuant to Court Remand, Husteel Co., Ltd. et al., v. United States*, Consol. Court No. 14-00215 (CIT September 2, 2015), dated February 22, 2016, at 52, available on Commerce's website at https://access.trade.gov/Resources/remands/15-100.pdf.

[146] *See, e.g.*, SeAH's Letter, "Oil Country Tubular Goods from the Republic of Korea – Response to the Department's July 2 Supplemental Questionnaire," dated July 26, 2021, at Appendix SA-5-A.

[147] *See Mid Continent Steel and Wire Inc. v. United States*, 941 F.3d 530, 545-46 (Fed. Cir. 2019) (sustaining Commerce's determination that it was unable to calculate profit cap due to the absence of information that could serve as a suitable profit cap).

already sustained the use of a facts available cap based on third-country sales of OCTG by SeAH.[148]

Hyundai Steel's reliance on this Court's decision in *Husteel* is misplaced.  In the underlying administrative review, which was the subject of that litigation, Commerce was unable to calculate a profit cap for Korea under section (iii) because there was no home market profit data for other exporters and producers in Korea of the same general category of products.  This Court found that even if Commerce's finding was reasonable, "Commerce was still required to attempt to apply the profit cap on the basis of facts available."[149]  Following a remand, in which Commerce applied such a facts available profit cap, the Court sustained Commerce's determination; the Court stated that, while Commerce's approach essentially constituted a failure to calculate the cap based on actual data, the approach was necessitated by the limitations of data on the record (which – as here – contained imperfect profit sources), and was reasonable:

> Commerce's failure to cap the profit rate, however, was reasonable based on the record … .  Commerce was faced with a difficult decision as all of the information on the record had imperfections, and the court is not persuaded that any of the 'caps' suggested by {the respondents} fulfill the statute any better than no cap.[150]

Here, Commerce calculated a profit cap based on facts available using SeAH's third-country sales as best available information.[151]  Contrary to Hyundai Steel's unsupported assertions, Commerce did examine the alternative profit sources on the record (and reexamined them for both the *Final Results* and this remand proceeding), concluding each time that SeAH's data are the best available information for using as the profit cap:

---

[148] *See NEXTEEL I*, 392 F. Supp. 3d at 1290 (affirming use of SeAH's third-country sales as the facts available profit cap); *CAFC NEXTEEL II*, 28 F.4th at 1241 (same); and SAA at 841 ("The Administration also recognizes that where, due to the absence of data, Commerce cannot determine amounts for profit under alternatives (1) and (2) or a 'profit cap' under alternative (3), it might have to apply alternative (3) on the basis of 'the facts available.'").
[149] *See Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1349 (CIT 2015).
[150] *See Husteel II*, 180 F. Supp. 3d at 1347-48.
[151] *See Final Results* IDM at 42.

> In the current {POR}, neither Hyundai Steel nor SeAH has a viable home market, and none of the CV profit sources placed on the record by interested parties show "the amount realized by exporters or producers in connection with the sale, for consumption in the foreign country, of the merchandise in the same general category of products as the subject merchandise." Moreover, the record of this review does not contain any information regarding profits earned on Korean sales of products in the same category of merchandise as OCTG.[152]

Commerce's selection of a facts available profit cap based on profit from third-country sales of OCTG, which were produced in Korea by a Korean exporter and producer, is a reasonable proxy for profits normally realized by Korean exporters and producers from sales of merchandise in the same category of merchandise as the subject merchandise. In contrast to the alternative profit sources, which *all* include sales of products that are outside the same general category of merchandise, "SeAH data meet the CV profit requirements for use with regard to SeAH under the preferred method of the law and *are not distorted by the production and sale of products not considered to be in the same general category of products as OCTG*."[153] Moreover, as stated earlier, the courts previously sustained a conceptually identical profit cap, which was based on SeAH's third-country sales to Canada.[154]

## IV.   FINAL RESULTS OF REDETERMINATION

As a result of these final results of redetermination, Hyundai Steel's weighted-average dumping margin has changed from 19.54 percent in the *Final Results* to 9.63 percent. Consequently, the dumping margin applicable to AJU Besteel, Husteel, and NEXTEEL has changed from 11.70 percent to 6.74 percent. Upon a final and conclusive decision in this

---

[152] *See Certain Oil Country Tubular Goods from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 FR 54928 (October 5, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum at 31; *see also Final Results* IDM at 43, stating that Commerce examined the alternative source in the *Preliminary Results* as well as reexamined them for the *Final Results* and found no grounds to reach a different conclusion.

[153] *See Final Results* IDM at 43 (emphasis added).

[154] *See NEXTEEL I*, 392 F. Supp. 3d at 1290 (vacated on other grounds and affirmed with respect to profit cap by *CAFC NEXTEEL II*, 28 F.4th at 1241 ("We thus affirm the holding of the Court of International Trade that Commerce's application of the profit cap was lawful.")).

litigation, as appropriate, Commerce will instruct U.S. Customs and Border Protection to require cash deposits and liquidate and assess final duties for the entries subject to this review consistent with these final results of redetermination.

8/15/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

41